IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re: | Case No.: 20-13482<br>Chapter 11 |
| RHA Stroud, Inc.[1],<br>      Debtor. | [Joint Administration Pending] |
| _____/ | |
| In re: | Case No.: 20-13483<br>Chapter 11 |
| RHA Anadarko Inc.,<br><br>      Debtor. | |
| _____/ | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE HOSPITALS TO USE CASH COLLATERAL,
(II) GRANTING CONDITIONAL ADEQUATE PROTECTION TO THE SECURED
PARTY, (III) SCHEDULING A FURTHER INTERIM HEARING (IV)
<u>SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF</u>**

**NOTICE OF OPPORTUNITY FOR HEARING**

**Your rights may be affected. You should read this document carefully and
consult your attorney about your rights and the effect of this document.** If you
do not want the Court to grant the requested relief, or you wish to have your views
considered, you must file a written response or objection to the requested relief with
the Clerk of the United States Bankruptcy Court for the Western District of
Oklahoma, 215 Dean A. McGee Avenue, Oklahoma City, OK 73102 no later than
**Tuesday, October 27, 2020, at 11:00 a.m. (CT)**. You should also serve a file-
stamped copy of your response or objection to the undersigned movant/movant's
attorney [and others who are required to be served] and file a certificate of service
with the Court. If no response or objection is timely filed, the Court may grant the
requested relief without a hearing or further notice.

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification number is: RHA Stroud,
Inc. (2635) and RHA Anadarko, Inc. (2528).  The principal place of business for the Debtors is 2308 Highway 66
West, Stroud, OK 74079 and 1002 East Central Blvd. Anadarko, OK 73005.

55143220;3

RHA Stroud, Inc., d/b/a Stroud Regional Medical Center ("Stroud Hospital") and RHA Anadarko, Inc. d/b/a The Physicians' Hospital in Anadarko ("Anadarko Hospital") (each a "Debtor," and collectively, the "Debtors" or "Hospitals") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move this Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), pursuant to sections 105(a), 361, 363, 503 and 507 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), Rules 4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Bankruptcy Rules for the Western District of Oklahoma (the "Local Rules") (i) authorizing the Hospitals to use Cash Collateral (as defined herein), initially for a limited period of two weeks; (ii) granting conditional Adequate Protection (as defined herein), with respect to the diminution in value of the interests of the Secured Party (as defined herein) as a result of the use of the Cash Collateral; (iii) scheduling a further interim hearing for the week of November 2nd (the "Interim Hearing"); (iv) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing on or before Friday, November 7 (the "Final Hearing"); and (v) granting related relief. The facts and circumstances supporting this Motion are set forth in the *Declaration of Charles M. Eldridge in Support of First Day-Motions* (The "First Day Declaration") filed contemporaneously herewith. In further support of this Motion, the Hospitals respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The basis for the relief requested herein are sections 105(a), 361, 362, 363, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 4001, 6003 and 6004 and Local Rule 4001-1.

**PRELIMINARY STATEMENT**

4.      The Hospitals seek authority to use Cash Collateral. As of the filing of this motion, the Hospitals do <u>not</u> have the consent of its Secured Party. As detailed below, the Secured Party purportedly holds blanket first-priority liens on substantially all of the Hospitals' assets, including its cash. As such, all or substantially all of the Hospitals cash-on-hand constitutes the Cash Collateral of the Secured Party.

5.      For the next two weeks, the Hospitals propose to use Secured Party's Cash Collateral on a limited basis— Hospitals seek this Court's authorization to utilize the Cash Collateral to pay any third-party utility and/or vendor claims in an amount not to exceed $289,000 per claim, per Hospital, and to pay any other operating expense as agreed upon with Secured Party. To the extent this results in a diminution of value of Secured Party's liens, the Hospitals propose that Secured Party be allowed Adequate Protection (defined herein) in the form of an Adequate Protection Superpriority Claim (defined herein), subject to a Carve-Out (defined herein). Upon filing, the Hospitals should regain access it its books and records, and it is the Hospitals intent to work diligently with its financial advisors and its management company (an affiliate of Secured Party) on preparing detailed cash collateral budget. Thus, the Hospitals also seek a further Interim Hearing the week of November 2nd.

6.      Approval of the Hospitals' use of Secured Party's Cash Collateral during the course of these Chapter 11 Cases is essential. Use of Cash Collateral will provide the Hospitals with the necessary liquidity to (i) fund the Hospitals' operating capital for a short period of time while allowing the Hospitals to obtain all necessary financial information from its management company

(an affiliate of the Secured Party); (ii) provide the Hospitals with the time needed to negotiate consensual use of Cash Collateral, (iii) allow the Debtors to continue to operate as Critical Access Hospitals, serving the health needs of the residents of Lincoln, Creek, and Caddo counties, and (iv) ultimately implement and consummate a plan for the reorganization of the Hospitals' estates.

7.      As described in detail in the First Day Declaration, the Hospitals faced significant challenges leading to the commencement of the Chapter 11 Cases.  Against this backdrop, the Hospitals determined that the most value-maximizing approach was to proceed with an examination of their respective executory contracts under the protection of chapter 11.  As detailed in the First Day Declaration, the Hospitals must obtain the ability to use Cash Collateral in order to continue operating their business, including to pay utilities, third-party vendors, and fund payroll—all with the aim of ensuring continued operations of the Hospitals. Without access to Cash Collateral at this critical point in their cases, the Hospitals will be unable to continue to service its patients — a failure that would prove detrimental to the Hospitals' estates, creditors, patients, and other stakeholders.

8.      For these reasons and those set forth below, it is critical for the Hospitals to be able to use Cash Collateral in order to continue to operate and service its patients. Accordingly, the relief requested in this Motion should be granted on both interim and, ultimately, final basis.

**CONCISE STATEMENT OF THE MATERIAL TERMS OF THE INTERIM ORDER**

9.      Pursuant to Fed. R. Bankr. P. 4001(b)(1), the Hospitals provide the following summary and highlight the following provisions relating to the proposed use of Cash Collateral and the location of such provisions in the Interim Order:[2]

---

[2] The description of the terms of the proposed Interim Order provided in this Motion is intended only as a summary. In the event of any inconsistency between this summary and the Interim Order, the terms of the Interim Order will control.

4

| Required Information / Highlighted Provision | Summary of Material Terms and Location |
|---|---|
| **Entities Interest in the Cash Collateral**<br>*FRBP 4001(b)(1)(B)(i)* | Rural Hospital Acquisition, LLC<br><br>(Interim Order, ¶[2]) |
| **Purposes for Use of Cash Collateral**<br>*FRBP 4001(b)(1)(B)(ii)* | Pay any third-party utility and vendor claims in an amount not to exceed $289,000 per claim, per Hospital, and to pay any other operating expense as agreed upon with Secured Party<br><br>(Interim Order, ¶[3]) |
| **Material Terms**<br>*FRBP 4001(b)(1)(B)(ii)* | Two weeks, through and including November 9, 2020<br><br>(Interim Order, ¶[2]) |
| **Adequate Protection**<br>*FRBP 4001(b)(1)(B)(iv)* | Superpriority administrative expense claim against each Hospital (jointly and severally) ahead of and senior to any and all other administrative expense claims and all other claims asserted against the Hospitals<br><br>(Interim Order, ¶[4]) |
| **Carve-Out** | The superpriority administrative expense claim against each Hospital subject to a carve-out for sum of all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest at the statutory rate<br><br>(Interim Order, ¶[5]) |
| **Joint Liability** | The Debtors are jointly and several liable for the Adequate Protection Super priority Claim.<br><br>(Interim Order, ¶[4]) |

5

## FACTUAL BACKGROUND

### A.    The Debtors Operations

1.      On October 25, 2020 the ("Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code").

2.      The Debtors are operating their business and managing their affairs as debtors-in-possession under 11 U.S.C. § 1107(a) and 1108.

3.      The Debtors are the largest non-profit healthcare system based in Lincoln County and Caddo County, Oklahoma, with combined annual revenues of approximately $94.3 million in fiscal year 2019.  One Cura Health f/k/a One Cura Wellness is the parent non-profit organization of the Debtors.  Affiliate companies operate two medical clinics located in Stroud and Anadarko, Oklahoma.

4.      The Debtors operate as a nonprofit health care system providing medical services to patients who generally reside in Lincoln County and Caddo County, Oklahoma and surrounding communities. Collectively, they have fifty (50) licensed beds, two active emergency rooms, and a host of medical specialties.

5.      The Hospitals in the health care system are designated Critical Access Hospitals ("CAH").[3] The Patient Days for the past year have exceed 12,000 cumulative patient days at an

---

[3] To be eligible to be a CAH the hospital must be located in a State that has established a State Medicare Rural Hospital Flexibility Program; be designated by the State as a CAH; be located in a rural area or an area that is treated as rural; be located either more than 35-miles from the nearest hospital or CAH or more than 15 miles in areas with mountainous terrain or only secondary roads; OR prior to January 1, 2006, were certified as a CAH based on State designation as a "necessary provider" of health care services to residents in the area; maintain no more than 25 inpatient beds that can be used for either inpatient or swing-bed services; maintain an annual average length of stay of 96 hours or less per patient for acute inpatient care (excluding swing-bed services and beds that are within distinct part units); demonstrate compliance with the CAH CoPs found at 42 CFR Part 485 subpart F; and Furnish 24-hour emergency care services 7 days a week.  *See*  https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs

6

approximate 88% capacity for the hospitals. Emergency Room visits exceed 7,500 per year. There were 880 Outpatient Surgeries for 2019 and that number is expected to be similar for 2020.

6.      Debtors' necessity to the health and welfare of the people of Lincoln County and Caddo County and surrounding counties is evidenced by several facts, including having the:

*only* Post-acute, medically complex swing bed program in Lincoln / Caddo County;

*only* Emergency Rooms in Lincoln / Caddo County;

*only* hospitals that offer inpatient/bedside dialysis in Lincoln / Caddo County

*only* hospital in Stroud, Oklahoma; and

*only* hospital in Anadarko, Oklahoma.

7.      The Hospitals are designated Critical Access as they are safety nets for people that cannot travel to the larger cities for care – and are especially critical for time-sensitive diagnosis and treatments such as heart attacks and strokes. The nearest alternative hospitals to Anadarko Hospital and Stroud Hospital are located respectively seventeen (17) and twenty (20) miles away.

8.      The Hospitals also provide a plethora of community service initiatives – many have been developed in partnership with local governments, police, schools and universities, etc. These programs include but are not limited to:

- Adult Basic Education (GED Preparation)

- Adult Financial Literacy

- Diabetes Prevention Program

- Telehealth Assessment Program (TAP)

- Wichita & Affiliated Tribes RISE Program for Suicide Prevention

- Dinner & Learn Series

7

55143220;3

- Diabetes Empowerment Education Program (DEEP)

- Meals on Wheels

- Tai Chi Classes

- Community Computer Access Program (CCAP)

- Live healthy, Eat healthy, and be Active with Diabetes (LEAD)

- Community Health Fairs

9.      The Debtors have no employees. All physicians, medical staff and employees are retained by First Physicians by virtue of documents such as a Staffing and Provider Services Agreement.

10.      Collectively, the Debtors provide the following services: 24 hour emergency department, inpatient medical services, inpatient surgical services, ambulatory and outpatient surgical services (including gastro intestinal procedures, general surgery, pain management, podiatry, ophthalmology, orthopedic, urology), cardiology clinic services, dialysis, physical and occupational therapy, speech therapy, respiratory therapy, radiology and imaging services to include CT scanning, Xray, and ultrasound,  sleep disorder diagnostic services, full service laboratory testing, acute inpatient services, skilled nursing facility, swing bed inpatient services, wellness programs, inpatient wound care, and wound care clinic.

11.      Each Hospital has an Advisory Board which is composed of local citizens, including educators, Chamber of Commerce, local Native American tribal leaders, bankers, and health practitioners.

12.      The Debtors are subject to numerous laws and regulations of federal, state, and local governments related to licensure, accreditations, and government healthcare program participation requirements, and reimbursement for patient services. For instance, the Hospitals are

licensed by the Oklahoma Health Care Authority and Oklahoma State Department of Health and are certified to participate in the Medicaid and Medicare programs.

13.    The Debtors are a party to a multiple of contracts and notes, including a management agreement, real property lease, ancillary service contracts, and staffing leasing agreement with companies collectively referred to herein as First Physicians.

14.    First Physicians filed suit against the Debtors seeking *inter alia* money judgments on two promissory notes and a lease, evict the Hospitals from the leased premises, and appointment of a receiver.

15.    This has triggered a real threat to the Debtors being able to keep operating the Hospitals and providing quality health services to the communities of Stroud and Anadarko.

16.    The Debtors' assets include their operating Hospitals, the lease rights to real estate on which the Hospitals operate, accounts receivable, equipment, supplies, and cash on hand. The Debtors have approximately $12.8 million in net accounts receivable ("A/R") as of September 30, 2019 based on historic collection rates. As of the Petition Date, the Debtors' combined cash on hand is $3,115,735.08. The Debtors aver they also have causes of action based upon significant failures caused by First Physicians.

17.    The Debtors have been hampered in their first day filings as First Physicians is currently in possession of Debtors' books and records. Upon initiating this bankruptcy case, the Debtors expect that First Physicians will provide the Debtors' access to its books and records so that the Debtors can comply with their bankruptcy obligations.

18.    The Debtors believe that a successful restructuring can only occur under the protection of bankruptcy.

9

### B.    The Acquisition of the Hospitals

19.    In furtherance of its mission, One Cura acquired both Stroud Hospital and Anadarko Hospital in 2011. In 2011, Mr. Eldridge entered into a 2011 Purchase Agreement ("Purchase Agreement") with Rural Hospital Acquisition, LLC ("RH Acquisition" or the "Secured Party")—a subsidiary of First Physicians—whereby Mr. Eldridge purchased RH Acquisition's 100% ownership interests in the Hospitals. The Hospitals' ownership was subsequently contributed to One Cura.

20.    Pursuant to the Purchase Agreement, both Stroud Hospital and Anadarko Hospital signed notes with RH Acquisition, attempting to secure each note with all or substantially all of the assets of the Hospitals. At the time, the note executed by Stroud Hospital was in the principal amount of $6,750,000, and the note executed by Anadarko Hospital was in the principal amount of $5,250,000.

21.    As a condition of the Purchase Agreement, Stroud Hospital and Anadarko Hospital were required to enter into a joint lease agreement (the "Lease") with First Physicians Realty Group, LLC ("First Physicians Realty"), a subsidiary of First Physicians Group, for the rental of the physical buildings in which the Hospitals operate.

22.    The Purchase Agreement likewise obligated the Hospitals to execute: (i) Management Services Agreements with First Physicians Business Solutions, LLC; (ii) Staff Leasing Agreements with First Physician Resources, LLC; and (iii) an Ancillary Services Agreements with First Physician Services, LLC (collectively the "Service Agreements"). All three counterparties to the Service Agreements are First Physician Group subsidiaries. It is through these Service Agreements that First Physician Group handles the management, staffing and day-to-day operation of the Hospitals.

10

23.     The Notes, Lease, and Service Agreements effectuated a deal wherein First Physicians could, on paper, sell the Hospitals to One Cura while, in practice, attempt to retain all of the benefits of ownership and control of the Debtors. Through these series of interrelated, oppressive agreements First Physicians could and indeed did control all of the financial and day-to-day operations of the Hospitals. Such control has allowed First Physicians to reap the financial benefits of its form of "ownership", while simultaneously acting to prevent the new owner from improving the Hospitals operations.

### C.     The Debt Structure

24.     Notwithstanding the foregoing, in November of 2015, Stroud Hospital executed a First Amended and Restated Seller Note (the "Stroud Note") payable to RH Acquisition in the amount of $5,928,028.05, in a good faith effort to restructure the outstanding balance under the original Stroud Hospital note. A true and correct copy of the Stroud Note is attached hereto and incorporated herein as **Exhibit B**.

25.     At or around the same time, Anadarko Hospital executed a near identical First Amended and Restated Seller Note (the "Anadarko Note", and together with the Stroud Note, the "Notes") payable to RH Acquisition in the amount of $8,097,684.06. Like the Stroud Note, the Anadarko Note also restructured the outstanding balance allegedly due and owing from the original Anadarko note. A true and correct copy of the Anadarko Note is attached hereto and incorporated herein as **Exhibit C**.

26.     In conjunction with the Notes, both Stroud Hospital and Anadarko Hospital entered into Security Agreements with Secured Party RH Acquisition, wherein the Hospitals granted Secured Party a blanket lien (the "Liens") on all or substantially all of the Hospitals assets, including, but not limited to, all accounts of the Debtors and any and all rights of the Debtor to the payment of money or other forms of consideration of any kind (the "Prepetition Collateral"). True

and correct copies of the Stroud Hospital Security Agreement and the Anadarko Security Agreement are attached hereto and incorporated herein as **Exhibit D** and **Exhibit E**.

27.      Upon information and belief, Secured Party RH Acquisitions didn't attempt to prefect its Liens in its Prepetition Collateral until October of 2018. *See* UCC Financing Statement 20181017021068950 and 20181017021068960 attached hereto and incorporated herein as **Composite Exhibit F**.

28.      As of the Petition Date, the Hospitals are allegedly indebted and liable to Secured Party under the Notes in the aggregate principal amount of not less than $14,025,712.11, exclusive of accrued and unpaid interest, and all other obligations of whatever nature owing.

**D.      The Hospitals' Assets**

29.      The Debtors' assets include their operating Hospitals, the lease rights to real estate on which the Hospitals operate, accounts receivable, equipment, supplies, and cash on hand. The Debtors have approximately $12.8 million in net accounts receivable ("A/R") based on historic collection rates. The Debtors aver they also have causes of action based upon significant failures caused by First Physicians.

30.      The below reflects the amount of funds in the Hospitals' bank accounts as of the Petition Date:

| Debtor Entity Name | Institution Name | Type of Account | Last Four Digits of Account Number | Value of Debtor's Interest as of Petition Date |
|---|---|---|---|---|
| RHA Stroud, Inc. | Valliance Bank | Lockbox | 4749 | $123,611.08 |
| RHA Stroud, Inc. | Valliance Bank | Operating | 7831 | $980,281.78 |
| RHA Stroud, Inc. | Valliance Bank | Debit Card | 3103 | $537.77 |
| RHA Stroud, Inc. | Valliance Bank | Grant Fund | 7906 | $112,147.31 |
| **Total** | | | | **$1,216,577.94** |

| Debtor Entity Name | Institution Name | Type of Account | Last Four Digits of Account Number | Value of Debtor's Interest as of Petition Date |
|---|---|---|---|---|
| RHA Anadarko, Inc. | Valliance Bank | Lockbox | 4756 | $38,377.12 |
| RHA Anadarko, Inc. | Valliance Bank | Operating | 7823 | $1,767,757.79 |
| RHA Anadarko, Inc. | Valliance Bank | Debit Card | 3707 | $802.04 |
| RHA Anadarko, Inc. | Valliance Bank | Lockbox | 7450 | $92,220.19 |
| **Total** | | | | **$1,899,157.14** |

31.     An analysis of the period of 9/24/20 to 10/23/20 of the Hospitals' operating account accounts reveals deposits in the amount of $3,115,735.08 (Stroud Hospital) and $6,191,683 (Anadarko Hospital).[4]

## RELIEF REQUESTED

32.     By this Motion, the Hospitals request entry of the Interim Order: (i) authorizing the Hospitals' use of Cash Collateral; (ii) granting conditional Adequate Protection to Secured Party,

---

[4] During that same period First Physician subsidiary, First Physicians Resources, LLC— the counterparty to the Hospitals' Staff Leasing Agreements —received wires in the amount of $3,782,350 (Stroud Hospital) and $4,171,731 (Anadarko Hospital).

13

RH Acquisition (iii) scheduling a further Interim Hearing for the week of November 2nd; (iv) scheduling a Final Hearing on or before Friday, November 7th, and (iv) granting related relief.

33.     The Hospitals wish to utilize the Cash Collateral to pay any third-party utility and/or vendor claims in an amount not to exceed $289,000 per claim, per Hospital, and to pay any other operating expense as agreed upon with Secured Party. To the extent this results in a diminution of value of Secured Party's Liens, the Hospitals propose that Secured Party be allowed adequate protection ("Adequate Protection"), in the form of a superpriority administrative expense claim against each Hospital (jointly and severally) ahead of and senior to any and all other administrative expense claims and all other claims asserted against the Hospitals (the "Adequate Protection Superpriority Claim"), subject to a carve-out for sum of all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest at the statutory rate (the "Carve-Out").

34.     Upon filing, the Hospitals should regain access it its books and records, and it is the Hospitals intent to work diligently with its financial advisors and its management company (an affiliate of Secured Party) on preparing detailed cash collateral budget. Thus, the Hospitals also seek a further Interim Hearing the week of November 2nd.

## BASIS FOR RELIEF

**A.     The Use of Cash Collateral Is Warranted and Should Be Approved**

35.     The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . .

14

to be used, sole, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id.* § 362(e).

36.    While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters are [to be] left to case-by-case interpretation and development." (brackets in original) (quotations omitted)). That said, it is clear that the adequate protection offered here is traditional, appropriate, and routinely granted. *See, e.g., In re Offshore Grp. Inv. Ltd.*, Case No. 15-12422 (BLS) (Bankr. D. Del. Jan. 8, 2016), D.I. 158 (granting prepetition secured parties adequate protection liens, superpriority claims subject to a carve out, fees and expenses, and requiring that the debtors deliver certain financial reports and budget compliance documents); *In re CTI Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del. Apr. 05, 2019) (D.I. 141) (granting certain prepetition secured parties indemnification liens, adequate protection liens, superpriority administrative claims, fees and expenses, and requiring the debtors to provide written financial reporting and other periodic reporting).

37.    In addition, pursuant to section 105(a) of the Bankruptcy Code, the Bankruptcy Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). The Hospitals respectfully submit that the entry of an order authorizing use of Cash Collateral under the circumstances in necessary and appropriate to enable them to both maintain their operations and maximize the value of their assets and should be approved.

15

### B.    The Adequate Protection Provisions Are Appropriate

38.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-exhaustive list of the types of adequate protection, including lump-sum or periodic cash payments, replacement liens, administrative priority claims and "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. See 11 U.S.C. § 361.  What constitutes adequate protection is determined on a case-by-case basis. *See, e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Southwest Assocs.,* 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

39.    The Hospitals have proposed that Secured Party be allowed Adequate Protection in the form of Adequate Protection Superpriority Claim, subject to a Carve-Out, in the event there is a diminution in the value of Secured Party's Liens. This conditioned Adequate Protection, detailed above, is intended to protect the Secured Party from any diminution in the value of its Liens during the two week interim use of Cash Collateral. The Hospitals submit that the proposed conditioned Adequate Protection will adequately protect the Secured Party during these two weeks. Accordingly, the Hospitals submit that the adequate protection is (i) fair and reasonable, (ii) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code and (iii) in the best interests of the Hospitals and their estates.

55143220;3

### C.    The Scope of the Carve-Out Is Appropriate

40.    The Interim Order subjects the security interests and administrative expense claims provided to the Secured Party to the Carve-Out. The Carve-Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for payment of the Clerk of the Court and U.S. Trustee fees.

### D.    Immediate Interim Relief is Necessary to Avoid Immediate and Irreparable Harm.

41.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to Section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court is empowered to conduct an interim expedited hearing on a motion to use cash collateral at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Fed. R. Bankr. P. 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

42.    Bankruptcy Rule 6003 likewise provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b).

43.    The Hospitals have an immediate need to use the Prepetition Collateral, including Cash Collateral, to, among other things, preserve and maintain the value of the Hospitals' assets, absent which immediate and irreparable harm will result to the Hospitals and their estates. The preservation and maintenance of the Hospitals' assets are necessary to maximize the value of the

17

Hospitals' estates.  Absent the Hospitals' ability to use the Prepetition Collateral, the Hospitals would not have sufficient available sources of financing and would be unable to pay their operating expenses or maintain their assets, to the severe detriment of the estates, its patients, and creditors.

44.    The Hospitals submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Hospitals for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

### NOTICE

45.    The Hospitals will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the Western District of Oklahoma (b) counsel for the Secured Party; (c) the parties listed in the list of twenty (20) largest unsecured creditors filed by the Hospitals in these Chapter 11 Cases; (d) the Internal Revenue Service; (e) all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the Prepetition Collateral; (f) the Office of the United States Attorney for the Western District of Oklahoma; and (g) any other party entitled to notice pursuant to Local Rule 9013-1(b).  The Hospitals submit that, in light of the nature of the relief requested, no other or further notice need be given.

### CONCLUSION

WHEREFORE, for the reasons set forth above and in the First Day Declaration, the Hospitals respectfully request the Court the Hospitals respectfully request that the Court enter the Interim Order, substantially in the form annexed hereto, granting the relief requested in this Motion and granting such other and further relief as may be just and proper.

18

55143220;3

Dated: October 25, 2020

Respectfully Submitted,

**RUBENSTEIN & PITTS, PLLC**

By: s/ Michael A. Rubenstein
Michael A. Rubenstein, OBA #7806
Leif Swedlow, OBA #17710
1503 E. 19th Street
Edmond, OK  73013
Telephone:  (405) 340-1900
Facsimile:  (405) 340-1001
mrubenstein@oklawpartners.com
lswedlow@oklawpartners.com

**AKERMAN LLP**

By: *s/ David W. Parham*
David W. Parham
Texas Bar No. 15459500
2001 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: (214) 720-4300
Facsimile: (214) 981-9339
david.parham@akerman.com
*Pro Hac Vice Pending*

*s/ Esther McKean*
Esther McKean
Florida Bar No. 028124
420 S. Orange Ave., Suite 1200
Orlando, FL 32801
Telephone: (407) 423-4000
Facsimile: (407) 843-6610
esther.mckean@akerman.com
*Pro Hac Vice Pending*

*s/ Catherine Kretzschmar*
Catherine Kretzschmar
Florida Bar No. 85843
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, FL 33301
Telephone: (407) 423-4000
Facsimile: (407) 843-6610
catherine.kretzschmar@akerman.com
*Pro Hac Vice Pending*

Proposed Attorneys for Debtors

19