IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

In re:                                          Case No.: __20-13482__
                                                Chapter 11
RHA Stroud, Inc.,[1]

                                                [Joint Administration Pending]
        Debtor.

_____/
In re:                                          Case No.: __20-13483__
                                                Chapter 11
RHA Anadarko, Inc.,

        Debtor.

_____/

## DECLARATION OF CHARLES M. ELDRIDGE
## IN SUPPORT OF FIRST DAY-MOTIONS

I, Charles M. Eldridge, hereby state and declare as follows:

1.      I am the President and Chief Executive Officer ("CEO") of RHA Stroud, Inc.,

d/b/a Stroud Regional Medical Center ("Stroud Hospital") and RHA Anadarko, Inc. d/b/a The

Physicians' Hospital in Anadarko ("Anadarko Hospital") (Stroud Hospital and Anadarko Hospital

are collectively herein referred to as "Debtors" or "Hospitals"). The Hospitals provide quality

health services to the rural communities of Stroud and Anadarko.

2.      I am employed by One Cura Health f/k/a One Cura Wellness ("One Cura"), a

nondebtor 501(c)(3) corporation that is the parent corporation of the Debtors.

3.      I founded One Cura in 2011 and since that time served as its President and CEO of

the Debtors.

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification number is: RHA Stroud, Inc. (2635) and RHA Anadarko, Inc. (2528). The principal place of business for the Debtors is 421 NW 13th St., Suite 210, Oklahoma, OK 73103.

4.      My experience includes twenty years of community based and governmental not-for-profit organizations. I hold a bachelor's degree from Georgetown University in government and a master's degree in public policy from Pepperdine University School of Public Policy.

5.      I am confident, based upon my experience and knowledge of the Debtors, that given the opportunity to restructure in chapter 11, the Debtors will emerge as a profitable healthcare system able to provide life-saving care to Lincoln and Caddo Counties and surrounding communities.

## I.    OVERVIEW

6.      The Debtors are the largest non-profit healthcare system based in Lincoln County and Caddo County, Oklahoma, with combined annual revenues of approximately $94.3 million in fiscal year 2019. One Cura Health f/k/a One Cura Wellness is the parent non-profit organization of the Debtors. Affiliate companies operate two medical clinics located in Stroud and Anadarko, Oklahoma.

7.      The following graphic depicts the prepetition organizational structure of the Debtor entities and affiliates:



55067478;7

## II.    THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

8.      As described in detail below in Section III.C, the Debtors are a party to a multiple of contracts and notes, including a management agreement, real property lease, ancillary service contracts, and staffing leasing agreement with companies collectively referred to herein as First Physicians.

9.      First Physicians filed suit against the Debtors seeking *inter alia* money judgments on two promissory notes and a lease, evict the Hospitals from the leased premises, and appointment of a receiver.

10.     This has triggered a real threat to the Debtors being able to keep operating the Hospitals and providing quality health services to the communities of Stroud and Anadarko.

11.     The Debtors have been hampered in their first day filings as First Physicians is currently in possession of Debtors' books and records. Upon initiating this bankruptcy case, the Debtors expect that First Physicians will provide the Debtors' access to its books and records so that the Debtors can comply with their bankruptcy obligations.

12.     The Debtors believe that a successful restructuring can occur under the protection of bankruptcy.

## III.    BACKGROUND OF THE DEBTORS

### A.    DEBTORS' BUSINESS AND STRUCTURE

#### i.    The Health System

13.     The Debtors operate as a nonprofit health care system providing medical services to patients who generally reside in Lincoln County and Caddo County, Oklahoma (collectively, the "Hospitals"). Collectively, they have fifty (50) licensed beds, two active emergency rooms, and a host of medical specialties.

3

55067478;7

14.    The Hospitals in the health care system are designated Critical Access Hospitals ("CAH").[2] The Patient Days for the past year have exceed 12,000 cumulative patient days at an approximate 88% capacity for the hospitals. Emergency Room visits exceed 7,500 per year. There were 880 Outpatient Surgeries for 2019 and that number is expected to be similar for 2020.

15.    Debtors' necessity to the health and welfare of the people of Lincoln County and Caddo County and surrounding counties is evidenced by several facts, including having the:

*only* Post-acute, medically complex swing bed program in Lincoln / Caddo County;

*only* Emergency Rooms in Lincoln / Caddo County;

*only* hospitals that offer inpatient/bedside dialysis in Lincoln / Caddo County

*only* hospital in Stroud, Oklahoma; and

*only* hospital in Anadarko, Oklahoma.

16.    The Hospitals are designated Critical Access as they are safety nets for people that cannot travel to the larger cities for care – and are especially critical for time-sensitive diagnosis and treatments such as heart attacks and strokes. The nearest alternative hospitals to Anadarko Hospital and Stroud Hospital are located respectively seventeen (17) and twenty (20) miles away.

---

[2] To be eligible to be a CAH the hospital must be located in a State that has established a State Medicare Rural Hospital Flexibility Program; be designated by the State as a CAH; be located in a rural area or an area that is treated as rural; be located either more than 35-miles from the nearest hospital or CAH or more than 15 miles in areas with mountainous terrain or only secondary roads; OR prior to January 1, 2006, were certified as a CAH based on State designation as a "necessary provider" of health care services to residents in the area; maintain no more than 25 inpatient beds that can be used for either inpatient or swing-bed services; maintain an annual average length of stay of 96 hours or less per patient for acute inpatient care (excluding swing-bed services and beds that are within distinct part units); demonstrate compliance with the CAH CoPs found at 42 CFR Part 485 subpart F; and Furnish 24-hour emergency care services 7 days a week. *See* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs

55067478;7

17.    The Hospitals also provide a plethora of community service initiatives – many have been developed in partnership with local governments, police, schools and universities, etc. These programs include but are not limited to:

- Adult Basic Education (GED Preparation)

- Adult Financial Literacy

- Diabetes Prevention Program

- Telehealth Assessment Program (TAP)

- Wichita & Affiliated Tribes RISE Program for Suicide Prevention

- Dinner & Learn Series

- Diabetes Empowerment Education Program (DEEP)

- Meals on Wheels

- Tai Chi Classes

- Community Computer Access Program (CCAP)

- Live healthy, Eat healthy, and be Active with Diabetes (LEAD)

- Community Health Fairs

18.    The Debtors have no employees, as described below, all physicians, medical staff and employees are retained by First Physicians by virtue of documents such as a Staffing and Provider Services Agreement.

19.    Collectively, the Debtors provide the following services: 24 hour emergency department, inpatient medical services, inpatient surgical services, ambulatory and outpatient surgical services (including gastro intestinal procedures, general surgery, pain management, podiatry, ophthalmology, orthopedic, urology), cardiology clinic services, dialysis, physical and occupational therapy, speech therapy, respiratory therapy, radiology and imaging services to

include CT scanning, Xray, and ultrasound, sleep disorder diagnostic services, full service laboratory testing, acute inpatient services, skilled nursing facility, swing bed inpatient services, wellness programs, inpatient wound care, and wound care clinic.

20. As depicted in the graphic above, One Cura sits atop the health system's corporate structure. One Cura is the holding company for the entire health system and is the sole member of Stroud Hospital and Anadarko Hospital.

21. Each Hospital has an Advisory Board which is composed of local citizens, including educators, Chamber of Commerce, local Native American tribal leaders, bankers, and health practitioners.

22. The Debtors are subject to numerous laws and regulations of federal, state, and local governments related to licensure, accreditations, and government healthcare program participation requirements, and reimbursement for patient services. For instance, the Hospitals are licensed by the Oklahoma Health Care Authority and Oklahoma State Department of Health and are certified to participate in the Medicaid and Medicare programs.

23. As part of the Debtors' mission to serve the community, the Debtors provide care to patients even though they may lack adequate insurance or participate in programs that do not pay full charges. Indeed, a significant portion of the Debtors' uninsured patients will be unable or unwilling to pay for the services provided. The Debtors provide approximately $377,000 per year of free charity care to those patients who are financially unable to pay for the healthcare services they receive.

*ii.    Stroud Hospital*

24. Stroud Hospital is an Oklahoma corporation which operates a twenty-five (25) bed CAH in Stroud, Oklahoma. Services offered at Stroud Hospital include medical, surgical,

55067478;7

labor/delivery and nursery care, 24-hour emergency, laboratory, imaging services, physical therapy, rehabilitation, urgent care, oncology, and cardiology. Members of the Stroud Hospital medical staff include specialists in emergency medicine, family practice, internal medicine, general surgery, neurosurgery, cardiology, pediatrics, obstetrics/gynecology, orthopedics, otolaryngology, radiology, and inpatient hospitalization.

25.     Stroud Hospital opened in 1978 and has grown to serve the greater Lincoln County. Originally, Stroud was formed as a result of the Stroud community coming together and forming the Stroud Hospital Authority. The hospital continued to grow and serve the community throughout the 1980s and 1990s. In May 1999, a tornado damaged the hospital resulting in it being closed until March 2001. At the re-opening of the hospital, the name was changed to Stroud Regional Medical Center. The Stroud Hospital Authority sold the hospital in 2002, the current Debtor has operated the hospital since 2011.

26.     Stroud Hospital is doing business as Stroud Regional Medical Center.

27.     The hospital operated by Stroud Hospital is located on real property leased from First Physicians Realty Group, LLC ("FP Realty").

28.     Stroud Hospital is exempt under Section 501(c)(3) of the Internal Revenue Code from federal income taxes except for unrelated business income.

    iii.    *Anadarko Hospital*

29.     Anadarko Hospital is an Oklahoma corporation which operates a twenty-five (25) bed CAH in Anadarko, Oklahoma and is doing business as The Physicians Hospital in Anadarko. Services offered at Anadarko Hospital include medical, surgical, labor/delivery and nursery care, 24-hour emergency, laboratory, imaging services, physical therapy, rehabilitation, urgent care, oncology, and cardiology. Members of the Anadarko Hospital medical staff include specialists in

7

emergency medicine, family practice, internal medicine, general surgery, neurosurgery, cardiology, pediatrics, obstetrics/gynecology, orthopedics, otolaryngology, radiology, and inpatient hospitalization.

30.     Anadarko Hospital was originally opened in June of 1978, and has grown to serve the greater Caddo County and is located east of town.  Originally, the facility's financing was made available mostly from the Farmer's Home Administration. Patient rooms were furnished by private citizens who wanted quality healthcare in their community.  The hospital was owned by the City of Anadarko.  In 2002, it was purchased by a private company.  Eventually in 2011, the current ownership occurred.

31.     The hospital operated by Anadarko Hospital is located on real property leased from FP Realty.

32.     Anadarko Hospital is exempt under Section 501(c)(3) of the Internal Revenue Code from federal income taxes except for unrelated business income.

    *iv.     Nondebtor entities*

33.     The following is a list of the Debtors' nondebtor affiliates:

- One Cura Family Clinic – Stroud

- One Cura Family Clinic – Anadarko

**B.     DEBTORS' ASSETS**

34.     The Debtors' assets include their operating Hospitals, the lease rights to real estate on which the Hospitals operate, accounts receivable, equipment, supplies, and cash on hand. The Debtors have approximately $12.8 million in net accounts receivable ("A/R") as of September 30, 2019 based on historic collection rates. As of the Petition Date, the Debtors' combined cash on

hand is $3,115,735.08. The Debtors aver they also have causes of action based upon significant failures caused by First Physicians.

## C.    DEBTORS' MANAGEMENT AGREEMENT WITH FIRST PHYSICIANS

35.    First Physicians Business Solutions, LLC, First Physicians Services, LLC, First Physicians Resources, LLC and First Physicians Capital Group, Inc. (collectively "First Physicians") previously owned through Rural Hospital Acquisition, LLC ("RH Acquisition") all the issued and outstanding membership interests of Stroud Hospital and Anadarko Hospital. In turn, Stroud Hospital and Anadarko Hospital owned all the assets of the Hospitals.

36.    In or about April 2011, I entered into a Membership Interest Purchase Agreement ("Purchase Agreement") with RH Acquisition pursuant to which I purchased all the membership interests of First Physicians Business Solutions, LLC, First Physicians Services, LLC, First Physicians Resources, LLC and First Physicians Capital Group, Inc., which were subsequently contributed to One Cura. Pursuant to the Purchase Agreement, First Physicians Business Solutions, LLC, First Physicians Services, LLC, First Physicians Resources, LLC and First Physicians Capital Group, Inc. each signed a note with RH Acquisition (as later amended, the "Notes") and secured those Notes with all of the assets of the Hospitals. In contrast, the Note executed by Stroud Hospital was in the principal amount of $6,750,000, and the Note executed by Anadarko Hospital was in the principal amount of $5,250,000.

37.    At the same time and as part of the same integrated Purchase Agreement transaction, the Debtors were also required to enter and entered into a Lease with FP Realty for the rental of the physical buildings in which the Hospitals operate, along with parallel Management Services Agreements (collectively, "MSA"), Staff Leasing Agreements, Ancillary Services Agreements and other agreements with FP Business and other First Physicians entities

9

related to the management, staffing and operation of the Hospitals (the most recent, current operative version of such contracts collectively referenced herein as the "Agreements").

38.    Section 2(a) of the Management Agreement provides that First Physicians is given "sole and exclusive right and obligation to furnish or perform, or arrange for the furnishing or performance of, the Management Services[3]...."

39.    First Physicians never made any demand to the Hospitals for any payment of interest under Notes or rent under the Lease during the parties' entire nearly nine year relationship until February 17, 2020, exactly one week before First Physicians filed its Complaint as discussed in Section III.D below.

40.    Debtors were not contractually permitted to make any payments from their accounts (of Note interest, Lease rent or otherwise) unless such payments were made by First Physicians.  The MSA provides that FP Business is the Hospitals' exclusive payment contractor with exclusive control over their respective revenues and bank accounts in the ordinary course of business.  Thus, in asserting that the Hospitals failed to make interest or rent payments, First Physicians is, in reality, alleging that it chose not to make those payments from the Hospitals' day-to-day operating accounts that it controls.  Indeed, the MSA explicitly provides that FP Business (the Manager):

> is authorized to withdraw funds from the [Hospitals'] Bank Accounts ... and to pay authorized expenses of the Company and the Hospital, including without limitation ... any principal and interest that is due under the New Notes relating to the loan indebtedness of the Company to Seller."

MSA, § 3(a)(xi).

41.    First and foremost, the parties' relationship through the Agreements was never about payment of rent or repayment of the Notes; it was -- and is -- about creating a vehicle

---

[3] 'Management Services' includes every aspect of the financial and day-to-day operations of the Hospitals.

55067478;7

through which First Physicians' various companies could charge and overcharge an escalating avalanche of fees and fees upon fees at the Hospitals' expense. For example, First Physicians charges a 100% mark up on expenses incurred for the Hospitals, including even non-variable administrative expenses and employee salaries, most of which are paid to First Physicians itself, effecting a double layer of mark ups.

42.    First Physicians abused its role as the Hospitals' payment contractor to prioritize paying itself for inflated costs purportedly incurred (but in reality mostly paid to itself) rather than paying the Hospitals' Note interest, Lease rent or other obligations.

43.    First Physicians' fees and costs paid to itself are not secured. Thus, by artificially prioritizing payment of its cost-related fees, First Physicians made sure that it was paid first on amounts that were not secured under the parties' Agreements.

44.    By intentionally failing to make payments pursuant to the Notes and Lease throughout the parties' relationship (because it was allocating the Hospitals' revenue to its own other fees and costs), First Physicians strategically kept the Hospitals in what could be characterized as a state of perpetual potential default. Until just before filing the Litigation (defined below), First Physicians had never before made any demand for such payments because the collective objective of the Agreements was to facilitate maximum extraction of value from the Hospitals for First Physicians.

45.    Through One Cura, the Hospitals are required to provide oversight of First Physicians conduct as their Manager, as well as confirm that costs incurred reflect fair market value to the Hospitals and, if they do, approve the Cost Reports required to be filed with CMS.

11

46.     More broadly, while the MSA provides First Physicians discretion to act as Manager as it "reasonably determines is appropriate," it also explicitly contemplates requiring the Hospitals' approval for its various actions on their behalf.  MSA, §§ 2(a) and (b).

47.     In order to facilitate that approval and the oversight to be able to provide it, among other relevant provisions, the MSA requires First Physicians to:  prepare and deliver Operating Plans (as defined therein) for the Hospitals annually; assist the Hospitals with obtaining and maintaining permits, certifications, accreditations and insurance; make payments required to be made from the Hospitals' bank accounts, including processing and payment of the Hospitals' vendors' invoices; provide regular financial statements reflecting the Hospitals' operations; contract with FP Business' First Physicians affiliates only on a most favorable terms and arms' length independent basis; maintain and provide the Hospitals access to First Physicians' business records and systems, including making copies or extracts thereof; and, of course, adhere to all applicable laws and regulations.

48.     The parties' most recent Staff and Provider Leasing Agreements, effective in or about February 2019 ("Staff and Provider Agreement"), similarly obligates First Physicians to facilitate, or at least not thwart, the Hospitals' oversight of their manager.  That Agreement also more specifically requires First Physicians to:  bill for its services (including but not limited to with respect to leased personnel and contracting with other First Physicians entities) only a the fair market value of such services; allow the Hospitals to conduct quarterly audits of First Physicians' financial functions and records; commit $5.25 million to the construction of an outpatient surgery center at Anadarko; work in good faith to perform its obligations to the Hospitals; and perform its duties and obligations in accordance with Applicable Law (a broadly defined term encompassing all relevant statutes, rules and regulations applicable to the Hospitals).

12

49.    As part of its facilitation of the Hospitals' ability to provide independent oversight of First Physicians' management and other dealings with the Hospitals, the Staff and Provider Agreement amended the parties' prior agreement and obligated First Physicians' to cause the Hospitals to pay One Cura (the Hospitals' owner) $62,500 per Hospital per month.  First Physicians is further obligated to separately reimburse One Cura for other expenses, costs and fees incurred related to mergers and acquisitions activities and defense of litigation, as well as pay the Hospitals' vendors retained as part of their review (through One Cura) of First Physicians' management and expenses.

50.    First Physicians has refused to allow the Hospitals to make such payments to One Cura or the consultants, accountants and attorneys it retains in order to oversee and check First Physicians' conduct related to the Hospitals' management.  In essence, First Physicians has cut off such payments as a means of self-help in further breach of the parties' Agreements, as well as to prevent effective oversight and/or the Hospitals' ability to defend and prosecute this action.

51.    Like the Staff and Provider Agreement, certain of the parties' Agreements have been amended since 2011.  For example, the Notes were amended in 2015 in order to capitalize nominally owed interest that RH Acquisition had never demanded and FP Business had never paid.

52.    The Hospitals were induced to enter into such amended Notes based on false representations by Adrian Reeder, the CFO of First Physicians.  In sum, Mr. Reeder misrepresented that amendment of the Notes to capitalize prior interest was necessary in order to refinance loans with the USDA through a bank in order to facilitate the Hospitals' ability to borrow money to rebuild the Outpatient Surgery Department at Anadarko.  In reality, as soon as

55067478;7

the Notes were amended, First Physicians discontinued the Hospitals' loan application and refused to rebuild that surgery center.

53.     First Physicians has breached its obligations to release the Hospitals with respect to Note interest and Lease rent incurred and owed from before February 2019 due to its own failure to make such payments from the Hospitals' accounts, as well as its obligation to cure that failing by making such payments going forward so as to keep the Hospitals current on all Note and Lease payments owed.

54.     First Physicians has still not made any progress toward -- indeed has refused to commit to -- the construction of an outpatient surgery center at Anadarko. That surgery center is not only needed by the community Anadarko serves, but is one of First Physicians' fundamental responsibilities and financial commitments as manager of that Hospital.

55.     First Physicians has similarly failed to reopen Stroud Hospital's outpatient surgical wing, which has diminished that Hospital's ability to serve the community as well as cost the Hospital substantial potential revenues from surgeries it could not perform. Further breaching its obligations, First Physicians also failed to maintain Anadarko Hospital's licensing for that surgical center, leaving it out of regulatory compliance.

56.     First Physicians has also consistently failed to produce required Operating Plans, jeopardized the Hospitals' certifications, and refused to provide access to its records and systems related to management and operation of the Hospitals or allow their audit to proceed as contractually required. As already noted, First Physicians has also used its control of the Hospitals' bank accounts to prevent required payments being made to One Cura and vendors retained to perform services for the Hospitals, services that First Physicians has failed to perform itself.

14

57.    First Physicians has also repeatedly delayed and refused to allow the Hospitals (through One Cura) access to relevant records necessary to establish (or correct) the fair market value of costs incurred by First Physicians.

58.    First Physicians has even billed the Hospitals for services it never even performed. For example, for several years, First Physicians charged the Hospitals $25,000 each for preparation of tax returns even where it was acknowledged that First Physicians did not do that work, and One Cura had to separately retain an accounting firm to prepare them. Although First Physicians stopped that charge in 2018, it still has never reversed the earlier phantom charges.

59.    When the Hospitals (through One Cura) attempted to check First Physicians' escalating costs and fees, litigation was the result.

60.    First Physicians' breached its obligation to assist the Hospitals with obtaining and maintaining permits, certifications, accreditations, First Physicians failed to execute and provide a Representation Letter requested by One Cura's accountants for the Hospitals, causing the Hospitals to be out of regulatory compliance with the Oklahoma State Department of Health and other authorities, and exposing the Hospitals to unnecessary fines and penalties.

61.    First Physicians failed to obtain a Community Needs Assessment for Stroud, which has already resulted in an IRS audit of that Hospital, exposing the Hospitals to fines and penalties of at least $50,000, and also jeopardizing that Hospital's tax exempt status.

62.    Not content with only one tax violation, First Physicians has also failed to maintain the Hospitals in compliance with IRC Section 501(r) by failing to publish certain required financial policies on the Hospitals' websites.

15

63.     First Physicians has also failed to provide One Cura with information required to negotiate managed care contracts with Oklahoma insurers, thereby requiring the Hospitals to lose revenue that could be used to the benefit of the Hospitals and their patient populations.

64.     Most recently, First Physicians exposed the Hospitals to potential violations of the CARES Act and related regulations by refusing to transfer funds advanced to the Hospitals in Hospital-controlled accounts where such CARES Act funding can be segregated and expenditures tracked to ensure that they are used solely for Covid-19 related purposes.

65.     Although such funds were swept into First Physicians'-controlled accounts intended for the Hospitals' day-to-day operations and expenses in the ordinary course, even First Physicians acknowledged that such CARES Act funds were not ordinary course funding and required specific Hospital tracking and certification to comply with legal obligations. Nevertheless, despite acknowledging that the Hospitals themselves (as the providers) must provide such certifications of any use of advanced CARES Act funds, First Physicians has refused to transfer such CARES Act funding to Hospital-controlled accounts as twice demanded by the Hospitals.

66.     First Physicians also refused to provide vendor attestations required by the terms and conditions for it to use or even hold the advanced CARES Act funds at issue.

67.     Since retaining CARES Act funds under such circumstances could have made the Hospitals' complicit in First Physicians' violations of law, the Hospitals had no choice but to accede to First Physicians' recommendation that the CARES Act funds be returned so that the Hospitals will not have access to such funds.

55067478;7

#### D.    LITIGATION WITH FIRST PHYSICIANS

68.    On February 24, 2020, RH Acquisition and FP Realty filed a Petition in the District Court of Lincoln County, Oklahoma ("District Court"), initiating Case No. CJ-2016-513 (the "Litigation").   Simultaneously, RH Acquisition and FP Realty filed an Application of Appointment of a Receiver for the Hospitals.

69.    As part of the Litigation, FP Realty sought to evict the Debtors from the Hospitals.

70.    On May 19, 2020, the Debtors filed an Answer, Affirmative Defenses, Counterclaims and Third-Party Claims, which was subsequently amended on July 30, 2020, naming as the third-party defendants First Physicians.

71.    The Debtors filed responses and briefs in opposition to the appointment of a receiver.   On September 14, 2020, the District Court conducted an evidentiary hearing on the contested application to appoint a receiver and issued a memorandum opinion sustaining First Physicians' application to appoint a receiver and ordered First Physicians and debtors to work on an order appointing a receiver.

72.    The District Court has scheduled a hearing on November 4, 2020 to discuss the form of the order and determine the appropriate bond that must be posted prior to any receiver having any powers.

73.    As of the Petition Date, the District Court has not authorized any receiver with powers as to the Hospitals nor has a bond been posted by a receiver which are prerequisites for a receiver to have any rights with respect to the Hospitals.

#### E.    EMPLOYEES LEASED BY THE DEBTORS

74.    All employees, including physicians, are employed pursuant to a Management Agreement with of a First Physicians' related company.   First Physicians hires, trains, and

17

manages the doctors, nurses, and administrative staff and performs all payroll functions necessary for hospital operations. The Debtors lease the employees from a First Physician entity.

75.    The Debtors are responsible for reimbursing First Physician for the compensation and benefits of these employees and physicians.

**F.    DEBTORS' INSURANCE POLICIES**

76.    The Debtors maintain various insurance policies issued by several insurance carriers (collectively, the "Insurance Carriers"). Collectively, these policies provide for coverage for, among other things: property, automobile, business interruption, equipment breakdown, general liability, (collectively, the "Insurance Policies").]

**G.    DEBTORS' BANK ACCOUNTS**

77.    As of the Petition Date, the Debtors maintain six (6) bank accounts in their name in addition to two lockbox accounts (the "Bank Accounts").

78.    Each Hospital has established a separate lockbox account at Valliance Bank ("Valliance") to receive electronic fund transfers ("EFT") and checks from third parties such as private health insurance, Medicare, Medicaid and VA.

79.    The lockbox accounts are swept at midnight on every banking day into each of the Debtor's respective operating accounts.

80.    In the ordinary course of business, the Debtors routinely transfer money between the Bank Accounts via electronic funds transfers.

81.    As of the Petition Date, there are two (2) sources of active cash flow as follows:

(a)    Cash and Check Payments by Patients.

When a patient visits the Hospital and makes a payment by cash or check, typically a copay or coinsurance, it is deposited daily into each Debtor's respective Operating Account.

    (b)    <u>Wires to Lockbox from Third Payors and Plus Merchant Services</u>

Payments from insurance companies, Medicare, Medicaid, VA and merchant services are wired to each Debtor's respective lockbox account. The funds in the lockbox account are deposited every bank business day into the Debtors' respective operating accounts.

## H.   DEBTORS' NOTES AND SECURITY AGREEMENTS

82.   In 2011, Stroud Hospital executed a Note in the principal amount of $6,750,000, and Anadarko Hospital executed a Note in the principal amount of $5,250,000 in favor of RH Acquisition.

83.   In November of 2015, Stroud Hospital executed a First Amended and Restated Seller Note (the "Stroud Note") payable to RH Acquisition in the amount of $5,928,028.05, in a good faith effort to restructure the outstanding balance under the original Stroud Hospital note.

84.   At or around the same time, Anadarko Hospital executed a near identical First Amended and Restated Seller Note (the "Anadarko Note", and together with the Stroud Note, the "Notes") payable to RH Acquisition in the amount of $8,097,684.06. Like the Stroud Note, the Anadarko Note also restructured the outstanding balance allegedly due and owing from the original Anadarko note.

85.   In conjunction with the Notes, both Stroud Hospital and Anadarko Hospital entered into Security Agreements with Secured Party RH Acquisition, wherein the Hospitals granted Secured Party a blanket lien on all or substantially all of the Hospitals assets, including, but not limited to, all accounts of the Debtors and any and all rights of the Debtor to the payment of money or other forms of consideration of any kind (the "Prepetition Collateral").

55067478;7

86.    As of the Petition Date, it is alleged that the Hospitals are indebted and liable to Secured Party under the Notes in the aggregate principal amount of not less than $14,025,712.11, exclusive of accrued and unpaid interest, and all other obligations of whatever nature owing.

87.    As of the Petition Date, the Debtors also collectively have a total of approximately $80 million in unsecured debt, not including amounts owed among the Debtors, affiliates, and subsidiaries.

## IV. FIRST DAY PLEADINGS

88.    The Debtors request that the relief described below in the following motions be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of its patients (the "Patients"), creditors, and the communities they serve.

89.    Contemporaneously with this Declaration, the Debtors have filed the following motions (collectively, the "First Day Motions") for emergency relief:

i.    *Debtors' Emergency Motion for Order Authorizing Joint Administration Pursuant to Bankruptcy Rule 1015 and Local Rule 1015;*

ii.    *Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Hospitals To Use Cash Collateral, (Ii) Granting Conditional Adequate Protection To The Secured Party, (III) Scheduling a Further Interim Hearing; And (IV) Scheduling A Final Hearing And (V) Granting Related Relief; and*

iii.    *Debtors' Emergency Motion For Entry Of Order Authorizing Debtors In The Ordinary Course To Use Cash Management System And Maintain Use Of Pre-Petition Lockbox Accounts.*

Each of the above First Day Motions is described more fully below.

55067478;7

## A.    ADMINISTRATIVE MOTIONS

90.    ' In the <u>Joint Administration Motion</u>, the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes and that the Court maintain one file, one docket, and a consolidated mailing matrix for all of the Chapter 11 Cases under the lead case, *In re RHA Stroud.*

91.    Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest. Many of the motions, hearings and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors. The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

## B.    OPERATIONAL MOTIONS REQUESTING IMMEDIATE RELIEF

92.    While the administrative motions are intended to ease certain burdens of case management for the Court and the estates and their creditors, the Debtors intend to file an Application requesting emergency relief related to the following motions, which are critical to ensuring smooth operational transition of the Debtors' business upon commencement of the Chapter 11 Cases. Accordingly, the Debtors intend to ask for immediate relief with respect to the following First Day Motions and will present them at the hearing thereon (the "<u>First Day Hearing</u>").

### i.    *Cash Collateral Motion*

93.    In November of 2015, both Hospitals executed a First Amended and Restated Seller Note payable to Rural Hospital Acquisition, LLC ( "RH Acquisition") in the amount of $5,928,028.05 (Stroud) and $8,097,684.06 (Anadarko). In conjunction with the First Amended

21

and Restated Seller Notes, both Stroud Hospital and Anadarko Hospital entered into Security Agreements with RH Acquisition, wherein the Hospitals granted RH Acquisition blanket liens (the "Liens") on all or substantially all of the Hospitals assets, including, but not limited to, all accounts of the Debtors and any and all rights of the Debtor to the payment of money or other forms of consideration of any kind. As such, all or substantially all of the Hospitals cash-on-hand constitutes the cash collateral of RH Acquisition (the "Cash Collateral").

94.     In its Emergency Cash Collateral Motion the Hospitals seek authority to use RH Acquisition's Cash Collateral on a limited basis— through its Emergency Cash Collateral Motion, the Hospitals seek this Court's authorization to utilize the Cash Collateral to pay any third-party utility and/or vendor claims in an amount not to exceed $289,000 per claim, per Hospital, and to pay any other operating expense as agreed upon with Secured Party.

95.     The Hospitals must obtain the ability to use Cash Collateral in order to continue operating their business, including to pay utilities, third-party vendors, and fund payroll—all with the aim of ensuring continued operations of the Hospitals. Without access to Cash Collateral at this critical point in their cases, the Hospitals will be unable to continue to service its patients — a failure that would prove detrimental to the Hospitals' estates, creditors, patients, and other stakeholders.

96.     To the extent this results in a diminution of value of Secured Party's Liens, the Hospitals propose that Secured Party be allowed adequate protection through the form of an superpriority administrative claim. The claim shall be subject to a carve-out for sum of all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a),

22

97.    Upon filing, the Hospitals should regain access it its books and records, and it is the Hospitals intent to work diligently with its financial advisors and its management company (an affiliate of RH Acquisition) on preparing detailed cash collateral budget. Thus, through its Emergency Cash Collateral Motion, the Hospitals also seek a further Interim Hearing the week of November 2nd.

98.    Approval of the Hospitals' use of Secured Party's Cash Collateral during the course of these Chapter 11 Cases is essential. Use of Cash Collateral will provide the Hospitals with the necessary liquidity to (i) fund the Hospitals' operating capital for a short period of time while allowing the Hospitals to obtain all necessary financial information from its management company (an affiliate of the Secured Party); (ii) provide the Hospitals with the time needed to negotiate consensual use of Cash Collateral, (iii) allow the Debtors to continue to operate as Critical Access Hospitals, serving the health needs of the residents of Lincoln, Creek, and Caddo counties, and (iv) ultimately implement and consummate a plan for the reorganization of the Hospitals' estates.

ii.    *Cash Management Motion.*

99.    By the Cash Management Motion, the Debtors move the Court for the entry of an order authorizing them to continue to use their cash management system, including the continued use of their existing lockbox accounts at Valliance Bank.

100.    The Hospitals main source of income is payments from Medicare, Medicaid, Veteran Affairs ("VA"), and private health insurance companies.

101.    Each Hospital has established a separate lockbox account at Valliance Bank ("Valliance") to receive electronic fund transfers ("EFT") and checks from third parties such as private health insurance, Medicare, Medicaid and VA.

55067478;7

102.    The lockbox accounts are swept at midnight on every banking day into each of the Debtor's respective operating accounts.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 25th day of October 2020, at _SANTA ANA_____, California.

Charles M. Eldridge

55067478;7