# EXHIBIT 4

## IN THE DISTRICT COURT OF LINCOLN COUNTY
## STATE OF OKLAHOMA

RURAL HOSPITAL ACQUISITION, LLC, and )
FIRST PHYSICIANS REALTY GROUP, LLC, )
                                     )
                  Plaintiffs, )
                                      )
v.                                         )     Case No. C J - 20 - 0003 1
                                      )
RHA STROUD, INC., and RHA ANADARKO, INC.; )
                                      )
                Defendants, )
                                      )

FILED

FEB 2 4 2020

CINDY KIRBY, COURT CLERK
LINCOLN COUNTY, OKLAHOMA

## FIRST PHYSICIANS REALTY GROUP'S EMERGENCY APPLICATION FOR
## APPOINTMENT OF RECEIVER, WITH BRIEF IN SUPPORT

Plaintiff, First Physicians Realty Group, LLC ("FP Realty"), hereby moves that this Court

appoint a receiver prior to February 28, 2020, for the real properties described in the Brief below,

for the reasons more fully set forth therein.

## BRIEF IN SUPPORT

## FACTUAL BACKGROUND

***The Lease Agreement***

1.      Plaintiff FP Realty is the owner of two hospitals, one located in Stroud, Oklahoma

and the other in Anadarko, Oklahoma. On April 1, 2011, Plaintiff FP Realty entered into an

Amended and Restated Lease with both RHA Anadarko, LLC, which was converted to Defendant

RHA Anadarko, Inc., and RHA Stroud, LLC, which was converted to Defendant RHA Stroud,

Inc., for a term of 20 years (the "Lease"). A true and correct copy of the Lease is attached hereto

as Exhibit A and its terms are incorporated herein by reference.

2.      Property covered by the Lease is to be used by Defendants as inpatient and

outpatient hospital facilities for the operations of a licensed hospital and related healthcare

practices, and any other uses allowed by the local zoning laws. Defendants are currently operating critical access hospitals on the leased premises.

3.      Defendant RHA Stroud, Inc. doing business as Stroud Regional Medical Center ("Stroud Hospital"), is the occupant and tenant of the real property described in the Lease that is located in Lincoln County, Oklahoma.

4.      Defendant RHA Anadarko, Inc., doing business as The Physicians Hospital in Anadarko ("Anadarko Hospital", and collectively with Stroud Hospital, "the Hospitals"), is the occupant and tenant of the real property described in the Lease that is located in Caddo County, Oklahoma.

### Defaults Under the Lease Agreement

5.      Under the terms of the Lease, Defendants are required to make monthly rent payments.

6.      The required rent payments under the Lease are due on or before the first day of each calendar month.

7.      Defendants RHA Anadarko, Inc. and RHA Stroud, Inc. have been notified of their default and have failed to pay rent as required under the terms of the Lease.

8.      As a result, Defendants are in default under Section 19.1.1 of the Lease.

9.      As such, FP Realty has the right to "pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Demised Premises is located." Exhibit A, the Lease, Section 19.2.3. In addition to the amounts due and owing under the Lease, Defendants have significant debt that they have defaulted on to Plaintiff, Rural Hospital Acquisition, LLC ("RH Acquisition").

10.     Rather than pay the rent due under the Lease or the debts due to RH Acquisition, in late 2018, without any explanation Defendants each began paying their parent company One Cura $100,000.00 per month per hospital from each of the hospitals' funds for purported management services.  Defendants had each been previously paying One Cura only $12,500 per month for its services – as One Cura only had (and on information and belief continues to have) one full time employee and occasionally a part-time clerk and contracts out the operations of the hospital to a separate management company, which manages the hospitals, employs and pays the employees, and pays the expenses relating to the operations of the Hospitals.  More recently, One Cura has agreed to be paid $62,500 per month per hospital.

11.     Around the same time, One Cura began incurring large attorney fees from its New York City law firm in amounts as high as $269,000.00 per month.  One Cura required Defendants' hospitals to pay them.  An example of such a legal bill from the NYC law firm for May 2018 is attached as Exhibit B.

12.     The total monthly charges from One Cura in recent months for these payments and attorney fees, which One Cura has identified as appropriate for inclusion on the Hospitals' cost reports but has otherwise refused to explain, have been as high as $468,000.00 per month.

13.     As with many other rural hospitals, both the Stroud Hospital and the Anadarko Hospital serve a significant number of patients who rely on Medicare and Medicaid.  As of 2019, Medicare patients made up the majority of patients at both Stroud Hospital and Anadarko Hospital.  In order to be eligible for payment for their treatment of patients who rely on Medicare, each hospital must be certified by Medicare and be issued a critical access license.

14.     The continued operation of the Stroud Hospital and Anadarko Hospital (collectively, the "Hospitals") depends on their ability to continue to provide services to this

3

population and on their timely receipt of payments from the Centers for Medicare & Medicaid Services ("CMS"). If the Hospitals do not timely receive CMS payments, they will not be able to maintain operations, in part because they will no longer have access to funds necessary for their management company, First Physicians Business Solutions, LLC, which has over 300 employees who manage the hospital operations and provide patient care on a day-to-day basis.

15.    In order to receive these CMS payments and maintain their critical access licenses, Defendants, as owners of the Hospitals, must timely submit annual Cost Reports to CMS. The Cost Report contains provider information such as facility characteristics, utilization data, cost and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data.

16.    The Oklahoma Health Care Authority [OHCA] has promulgated regulations that, among other things, govern the creation and submission of Medicare cost reports. See, Okla. Admin. Code 317:1-1-1 et seq. The following regulations demonstrate that Defendants, as the Owners of the Hospitals, have the responsibility to sign and submit the Cost Reports:

> "'Medicare Cost Report' means the Hospital Cost Report, Form CMS-2552-96 or subsequent versions." Okla. Admin. Code 317:30-5-58(b)(6). "The report referenced in paragraph (b)(6) [i.e., the cost report] *must be signed by the preparer and by the Owner, authorized Corporate Officer or Administrator of the facility for verification and attestation that the reports were compiled in accordance with this section.*" *Id.* 317:30-5-58(e)(1).

17.    The Cost Reports for 2019 are currently due on February 28, 2020. If the Hospitals fail to file on that date, they will compromise all Medicare payments made to date for this fiscal year, as well as their hospital licenses and critical access designations, which would require the Hospitals to be closed as critical access hospitals.

18.    For the past seven years, the Cost Reports have been prepared by Certified Public Accountants for the Hospitals and timely filed and signed by Charles Eldridge, on behalf of the Hospitals.

19.    On information and belief, Defendants do not intend to submit the Cost Reports for the Hospitals that are due on February 28, 2020.  Defendants were provided with the data required for the Cost Report (the same data provided for the last seven years) over three weeks ago, but to date have not agreed to sign and file the Cost Reports.  Historically, Defendants have signed and submitted the Cost Reports within 2-3 days.

20.    In order to preserve the Hospitals and keep them in operation, a receiver should be appointed who is authorized to sign the Cost Reports on or before February 28, 2020 on behalf of the Hospitals in order to preserve the critical access license and access to the funds necessary to continue to operate the hospitals.

21.    The Hospitals' failure timely to submit the Cost Reports will therefore also destroy the value of the property for Plaintiff FP Realty Group.

## ARGUMENT AND AUTHORITIES

The purpose of the appointment of a receiver is "to place the property in the custody of the court, that it may be subjected to the court's final order with respect to the rights of the parties thereto."  *Exchange Trust Co. v Oklahoma State Bank of Ada,* 1927 OK 182, ¶ 53, 259 P. 589. The decision whether to appoint a receiver is within the sound discretion of the trial court.  *Stovall v. Edwards,* 1944 OK 335, 151 P.2d 385; *see also Oklahoma Co. v. O'Neil,* 1968 OK 63, ¶ 42, 440 P.2d 978; *D.W.L., Inc. v Goodner-Van Engineering Co.,* 1962 OK 121, ¶ 21, 373 P.2d 38.  In this instance, the Court should exercise its discretion to appoint a receiver in order to preserve the two hospitals at issue, their operations, and the funds to pay the debts owed to Plaintiffs.

Under Title 12 O.S. § 1551(1), a receiver may be appointed in an action where "a creditor [seeks] to subject any property or fund to his claim ... [or] any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured." Applying this statute, the Oklahoma Court of Appeals upheld the granting of a receivership at the request of a landlord where there was a lease default, stating:

> This Court concludes that the statutes as a whole recognize a state district court's power and authority to appoint a receiver at the behest of an interested party—in this case, a landlord—when the property at issue is a nursing home and the property lessor has defaulted on its lease, thereby endangering the continued residential status and stability of the property's residents.

*H.A. Sand Springs, LLC v. Lakeside Care Ctr., LLC*, 2012 OK CIV APP 21, ¶ 22, 273 P.3d 73, 77.

Here, Defendants have endangered their ability to continue to function as critical access hospitals by failing to pay their rent and their other debts, which in turn endangers the communities where those hospitals operate. In addition to being in default on the Lease, Defendants are in default to another creditor on various note payments as outlined in the Petition. Defendants are millions of dollars in debt and arrears and seemingly lack an ability to repay the amounts owed – even though they take money off the top to pay themselves and their attorneys. Defendants are also in debt to the management company of the Hospitals. In short, Defendants are insolvent, which likewise renders appointment of a receiver necessary pursuant to 12 O.S. § 1551(5).

Further, Defendants' anticipated operational failures have put their ability to collect CMS payments at risk. These payments are the primary funding Defendants receive and are necessary for the survival of the Hospitals. Because these critical CMS funds are at risk, FP Realty, as landlord under the Lease, is entitled to a receiver. Failure of either of the critical access hospitals

being operated by Defendants would result in the loss of medical care for the current patients and local residents that depend on the Hospitals.

More particularly, under the authority of this Court pursuant to 12 O.S. § 1551, the Receiver should be qualified, ordered, authorized and directed to immediately take RHA Stroud, Inc. and RHA Anadarko, Inc., including the Hospitals, into its possession and control. Defendants and all persons claiming under them should be ordered and directed to immediately deliver to the Receiver all of the following in their possession: (1) possession and control of the Hospitals and Hospital premises; (2) any leases, contracts, agreements (including CMS Medicare Provider Agreement), books and records with respect to the operations and business of the Hospitals; (3) all deposit accounts and other accounts in the names of Defendants relating to the Hospitals; and (4) all licenses (including the hospital licenses), CMS provider numbers, registrations, certifications, books, records and documents related to the Hospital.

Further, immediately upon entry of an Order, said Receiver should be ordered and authorized to operate and manage the Hospitals, including without limitation under the current license and Medicare and Medicaid certifications issued to and in the name of the Defendants, to the best advantage and to apply for (including by signing required CMS Cost Reports) and receive all accrued or accruing revenues, collections, accounts, income, profits, rents and proceeds therefrom, including without limitation payments from the Medicare and Medicaid programs. Out of all remaining revenues, collections, accounts, income, profits, rents and proceeds coming into its hands pursuant to the terms of the Order, said Receiver should be authorized to pay the reasonable and necessary expenses required to carry on the business of running, operating and managing the Hospitals, including lease payments and obligations, all accumulated taxes on any property, insurance premiums, expenses for the operations and management of the Hospitals,

expenses of any repairs necessary to preserve said Hospitals and Hospital premises in good condition, and to maintain all required licenses and permits for the operation and management of the Hospital.

Any revenues obtained by the Receiver in excess of the approved expenses authorized above should be held by the Receiver to await the further order of the Court. Unless a loss is compensable by the Receiver's Bond or pertinent insurance, the Receiver should not be personally responsible for financial losses of the Hospitals. The Receiver further should have the right to contact and request the cooperation and assistance of the parties, and all other persons or entities served with a copy of the Order Appointing Receiver, should be required to cooperate fully with and assist the Receiver in the performance of its duties.

This cooperation and assistance should include, but not be limited to, providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under the Order appointing it; providing any password required to access any computer or electronic files in any medium; turning over any assets (cash or other tangible assets), and advising all persons who owe money to the Hospitals or any other entity to or for the Hospitals, that all debts should be paid directly to the Receiver.

In summary, Defendants RHA Anadarko and RHA Stroud have defaulted on the Lease, created insurmountable debt, and are placing the operations of the only assets they have at risk by indicating that the Cost Reports will not be timely filed. Protections must be put in place to protect FP Realty, as landlord; RH Acquisition, as creditor; and the patients and public who rely on the critical access hospital services.

## CONCLUSION

Under Oklahoma law, FP Realty is entitled to the appointment of a receiver for the property and funds at issue, pursuant to the instruments at issue and in order to preserve the property and operations of the hospitals.

WHEREFORE, Plaintiff, First Physicians Realty Group, LLC prays that this Court appoint a Receiver for the properties under the Lease, and that said Receiver be specifically ordered and instructed to take immediate possession of the properties and control of the hospital operations; sign and timely file the Cost Reports; and generally, do such actions outlined above and otherwise respecting the properties and hospital operations as may be reasonably necessary or this Court may authorize, until other order of this Court.

Respectfully submitted,

J. Clay Christensen (OBA #11789)
T. P. Howell (OBA #10347)
Lisa M. Molsbee (OBA #19530)
Jonathan M. Miles (OBA #31152)
CHRISTENSEN LAW GROUP, P.L.L.C.
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Telephone: (405) 232-2020
Facsimile: (405) 228-1113
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
lisa@christensenlawgroup.com
jon@christensenlawgroup.com

-and-

Christopher Tayback (California Bar No. 145532)
Kristen Bird (California Bar No. 192863)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
christayback@quinnemanuel.com
kristenbird@quinnemanuel.com
*To Request Pro Hac Vice Admission*

-and-

Kyle Batter (California Bar. No. 301803)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100
kylebatter@quinnemanuel.com
*To Request Pro Hac Vice Admission*

ATTORNEYS FOR PLAINTIFFS

# AMENDED AND RESTATED LEASE

### BY AND BETWEEN

### First Physicians Realty Group, LLC, a Nevada limited liability company

### ("Landlord")

### and

### RHA Anadarko, LLC, an Oklahoma Limited Liability Company
### RHA Stroud, LLC, an Oklahoma Limited Liability Company

### (Jointly referred to herein as "Tenant")



**EXHIBIT**

tabbies®

A

## LEASE

This Lease ("Lease") is made and entered into this 1st day of April, 2011, between **First Physicians Realty Group, LLC**, a Delaware limited liability company (hereafter called "Landlord") and **RHA Anadarko, LLC**, and **RHA Stroud, LLC**, all Oklahoma limited liability companies (hereafter jointly referred to as "Tenant"). This Lease will be executed simultaneously with the *Stock Purchase Agreement* between the parties.

### WITNESSETH:

1. Demise, Exhibits and Construction of Tenant Improvements.
   1.1 Landlord does hereby demise and lease to Tenant the land legally described and depicted on Exhibit A attached hereto and made a part hereof (the "Land") and the buildings (the "Buildings"). The Land and the Buildings are collectively herein referred to as the "Demised Premises". Landlord hereby leases the Demised Premises to Tenant, and hereby grants to Tenant its guests, invitees and licensees all Landlord's easements, rights and privileges appurtenant thereto, including the right to use all of the parking areas, driveways, roads, alleys, means of ingress and egress and other portions of the Demised Premises, all in accordance with the terms, conditions and covenants contained in this Lease.

   1.2 Exhibits. The exhibits listed below and attached to this Lease are incorporated herein by reference:

   | | |
   |---|---|
   | EXHIBIT "A" | Legal Description of the Land |
   | EXHIBIT "B" | Base Rent |
   | EXHIBIT "C" | Subordination, Non-Disturbance and Attornment Agreement |
   | EXHIBIT "D" | Commencement Agreement |
   | EXHIBIT "E" | ACH Agreement |

2 Term and Use.
   2.1 Term Commencement Date. The Primary Term of this Lease shall begin on the 1st day of April, 2011 (the "Commencement Date") and shall end at midnight on the last day of the twentieth (20th) Lease Year following the Commencement Date (the "Primary Term"). For purposes of this Lease, a "Lease Year" shall be defined as that twelve (12) month period during the Primary Term, or any Renewal Term, commencing on the Commencement Date or the annual anniversary thereof, as may be applicable; provided, however, that if the Commencement Date is a day other than the first day of a calendar month, then the first Lease Year shall include that period of time from the Commencement Date up to the first day of the next calendar month, and any subsequent Lease Year shall be the twelve (12) month period beginning on the annual anniversary thereof. For purposes of this Lease, a "Lease Month" shall be defined as those successive calendar month periods beginning with the Commencement Date and continuing through the Primary Term or any Renewal Term of this Lease; provided, however, if the Commencement Date is a day other than the first day of a calendar month, then the first Lease Month shall include that period of time from the Commencement Date up to the

first day of the next calendar month, and each subsequent Lease Month shall be a calendar month period beginning on the first day of such month.

2.2 <u>Renewal Term</u>. Unless Tenant gives Landlord notice that it does not elect to extend the term of this Lease not later than one hundred eighty (180) days prior to expiration of the Primary Term or the then-current Renewal Term, as applicable, this Lease shall automatically extend for an additional term of ten (10) years on the same terms and conditions as provided herein except that the Base Rent (as hereinafter defined) for any such Renewal Term shall be as shown on Exhibit B hereto. Any reference in this Lease to "Term" shall refer to the Primary Term and any such Renewal Term.

2.3 <u>Commencement Agreement</u>. Within ten (10) days of the Commencement Date, Landlord and Tenant shall enter into a supplemental agreement specifying the actual date for the expiration of the Primary Term in accordance with the form attached hereto as Exhibit D.

2.4 <u>Use</u>. The Demised Premises may be used and occupied by Tenant for the following purposes: inpatient and outpatient hospital facilities for the operations of a licensed hospital and related healthcare practices, and any other use allowed by the zoning on said Land. Tenant agrees not to permit any illegal practice to be carried on or committed on the Demised Premises. Notwithstanding, the parties acknowledge that Tenant may attempt obtain federally qualified health center status for the facilities to be operated at the Demised Premises. The Tenant must obtain the prior written consent of the Landlord to any such change of status. If the Landlord consents to such change in status, the parties agree to negotiate in good faith any necessary modifications or amendments to any provisions of this Lease that may be affected by such conversion.

3   Rent.

3.1 <u>Base Rent</u>. Commencing on the Commencement Date (the "Rent Commencement Date"), Tenant shall pay to Landlord for the use and occupancy of the Demised Premises, minimum monthly base rent in the amounts specified on Exhibit B hereto "Base Rent". The Monthly Base Rent shall be paid in advance and shall be due on or before the first day of each calendar month during the Term. In the event the Commencement Date falls on a date other than the first day of a month then the Monthly Base Rent for such first month shall be prorated accordingly. Base Rent is herein collectively referred to as "Rent".

3.2 <u>Payment of Rent</u>. Upon execution of this Lease Tenant shall execute an automatic wire transfer agreement, in the form attached as Exhibit E, authorizing Landlord to withdraw funds for the payment of the Rent.

4   Taxes. In addition to the Rent provided for herein, Tenant agrees to reimburse Landlord as follows:

4.1 <u>Liability For Taxes</u>. Tenant shall be responsible for all real and personal property taxes, general assessments, special assessments, license fees, and any other public charges (hereinafter "Real Estate Taxes"), subject to any exemptions that may apply based upon the status of the facilities operated by Tenant at the Demised Premises, which may be levied, imposed, or assessed upon or against the Demised Premises by any lawful authority for each calendar year or portion thereof, during the Primary Term or any Renewal Term, commencing on the Commencement Date. The term "Real Estate Taxes" and "Personal Property Taxes" as used herein shall mean only those installments of Real

Estate Taxes which are assessed for a period during the Term of this Lease. Said Real Estate Taxes and Personal Property Taxes are to be prorated for any partial Lease Year occurring during the period in which the public authority assesses Real Estate Taxes.

4.2 Payment of Taxes. Upon receipt by Landlord of any bill for such Real Estate Taxes and or Personal Property Taxes attributed to any calendar year during the Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of such Real Estate Taxes or Personal Property Taxes together with a copy of such bills, and Tenant shall pay such amount due and provide Landlord with written evidence of such payment within thirty (30) days of such statement, but in no event later than the date said Real Estate Taxes and or Personal Property Taxes are due the taxing authority. Landlord's and Tenant's obligations under this Section shall survive the expiration of the Term of this Lease.

4.3 Contest Of Tax Valuation. Landlord shall promptly send to Tenant copies of all assessment valuations and revaluations received from the taxing authority. Tenant may, upon the receipt of prior written approval of Landlord, such approval not to be unreasonably withheld, contest any Real Estate Taxes or Personal Property Taxes against the Demised Premises and attempt to obtain a reduction in the assessed valuation of the Demised Premises for the purpose of reducing any such tax assessment. In the event Landlord approves and upon the request of Tenant, but without expense or liability to Landlord, Landlord shall cooperate with Tenant and execute any document which may be reasonably necessary and proper for any proceeding related to obtaining such a reduction. In the event Landlord desires to contest any Real Estate Taxes or Personal Property Taxes, Tenant agrees to cooperate with Landlord and execute any document which may be reasonably necessary and proper for any such proceeding at no cost to Tenant.

4.4 Liens For Taxes. Tenant shall take all reasonable actions necessary to ensure that a lien does not attach to the Demised Premises for any Real Estate Taxes or Personal Property Taxes, or if one does attach by operation of law, that such lien shall be promptly extinguished before such time as the taxing authority benefiting by such lien may enforce it against the Demised Premises. Tenant shall indemnify and hold harmless Landlord, its successors and assigns from any and all claims, damages, fines, judgments, penalties, costs, liabilities or losses (including attorney's fees) arising from or resulting from the attachment of any such lien against the Demised Premises.

5 Landlord Warranties and Covenants. In addition to the other warranties, representations and covenants of Landlord in this Lease, Landlord warrants, represents and covenants to Tenant as follows:

5.1 That the Building and all of the Permitted Uses are and as of the Commencement Date shall be in compliance with all applicable zoning and land use laws.

5.2 That as of the Commencement Date, or earlier, Landlord shall be the fee simple owner and record title holder of the surface of the Demised Premises.

5.3 That Landlord has not received any notice and does not have any knowledge of any eminent domain or similar proceeding, which would affect all or any portion of the Land or the Demised Premises.

5.4 That Landlord has the full right, power and authority to make this Lease.

5.5 That Tenant, or any permitted assignee or sublessee of Tenant, upon the payment of the Rent and other required payments under this Lease and performance of the covenants

Case: 20-13482    Doc: 60-4    Filed: 11/05/20    Page: 16 of 34

hereunder, shall and may peaceably and quietly have, hold and enjoy the Demised Premises and improvements thereon during the Term or any renewal or extension thereof, pursuant to the provisions hereof.

6   Landlord's Repairs and Maintenance.  Except as otherwise set forth in this Lease, Landlord and Tenant agree that Landlord shall have no obligations with respect to repairs and maintenance of the Demised Premises whatsoever.

7   Environmental Matters.
   7.1 Landlord represents and warrants that there are no hazardous or toxic substances (as defined by any applicable government authority and hereafter being referred to as "Hazardous Materials") located on or within the Land and there shall be none as of Commencement Date on or within the Land, the Building and the Demised Premises.
   7.2 Landlord represents and warrants that while the Demised Premises have been owned or under Landlord's custody and control, and that any handling, transportation, storage, treatment or usage of Hazardous Materials that has occurred on the Demised Premises was in compliance with all applicable federal, state and local laws, regulations and ordinances.  Landlord further represents and warrants that during such period no leak, spill, discharge, emission or disposal of Hazardous Materials has occurred on the Demised Premises.
   7.3 Landlord shall deliver to Tenant on or before the Commencement Date a current Phase I Report satisfactory to Tenant showing that the Land, the Building and Demised Premises are in full compliance with the warranties set forth in this Section.

8   Alterations.  Except as expressly provided in this Lease or any Exhibits hereto, Tenant shall not make any exterior or structural alterations to or additions in any portion of the Demised Premises, nor any alterations to the storefront or the exterior of the Demised Premises without, in each instance, first obtaining the written consent of Landlord, which shall not be unreasonably withheld, delayed or conditioned.  All such alterations to or additions in any portion of the Demised Premises permitted by Landlord under this Section shall remain upon and be surrendered with the Demised Premises and become the property of Landlord at the expiration or earlier termination of this Lease, unless Landlord requests their removal, in which event Tenant shall, at Tenant's expense, remove the same and restore the Demised Premises to their original condition existing prior to such alterations or additions.

9   Fixtures And Personal Property.

   9.1 Landlord's Property.  At the Commencement Date, any trade fixtures, signs, counters, shelving, and any other and all other personal property installed appurtenant to or in, or on the Demised Premises, are and at all times shall remain the property of the Landlord ("Landlord's Property"), with the exception of the furniture, medical equipment, business equipment, clinical equipment, and other personal property and equipment that belongs to the Tenant, and Tenant shall not have or at any time claim any right, title, lien, security interest or other interest of any kind or nature therein.  Landlord agrees that Tenant shall have the right, at any time or from time to time prior to the expiration or earlier termination of this Lease, to replace any and all of Landlord's Property with prior written

Lease Agreement                                          5

notice and written approval of Landlord. Tenant at its expense shall immediately repair any damage occasioned by the replacement or removal of Landlord's Property, and upon expiration or earlier termination of this Lease, shall leave the Demised Premises in a neat and clean condition, free of debris, normal wear and tear, casualty loss for which there is insurance reimbursement payable, repairs for which Landlord is responsible hereunder and any loss due to condemnation excepted.

9.2 Tenant's Property. Any medical equipment, furniture, clinical equipment, business equipment, and other personal property in the Demised premises, or installed after the Commencement Date, are and at all times shall remain the property of the Tenant; and Landlord shall not have or at any time claim any right, title, lien, security interest or other interest of any kind or nature therein. Tenant at its expense shall immediately repair any damage occasioned by the removal of Tenant's Property, and upon expiration or earlier termination of this Lease, shall leave the Demised Premises in a neat and clean condition, free of debris, normal wear and tear, casualty loss for which there is insurance reimbursement payable, repairs for which Landlord is responsible hereunder and any loss due to condemnation excepted.

9.3 Personal Property Taxes. Subject to any exemptions that may apply based upon the status of the facilities operated by Tenant at the Demised Premises, Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation in the Demised Premises, to include Personal Property Taxes assessed on Landlord's Property, as well as upon Tenant's Property.

10 Liens. Neither Landlord nor Tenant shall permit to be created nor to remain undischarged any lien or encumbrance against the Demised Premises arising out of the work of any contractor, mechanic, laborer or materialman contracted for by Tenant or Landlord. If any lien or notice of lien on account of an alleged debt of Tenant or Landlord or any notice of contract by a party engaged by Landlord or Tenant or Landlord's or Tenant's contractor to work in the Demised Premises shall be filed against the Demised Premises, Landlord or Tenant shall, within sixty (60) days after notice of the filing thereof, cause the same to be discharged of record by payment, deposit or bond.

11 Laws And Ordinances. Except as otherwise set forth in this Lease, Tenant agrees, at its sole cost and expense, to comply with all laws, ordinances, orders and regulations regarding Tenant's operation of the Demised Premises and its business therein.

12 Utility Services.

  12.1    Utility Facilities. Landlord warrants that as of the Commencement Date, water, sewer, gas, electricity and telephone and Internet facilities shall be available at and to the Demised Premises.

  12.2    Payment For Utility. Tenant shall be solely responsible to arrange for and shall promptly pay all charges for the use and consumption of sewer, gas, electricity, water,

telephone and all other utility services used within the Demised Premises during the Term of this Lease.

13  Tenant Repairs And Maintenance.  Except as otherwise set forth in this Lease, Tenant shall have the obligation, to perform or cause to be performed all maintenance, repair and replacements necessary to keep or put all of the Demised Premises in good condition and repair, reasonable wear and tear excepted.  Tenant shall, at all times during the Term of this Lease and at surrender of the Demised Premises, keep or put the Demised Premises in a clean, tenantable condition, reasonable wear and tear excepted.  Within thirty (30) days after Tenant has received written notice from Landlord specifying the nature of any maintenance, repairs or replacements necessary, Tenant, to the extent required by this Lease, shall complete such repairs or maintenance or diligently and continuously work towards completion thereof.

14  Damage To Demised Premises.
   14.1      Repair.  In the event the Building or the Demised Premises or any portion thereof is damaged or destroyed or rendered partially untenantable for their intended use by fire or other casualty insured under the coverage which Tenant is obligated to carry pursuant to Section 16, such insurance proceeds for the Demised Premises, not including proceeds for Tenant's Property, shall be immediately assigned to Landlord and Landlord shall, within forty five (45) days after such casualty, commence and diligently proceed to repair said Building and restore the Demised Premises to substantially the same condition in which it was immediately prior to the occurrence of the casualty and any alterations, additions and Tenant's Property installed by Tenant after the Commencement Date of this Lease.  From the date of such casualty until Landlord's repairs are substantially complete, Rent and all other charges and items payable hereunder shall abate in such proportion as the part of the Demised Premises thus destroyed or rendered untenantable bears to the total Demised Premises.  From the date of such casualty until Landlord's repairs are substantially complete, Rent and all other charges and items payable hereunder shall fully abate if Tenant is unable to reasonably operate the Demised Premises for the purposes permitted by this Lease.
   14.2      Repairs During Last Year.  In the event that fifty percent (50%) or more of the Building is destroyed or rendered untenantable by fire or other casualty during the last year of the Primary Term or the last year of any Renewal Term of this Lease, then Landlord or Tenant shall have right to terminate this Lease, effective as of the date of the casualty, by giving one to the other, within thirty (30) days of such casualty, written notice of termination.

15  Insurance.
   15.1      Landlord's Property Insurance.  During the Term of this Lease, Tenant shall carry and maintain in full force a policy or policies of standard form all risk property insurance (hereafter, "Landlord's Property Insurance") covering fire and extended coverage, vandalism and malicious mischief, sprinkler leakage and other similar perils of direct physical loss or damage, issued by one or more insurance carriers licensed to do business in the state in which the Demised Premises are located insuring the Building, and Landlord's Property, and all appurtenances thereto (excluding Tenant's Property) for the

full replacement value thereof as of the date of loss or damage, having a aggregate limit of not less than (a) $10.324 million during the first year of the Lease Term, and specifically:

> RHA Anadarko replacement value of $5.704 million
> RHA Stroud replacement value of $4.62 million

and thereafter, (b) an amount as may be, from time to time, reasonably agreed to between Landlord and Tenant during the remainder of the Lease Term. Tenant shall arrange to have Landlord named as the Loss Payee on the Landlord's Property Insurance.

15.2    Liability Insurance. Tenant agrees to carry general liability insurance on the Demised Premises during the Term hereof naming Landlord as an additional insured, with companies reasonably satisfactory to Landlord and giving Landlord and Tenant a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in coverage in such insurance. Such insurance shall have a coverage of not less than One Million Dollars ($1,000,000.00) combined Bodily Injury and Property Damage Liability including General Aggregate, Products- Completed Operations Aggregate, Each Occurrence, Personal & Advertising Injury, and Fire Damage.

15.3    Tenant's Property Insurance. Tenant agrees to carry all risk property insurance covering, fire and extended coverage, vandalism and malicious mischief, sprinkler leakage and all other perils of direct physical loss or damage, including glass breakage, for at least eighty percent (80%) of the replacement value, and covering all of Tenant's Property located on or within the Demised Premises. Landlord agrees that it shall not have any right, title or interest in and to Tenant's property insurance, or any proceeds therefrom.

15.4    Insurance Certificates. Each insurance policy obtained by Tenant pursuant to this Section 16 shall name Landlord as an additional insured and provide that at least thirty (30) days prior written notice of policy cancellation, termination or change in coverage shall be given by the insurance carrier to Landlord prior to any cancellation, termination or change in coverage. Landlord and Tenant and all parties claiming under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard, covered or required to be covered in whole or in part by insurance on the Demised Premises or in connection with property on or activities conducted on the Demised Premises, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof; provided however, that such release, discharge or waiver shall be effective only if such release, discharge or waiver does not violate the terms of any insurance policies covering the Demised Premises or adversely affect Landlord's or Tenant's rights to collect thereunder. Tenant shall provide Landlord certificate(s) of insurance from the insurance carrier(s) for each policy or policies of insurance required of Tenant pursuant to this Section 16.

16 Indemnification.

16.1    Tenant Indemnification. Subject to Section 17.2, in addition to all other indemnities provided in this Lease, Tenant hereby indemnifies and holds Landlord its successors, assigns, members, managers, officers and employees harmless from and

against any and all claims, demands, liabilities, damages and expenses, including without limitation attorneys' fees, arising from Tenant's use of the Demised Premises or from any negligent or willful act or omission in or about the Demised Premises by Tenant or its agents, employees, or contractors, or from any breach or default by Tenant of this Lease, except to the extent caused by the breach of this Lease by Landlord, or by the negligence or willful misconduct of Landlord, its agents, employees or contractors. In the event any action or proceeding shall be brought against Landlord its successors, assigns, members, managers, officers and employees by reason of any such indemnified claim, Tenant shall defend the same at Tenant's expense by counsel selected by Tenant and reasonably satisfactory to Landlord.

17  Assignment and Subletting.
   17.1     Authorized Assignments.   Tenant shall not, without Landlord's prior written approval, have the right to sublet, assign or otherwise transfer its interest in this Lease.

18  Access To Demised Premises.   Upon reasonable prior notice (except in the case of an emergency), Landlord may enter the Demised Premises during Tenant's business hours for purposes of inspection, to show the Demised Premises to prospective purchasers, future tenants and lenders or to perform any obligation imposed upon or to exercise any right granted to Landlord by this Lease.

19  Defaults By Tenant.
   19.1     Tenant Default.   The following events shall be deemed Events of Default by Tenant under this Lease:
       19.1.1 Any failure by Tenant to pay Rent or make any other payment required of Tenant by this Lease by the date due and such failure shall continue for a period of thirty (30) days after receipt by Tenant of written notice that the same is then due and owing.
       19.1.2 If Tenant shall fail to comply with any other term, provision or covenant of this Lease, other than the payment of Rent or other payments required hereunder, and shall not cure such failure within thirty (30) days after receipt of written notice thereof by Landlord, except that this thirty (30) day period shall be extended for a reasonable period of time if the alleged event of default is not reasonably capable of cure within said thirty (30) days and Tenant commences cure within such thirty (30) day period and thereafter diligently continues its efforts to cure such default.
       19.1.3 If Tenant shall file or have filed against it a petition to be adjudged a bankrupt or for reorganization under any applicable federal law relating to bankruptcy or reorganization; provided, however, that no default shall occur if such petition in bankruptcy is dismissed within sixty (60) days.

   19.2     Landlord's Remedies.   On the occurrence of any Event of Default of this Lease by Tenant, Landlord may, at any time prior to cure or waiver, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have:
       19.2.1 Terminate Tenant's right to possession of the Demised Premises and re-enter the Demised Premises by any lawful means, in which case this Lease shall terminate.

In such case Tenant shall immediately surrender possession of the Demised Premises to Landlord; or

19.2.2  Maintain Tenant's right to possession of the Demised Premises, in which case this Lease shall continue in effect whether or not Tenant has abandoned the Demised Premises. In such event, Landlord shall be entitled to enforce all Landlord's rights and remedies under this Lease, including the right to recover the Rent and other payments required to be made hereunder as they become due, and Landlord shall have the right, but not the obligation, to occupy or re-let the whole or any part of the Demised Premises for the account of Tenant in order to mitigate damages; or

19.2.3  Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the state in which the Demised Premises is located.

19.2.4  If Landlord re-enters the Demised Premises under the provisions of section 20.2.2 hereof, Landlord shall not be deemed to have terminated this Lease, or the liability of Tenant to pay any Rent or other charges that are due or thereafter accruing, or Tenant's liability for damages under any of the provisions hereof. In the event of any entry or taking possession of the Demised Premises as aforesaid, Landlord shall have in addition to its rights otherwise granted in this Section, shall have the right, but not the obligation, to remove from the Demised Premises any personal property located therein and to place it in storage at a public warehouse at the expense and risk of Tenant.

19.2.5  Landlord's exercise of any right or remedy shall not prevent it from exercising any other right or remedy.

20  Defaults By Landlord. If Landlord should be in default in the performance of any of its material obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default with particularity, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (and Landlord has not undertaken procedures to cure the default within such thirty (30) day period and diligently pursued such efforts toward completion), Tenant, in addition to any other remedy available at law or in equity at its option, may terminate this Lease.

21  Eminent Domain.

21.1     In the event that any portion of the Land or Building shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority to the extent that Tenant cannot conduct its business in the remaining portion of the Building in substantially the same manner as conducted prior to the taking, then at the election of Tenant, this Lease shall terminate and expire as of the date of such taking, and both Landlord and Tenant shall thereupon be released from any liability thereafter accruing hereunder.

21.2     Notice of any termination relating to such eminent domain proceeding must be made by Tenant within sixty (60) days after receipt of written notice of such taking, unless, with Landlord's prior written consent, Tenant elects to contest such taking in which case the aforestated notice period shall be extended until sixty (60) days from the final resolution of such contestment. In the event of such termination, both Landlord and Tenant shall thereupon be released from any liability thereafter accruing hereunder. If

this Lease is terminated as herein above provided, all items of Rent and other charges payable by Tenant hereunder for the last month of Tenant's occupancy shall be prorated, and Landlord agrees to refund to Tenant any Rent or other charges paid in advance. If Tenant does not elect to so terminate this Lease, Tenant shall remain in that portion of the Demised Premises which shall not have been appropriated or taken as herein provided, and Landlord agrees, at Landlord's cost and expense, to, as soon as reasonably possible, restore the remaining portion of the Demised Premises to a complete unit of like quality and character as existed prior to such appropriation or taking, and thereafter all Rent and other payment obligations of Tenant hereunder shall be adjusted on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining. For the purpose of this Section, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain. A separate award for damage to or for taking of respective interests of the Landlord and the Tenant may be made for each of them, and each of them shall be entitled to approve, receive and retain such awards as shall be made to it. The termination of this Lease shall not affect the rights of the Landlord and Tenant with respect to the separate awards under such eminent domain proceedings.

22 <u>Attorneys' Fees</u>. In the event either Landlord or Tenant shall institute any action or proceeding against the other relating to the interpretation or enforcement of the provisions of this Lease, or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expenses of attorneys' fees and paralegal fees and disbursements incurred therein by the successful party. Such reimbursement shall include all legal expenses incurred prior to trial, at trial and at all levels of appeal and post judgment proceedings including fees and costs incurred to collect any judgment or enforce any claim.

23 <u>Notices</u>. Notices and demands required, or permitted, to be sent to either party shall be sent by certified mail, return receipt requested, postage prepaid, by hand delivery, or by facsimile and shall be deemed to have been given upon the date the same is sent by certified mail, on the date of hand delivery, or on the date sent by facsimile, but shall not be deemed received until three (3) days following deposit in the United States Mail if sent by certified mail (so long as the return receipt shows delivery or attempted delivery within such time) to address shown below, on the date hand delivered, or on the date sent by facsimile with answer back, and addressed to:

**LANDLORD:**
Attn: First Physicians Realty Group, LLC

_____
WALTER HENSCHEN
MANAGING MEMBER

**TENANT:**
RHA Anadarko, LLC

_____
CHARLES ELDRIDGE
RHA Stroud, LLC

_____
CHARLES ELDRIDGE
Attn: _____

or at such other address requested in writing by either party upon thirty (30) days notice to the other party.

24 Remedies. Except as may otherwise be provided in this Lease, all rights and remedies of Landlord and Tenant are cumulative, and any one or more rights or remedies may be exercised and enforced concurrently or consecutively and whenever and as often as deemed desirable. The failure of either Landlord or Tenant to insist upon strict performance by the other of any of the provisions of this Lease shall not be deemed a waiver of any subsequent breach or default in any such provision. No surrender of the Demised Premises by Tenant shall be affected by Landlord's acceptance of Rent or by other means whatsoever unless the same is evidenced by Landlord's written acceptance of the surrender.

25 Successors And Assigns. All of the provisions of this Lease shall be binding upon, apply and inure to the parties hereto and their respective heirs, representatives, successors and permitted assigns.

26 Holding Over. If Tenant or any party claiming by, through or under Tenant remains in possession of the Demised Premises or any part thereof after any termination or expiration of this Lease, without Landlord's written consent, Landlord, in Landlord's sole discretion may treat such holdover as an automatic renewal of this Lease for a month to month tenancy subject to all the terms and conditions provided herein, except that the Base Rent shall be one hundred fifty percent (150%) of the Base Rent payable immediately prior to the expiration or termination of this Lease.

27 Interpretation. The parties hereto agree that it is their intention hereby to create only the relationship of Landlord and Tenant, and no provision hereof, or act of either party hereunder, shall ever be construed as creating the relationship of principal and agent, or a partnership, or a joint venture or enterprise between the parties hereto.

28 Tenant Representations. Tenant represents and warrants that (a) there is no action, suit, proceeding or investigation pending or threatened which, if adversely determined, would have a material adverse effect on Tenant or Tenant's business; (b) the making and performance of this Lease shall not violate any provision, or constitute a default, under any indenture, agreement or instrument to which Tenant is bound or affected; (c) Tenant is an Oklahoma limited liability company duly organized, validly existing and in good standing under the laws of such state, and is in good standing and validly authorized to do business in the state in which the Demised Premises are located; and (d) Tenant has all requisite power, authority and legal right to enter into and perform this Lease.

29 Estoppel. At any time and from time to time either party, upon request of the other party, shall execute, acknowledge and deliver an instrument, stating, if the same be true, that this Lease is a true and exact copy of the Lease between the parties hereto, that there are no amendments hereof (or, if not so, stating what amendments there may be), that the same is then in full force and effect and that, to the best of its knowledge, there are no offsets, defenses or counterclaims with respect to the payment of Rent reserved hereunder or in the performance of the other terms, covenants and conditions hereof on the part of Tenant or

Landlord, as the case may be, to be performed (or, if not so, setting forth those offsets, defenses or counterclaims existing), and that as of such date no default has been declared hereunder by either party, or if a default has been declared, such instrument shall specify same. Such instrument shall be executed by the other party and delivered to the requesting party within fifteen (15) days of receipt of the request therefor, or else the statements made in the proposed estoppel request shall be deemed to be correct.

30 <u>Force Majeure</u>. In the event that either party hereto shall be delayed or hindered in or prevented from the performance required hereunder other than the payment of a sum due pursuant hereto, by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war, acts of terrorism, acts of God, or other reason of like nature not the fault of the party delayed in performing work or doing acts (hereafter, "Permitted Delay" or "Permitted Delays"), such party shall be excused for the period of time equivalent to the delay caused by such Permitted Delay.

31 <u>Severability</u>. Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provisions hereof and such other provisions shall remain in full force and effect.

32 <u>Governing Law And Venue</u>. This Lease shall be governed by the laws of the state of Oklahoma.

33 <u>Brokers.</u> Landlord and Tenant represent and warrant one to the other that they have not had any dealings with any real estate brokers or agents in connection with the negotiation of this Lease. Landlord and Tenant agree to indemnify and hold each other harmless from and against any and all liability and cost which Landlord or Tenant, as applicable, may suffer in connection with any real estate broker claiming by, through, or under Landlord or Tenant, as applicable, seeking any commission, fee or payment in connection with this Lease.

34 <u>Time Of The Essence</u>. Time shall be of the essence in performance of this Lease.

35 <u>Entire Agreement</u>. This Lease contains all of the agreements of the parties hereto with respect to matters covered or mentioned in this Lease and no prior agreement, letters, representations, warranties, promises, or understandings pertaining to any such matters shall be effective for any such purpose. This Lease may be amended or added to only by an agreement in writing signed by the parties hereto or their respective successors in interest.

IN WITNESS WHEREOF, the parties hereto have executed this Lease on the day and year first mentioned, the corporate party or parties by its or their proper officers thereto duly authorized.

**TENANT:**

RHA Anadarko, LLC

By: CHARLES ELDRIDGE

Its:

RHA Stroud, LLC

By: CHARLES ELDRIDGE

Its:

**LANDLORD:**

First Physicians Realty Group, LLC

By:

Its: MANAGING MEMBER

STATE OF OKLAHOMA    )
                     ) ss.
COUNTY OF OKLAHOMA )

On this ____ day of _____, 2011, before me, the undersigned Notary Public in and for said County and State, personally appeared_____, _____ of First Physicians Realty Group, LLC, who executed the foregoing instrument on behalf of said limited liability company for the purposes therein expressed.

In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

_____
Notary Public Signature

My commission expires: _____
Commission No. _____

STATE OF OKLAHOMA   )
                    ) ss.
COUNTY OF OKLAHOMA )

    On this _____ day of _____, 2011, before me, the undersigned Notary Public in and for said County and State, personally appeared _____ who is Manager and sole Member of RHA Anadarko, LLC, who executed the foregoing instrument on behalf of said corporation for the purposes therein expressed.

    In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

                                _____

                                Notary Public Signature

My commission expires:
_____
Commission No. _____

STATE OF OKLAHOMA    )
                             ) ss.
COUNTY OF OKLAHOMA )

On this ____ day of _____, 2011, before me, the undersigned Notary Public in and for said County and State, personally appeared _____who is Manager and sole Member of RHA Stroud, LLC, who executed the foregoing instrument on behalf of said corporation for the purposes therein expressed.

In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

                                                  _____
                                                  Notary Public Signature

My commission expires:

_____
Commission No. _____

## EXHIBIT "A"

## LEGAL DESCRIPTION OF THE LAND

*To be attached. The legal description of the Real Property of the Demised Premises and the depiction thereof on the documents attached to this Exhibit A.*

## EXHIBIT "B"

## BASE RENT

The monthly Base Rent shall be:

For year 1 of the Lease Eighty Six Thousand Thirty Three dollars and Thirty Cents ($86,033.30) per month, calculated as follows;

    RHA Stroud  $38,500
    RHA Anadarko  $47,533.33 per month

and,

For years 2-20 the monthly Base Rent shall be increased by 3% each year beginning on the anniversary date of the lease at the end of the 1st year.

Following the expiration of the Primary Lease, if the Lease continues for a Renewal Term, then during the Renewal Term the lease shall continue to increase by 3% per year, unless renegotiated and agreed to in writing by the Parties prior to the beginning of the Renewal Term.

**EXHIBIT "C"**

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

*To be attached.*

**EXHIBIT "D"**
**COMMENCEMENT AGREEMENT**

THIS AGREEMENT, made this 1st day of April, 2011 by and between First Physicians Realty Group, LLC, an Oklahoma limited liability company (herein "Landlord") and RHA Anadarko, LLC, and RHA Stroud, LLC, all Oklahoma limited liability companies (herein jointly referred to as "Tenant").

WITNESSETH:

WHEREAS, Landlord and Tenant have entered into that certain Lease dated the 1st day of April,

2011 ("Lease") for Demised Premises located in Grady County, Johnston County, and Lincoln County,

Oklahoma; and

WHEREAS, Landlord and Tenant wish to set forth their agreements as to the commencement of the Term of this Lease.

NOW, THEREFORE, in consideration of the Demised Premises as described in this Lease and the covenants set forth therein, Landlord and Tenant agree as follows:

1.    The Primary Term of this Lease commenced on _April 1, 2011._

2.    The Primary Term of this Lease shall expire on _April 1, 2031._

3.    Tenant has one additional ten (10) year option.

4.    The Rent Commencement Date under this Lease Agreement is __April 1, 2011._

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANDLORD:                      TENANT:
First Physicians Realty Group, LLC    RHA Anadarko, LLC

By_____    By_____
Name: _____    Name: _____
Its: _____    Its: _____


RHA Stroud, LLC
By_____
Name: _____
Its: _____


**EXHIBIT "E"**

# AUTOMATIC WIRE TRANSFER AGREEMENT FOR PAYMENT OF RENT

*To be attached.*

# akerman

Akerman LLP
Post Office Box 4906
Orlando, FL 32802
Tel: 407.254.2305
Fax: 407.254.3408

**Remittance Copy**

| | |
|---|---|
| Invoice Date | June 11, 2018 |
| Invoice No. | 9355637 |

ONE CURA WELLNESS, INC.
8502 E. CHAPMAN AVE., SUITE 431
ORANGE, CA 92869

Joint ID:   **075990**

---

*For professional services rendered through May 31, 2018 as summarized below:*

| | |
|---|---|
| Services | $82,862.50 |
| Disbursements | $31.01 |
| **TOTAL THIS INVOICE** | **$82,893.51** |
| **PAST DUE BALANCE** | **90,601.07** |
| **TOTAL NOW DUE** | **$173,494.58** |

---

*To ensure proper credit to the above account, please indicate invoice no. 9355637*
*Return remittance sheet with payment in US funds.*
*Wired funds accepted:*
Akerman LLP Operating Account
c/o SunTrust Bank, Atlanta, GA
ABA Number: 061000104
Account Number: 0215-252207533
Swift code SNTRUS3A (For International Wires Only)
*IRS EIN 59-3117860*



EXHIBIT

B