IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re. | ) | Case No.: 20-13482-SAH |
| | ) | Chapter 11 |
| RHA Stroud, Inc.,[1] | ) | |
| | ) | [Jointly Administered] |
| Debtor. | ) | |

**DEBTORS' RESPONSE TO FP GROUP'S AMENDED MOTION TO DISMISS OR
ABSTAIN, WITH BRIEF AND WITH NOTICE OF OPPORTUNITY FOR HEARING**

Submitted by:

By: _s/ Esther McKean_
Esther McKean
AKERMAN LLP
Florida Bar No. 028124
420 S. Orange Ave., Suite 1200
Orlando, FL 32801
Telephone: 407-419-8583
Fax: 407-843-6610
esther.mckean@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

By: _s/ David W. Parham_
David W. Parham
AKERMAN LLP
Texas Bar No. 15459500
2001 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: 214-720-4300
Fax: 214-981-9339
david.parham@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

By: /s/ Michael A. Rubenstein
Michael A. Rubenstein, OBA #7806
Leif Swedlow, OBA #17710
Rubenstein & Pitts PLLC
1503 E. 19th Street
Edmond, OK 73013
Telephone: 405- 340-1900
Fax: 405- 340-1001
mrubenstein@oklawpartners.com
lswedlow@oklawpartners.com
Proposed Attorneys for Debtors

By: _s/ Catherine Kretzschmar_
Catherine Kretzschmar
AKERMAN LLP
Florida Bar No. 85843
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, FL 33301
Telephone: 954-486-2443
Fax: 954-847-5336
catherine.kretzschmar@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification number is: RHA Stroud, Inc. (2635) and RHA Anadarko, Inc. (2528). The principal place of business for the Debtors is 2308 Highway 66 West, Stroud, OK 74079 and 1002 East Central Blvd. Anadarko, OK 73005.

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

    A.  The Hospitals' Background ...................................................................................... 3

    B.  One Cura and the Debtors' Oversight Role of the FP Group ............................. 4

    C.  The State Court Litigation ...................................................................................... 6

    D.  The Reorganization of the Hospitals..................................................................... 8

ARGUMENT ...................................................................................................................... 9

    A.  Standard for Dismissal of a Chapter 11 Case ................................................... 10

    B.  The Debtors Commenced These Cases In Good Faith ...................................... 11

        1.  This is Not a Two Party Dispute ................................................................... 11

        2.  This is Not a Single Asset Case ..................................................................... 13

        3.  Having No Direct Employees Is Not Cause for Dismissal ........................ 13

        4.  The Debtors' Prepetition Conduct Was Appropriate.................................. 13

        5.  The Debtors Can Confirm a Plan of Reorganization ................................. 15

    C.  Abstention is Not Warranted ................................................................................ 18

CONCLUSION.................................................................................................................. 20

55509559;1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 4 C Sols., Inc.*,
  289 B.R. 354 (Bankr. C.D. Ill. 2003) .................................................................15

*In re AdBrite Corp.*,
  290 B.R. 209 (Bankr. S.D.N.Y. 2003) ...............................................................10

*In re Cash Currency Exchange, Inc.*,
  762 F.2d 542 (7th Cir. 1985), *cert. denied sub nom. Fryzel v. Cash Currency Exchange, Inc.*,
  474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985) ...........................................15

*In re Forest Hill Funeral Home & Mem'l Park*,
  364 B.R. 808 (Bankr. E.D. Okla. 2007) .......................................................... passim

*In re Haines*,
  2010 WL 252183 (W.D. Wash. 2010) ...............................................................17

*In re Independence Village, Inc.*,
  52 B.R. 715 (Bankr. E.D. Mich. 1985) ...............................................................18

*In re Labankoff*,
  2010 WL 6259969 (B.A.P. 9th Cir. 2010) ...........................................................17

*In re Lizeric Realty Corp.*,
  188 B.R. 499 (Bankr. S.D.N.Y. 1995) ...............................................................10

*In re LJBV LTD*,
  544 B.R. 401 (Bankr. N.D. Ill. 2016) ............................................................14, 15

*In re Muskogee Envtl. Conservation Co.*,
  236 B.R. 57 (Bankr. N.D. Okla. 1999) ...............................................................12

*In re O'Neil Vill. Pers. Care Corp.*,
  88 B.R. 76 (Bankr. W.D. Pa. 1988) ...................................................................19

*In re Otero County Hospital Assoc., Inc.*,
  2012 WL 5376623 (Bankr. N.M. 2012) ...............................................................18

*In re Ramreddy, Inc.*,
  440 B.R. 103 (Bankr. E.D. Pa. 2009) ................................................................16

*In re RCM Glob. Long Term Capital Appreciation Fund, Ltd.*,
  200 B.R. 514 (Bankr. S.D.N.Y. 1996) ...............................................................13

*In re Stolrow's Inc.*,
     84 B.R. 167 (B.A.P. 9th Cir. 1988)......................................................................15

*In re SUD Properties, Inc.*,
     462 B.R. 547 (Bankr. E.D.N.C. 2011) ...............................................................16

*In re Surf City Investments*,
     No. 11–01398–8–RDD, 2011 WL 5909489 (Bankr. E.D.N.C. May 6, 2011) .......................16

*In re Woodbrook Assocs.*,
     19 F.3d 312 (7th Cir. 1994) ..............................................................................10

*Keven A. McKenna, P.C. v. Official Committee of Unsecured Creditors, Bankr. L. Rep.*
     (CCH)...........................................................................................................17

*Matter of Hulse*,
     66 B.R. 681 (Bankr. M.D. Fla. 1986) .................................................................11

iii

RHA Stroud, Inc., d/b/a Stroud Regional Medical Center ("Stroud Hospital") and RHA Anadarko, Inc. d/b/a The Physicians' Hospital in Anadarko ("Anadarko Hospital") (each a "Debtor," and collectively, the "Debtors" or "Hospitals") in these chapter 11 cases (the "Chapter 11 Cases") as debtors and debtors-in-possession ("Debtors"), by and through undersigned counsel, respectfully file this response to FP Group's Amended Motion to Dismiss or Abstain, with Brief and with Notice of Opportunity for Hearing [Doc. No. 65] (the "Motion to Dismiss") and say:

## **INTRODUCTION**

The Debtors have a clear and legitimate purpose in proceeding with the Chapter 11 Cases. The Debtors, two nonprofits, operate rural hospitals in Stroud and Anadarko that are critically important to their communities (the "Hospitals"). Through this bankruptcy, the Debtors seek to reject burdensome executory contracts consisting largely of the FP Group's overpriced services and inflated costs, propose a plan to pay creditors, and provide the communities of Stroud and Anadarko with fiscally sound hospitals providing high quality service.

The Debtors generated $87,664,077 in combined revenue in FYE 2019,[2] in FYE 2020 combined revenue was $89,263,596 and the Debtors currently estimate a combined revenue of $90,357,706 in FYE 2021. The projected savings from the Debtors' rejection of the FP Group's burdensome executory contracts and entry into a new management agreement with Arcadia Health Partners, LLC ("Arcadia") is approximately $35 million per annum. This $35 million savings generated by replacement of FP as managers and providers of overpriced services will enable the Debtors to reorganize was the primary reason for this bankruptcy filing. FP Group's assertion that the Debtors filed bankruptcy so that the Debtors' shareholder, One Cura Health ("One Cura"), could continue collecting management fees is simply not true. The referenced management fees

---

[2] The Hospitals fiscal year end is September 30.

previously paid to One Cura (a) were an amount that FP Group had agreed to and facilitated the payment of for more than a year before it filed the prior state court litigation, and (b) were also *de mimimis* in comparison to the massive fees and inflated costs extracted from the Hospitals by FP Group's various affiliates.

The allegations made by the FP Group are either patently false or at best, red herrings. For example, calling this a two party dispute is simply inaccurate. The FP Group themselves are five separate corporations, each with separate agreements and claims. The FP Group is comprised of different creditors with diverse interests - a secured creditor, a landlord, and three service providers (*i.e.* general unsecured creditors).   In addition to the multiple FP Group creditors, there are numerous other trade, vendor, utility, and supply creditors, and hundreds of other interested parties, including the third party surgical group that provides an invaluable service to the communities served by Debtors' hospitals.

Moreover, the entire FP Group did not seek relief from the state court.  That action was prompted by the Debtors retention of consultants seeking to generally review the propriety of the charges for services provided by the FP Group.  Rather than work with the Debtors, FP Group decided to file the state court action to try to coerce them into submission.  Without making any comment about the propriety or impropriety of the FP Group's charges, t**he state court decided to appoint a receiver purely because of the "toxic" relationship between the parties, which the judge noted was due in large part to FP Group's actions.**  The Debtors filed this proceeding so that they could continue to operate while addressing their debts and the FP Group's burdensome contracts – i.e., exactly the point of bankruptcy protection.

FP Group criticizes the Debtors for not paying interest and rent for more than nine years. What they conspicuously do not say is that the Debtors lacked the contractual right to make such

payments.  Only FP Group's manager entity had the contractual right to cause such payments to be made, and it was FP Group's affirmative decision to not make those rent and secured debt service payments so that it could take money out of the Hospitals as management fees and marked up costs instead.  The result?  While FP Group tries to distract the Court with $125,000 monthly payments to One Cura for oversight, **FP group was extracting profits from the Hospitals of more than ten times that amount – totaling approximately $35 million over 2018 and 2019**. Once the Debtors are able to shed such onerous management and services agreements there will be no issue servicing their debts and pay the landlord and other creditors.

Everything the FP Group asserts in their premature Motion to Dismiss is not a ground to dismiss the case. The Debtors are operating entities who filed Chapter 11 to reorganize their debts in order to continue to fulfill their larger societal purpose of providing affordable healthcare services to Oklahoma's rural population. The Debtors filed these cases in good faith.  The Court should deny the FP Group's Motion to Dismiss.

## FACTUAL BACKGROUND

### A.     The Hospitals' Background

Details of the Hospitals' history are set forth in the Declaration of Charles M. Eldridge and incorporated as if fully set forth herein (the "First Day Declaration") [Doc. No. 6].

Prior to April 2011, First Physicians Business Solutions, LLC ("FP Business"), First Physicians Services, LLC ("FP Services"), First Physicians Resources, LLC ("FP Resources") and First Physicians Capital Group, Inc. ("FP Capital") through Rural Hospital Acquisition, LLC ("RH Acquisition") (collectively, the "FP Group") owned all the issued and outstanding membership interests of the Hospitals. The Debtors' parent company, One Cura, acquired 100% of all ownership interest in the Hospitals pursuant to a 2011 purchase agreement (the "Purchase Agreement") with RH Acquisition.

Pursuant to the Purchase Agreement, FP Business, FP Services, FP Resources, and FP Capital each signed a note with RH Acquisition (as later amended, the "Notes") secured by all of the assets of the Hospitals.  The Note executed by Stroud Hospital was in the principal amount of $6,750,000, and the Note executed by Anadarko Hospital was in the principal amount of $5,250,000.  *See* First Day Declaration at ¶¶ 82-84

The Purchase Agreement obligated the Hospitals to execute Management Services Agreements (the "Management Agreements" or "MSAs") with FP Business, Staff Leasing Agreements ("Staffing Agreements") with FP Resources, and Ancillary Services Agreements (the "Ancillary Agreements") with FP Services (the most recent versions of such contracts collectively referenced herein as the "Agreements").  Essentially, rather than own the Hospitals outright as they had previously, FP Group set up a structure where by the Hospitals were sold to a third party (One Cura) but were required to enter into the one-sided Agreements that facilitated FP Group affiliates' consistent draining of Hospital resources and conversion into massive, recurring FP Group profits.  Through these oppressive Agreements, the FP Group handles the management, staffing, and day-to-day operation of the Hospitals.

Also as part of the Purchase Agreement, the Debtors entered into a lease with FP Realty for the rental of the physical buildings in which the Hospitals operate (the "Lease").

**B.    One Cura and the Debtors' Oversight Role of the FP Group**

Pursuant to the Management Agreements, the Debtors were not permitted to make any payments from their accounts to satisfy the Notes, which continued to accrue interest, the Lease, under which rent obligations continued to accrue, or any other debt, unless the FP Group, who had exclusive control, made the payment.[3]  Thus, in asserting the Hospitals failed to make interest or

---

[3] The MSA explicitly provides that FP Business (the Manager):

rent payments, the FP Group, in reality, is alleging it elected not to make those payments from the Hospitals' operating accounts it controlled. Based on historical revenues, those payments easily could have been made, but it could have interfered with other FP Group entities' ability to continue to charge massive and inflated fees and costs. So FP Group favored itself, using Hospital funds to effect payment of its affiliates' fees and inflated costs, and leaving the Hospitals rent and Notes unpaid. In sum, the FP Group abused its role as the Hospitals' payment contractor to prioritize paying itself for inflated services, rather than paying the Hospitals' Note interest, Lease payments, or other obligations. The FP Group, by intentionally failing to make payments on the Leases and Notes, which kept accruing interest and were secured, kept the Hospitals in what could be characterized as a state of perpetual potential default for nearly nine years.

Section 2(a) of the MSA provides that First Physicians is given "sole and exclusive right and obligation to furnish or perform, or arrange for the furnishing or performance of, the Management Services[4]…." The FP Group thus controlled the Debtors' purse strings throughout the almost decade long relationship, chose not to pay itself on the outstanding debt, and never made demand to the Hospitals for payment of interest or rent until February 17, 2020.

The Hospitals oversee the FP Group's actions; the MSA explicitly requires the Hospitals' approval for the FP Group's actions on the Hospitals' behalves. One Cura also ensures -- or has tried to ensure -- that costs incurred by the Hospitals are for fair market value and approves Cost Reports which are required to be filed with the Centers for Medicare and Medicaid Services. Notwithstanding the historical friction between the Debtors and the FP Group, these Cases were precipitated by a series of steps recently taken by the FP Group which jeopardized the Hospitals'

---

"is authorized to withdraw funds from the [Hospitals'] Bank Accounts … and to pay authorized expenses of the Company and the Hospital, including without limitation … any principal and interest that is due under the New Notes relating to the loan indebtedness of the Company to Seller."   MSA, § 3(a)(xi).

[4] 'Management Services' includes every aspect of the financial and day-to-day operations of the Hospitals.

tax exempt status and operations, and prevented One Cura from fulfilling its oversight duties.

The Hospitals rely on the information the FP Group, as Manager, provides the Hospitals to fulfill their oversight obligations. The Staffing Agreement from February 2019 obligated the FP Group to facilitate the Hospitals' oversight. The Staffing Agreement also amended the prior agreement and obligated the FP Group to cause the Hospitals to pay One Cura $62,500 per Hospital per month and required the FP Group to perform, and allow the Hospitals to perform, certain financial and operational duties. The FP Group is obligated to reimburse One Cura for expenses related to mergers and acquisitions and defense of litigation, and pay the Hospitals' vendors retained as part of One Cura's oversight duties over the FP Group.

While One Cura sought compensation for its oversight through its principal, Mr. Eldridge, who has over 20 years of community based and governmental not-for-profit experience, and for professionals, because the FP Group controls the purse strings, no payments have been made to One Cura since February 2020, which was not coincidentally shortly after Mr. Eldridge began questioning FP Group's massive fees and inflated costs reported on the its Cost Reports, and shortly before FP Group's secured creditor affiliates filed the state court litigation. This has effectively and intentionally thwarted One Cura's ability to provide oversight, leading to problems with the FP Group's unfettered operations of the Hospitals.

C.    **The State Court Litigation**

The schism between the Debtors, One Cura, and the FP Group came to a breaking point in 2020 when One Cura questioned FP Group's Cost Reports and moved to retain a consultant to do a more in depth review of the costs reported therein.

Rather than cooperate with the Debtors, on February 24, 2020, RH Acquisition and FP Realty filed a Petition in the District Court of Lincoln County, Oklahoma ("District Court"), initiating Case No. CJ-2016-513 (the "Litigation") and an Application of Appointment of a

6

Receiver for the Hospitals. As part of the Litigation, FP Realty also threatened to evict the Debtors from the Hospitals, ostensibly for its affiliate's failure to cause rent to be paid during the preceding years, but in reality as part of FP Group's effort to cause the liquidation of the Hospitals so it could continue to prioritize its interests over those of the Debtors and the communities they serve.

The Debtors opposed the appointment of a receiver.  Following an evidentiary hearing, the District Court issued a memorandum opinion approving the appointment of a receiver because FP Group had created such a "toxic" relationship that it was not sustainable, and ordered the parties to prepare a form of order (the "Order").

The District Court then scheduled a hearing for November 4, 2020 to discuss the form of the order and determine an appropriate bond. As of this bankruptcy filing, the District Court had not appointed any receiver as to the Hospitals, nor had a bond been posted by a receiver, both of which are prerequisites for a receiver to have any rights with respect to the Hospitals.

The District Court, in the Order, made the following factual findings which are dispositive to the Debtors' good faith and justify the reasons for filing this case:

a.     "…First Physicians controls the finances and pays the expenditures of the hospitals."

b.     "There is no dispute that the hospitals are insolvent."

c.     "There is not dispute that the hospitals are running smoothly and efficiently."

d.     "Arguably, although **the breakdown of the relationship of the parties is largely due to the actions of the Plaintiffs [FP Realty and RH Acquisition]**, that relationship has now become toxic. The appointment of a receiver has become necessary in order to neutralize the parties during the pendency of this litigation in order to aid the hospitals to continue their successful operations."

The District Court made no findings of bad faith, mismanagement, malfeasance, or any other type of misconduct as to the Hospitals, but did acknowledge that the "toxic" relationship had

been caused "largely due to the actions of" FP Group.  The District Court also indirectly acknowledged the need for a reorganization or some other stopgap measure for ensuring the smooth operation of the Hospitals during the Litigation. The Hospitals, while insolvent, are still valuable operating entities. While it may not serve FP Group's separate and divergent interests, there are no better alternatives for profitable operating entities like the Debtors than Chapter 11.

**D.     The Reorganization of the Hospitals**

On October 25, 2020 ("Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

On November 6, 2020, less than two weeks after the Petition Date, the FP Group filed its Amended Motion to Dismiss Case.  *See* Doc. No. 65.

On November 16, 2020, the Debtors filed an Omnibus Motion to Reject Contracts with First Physicians ("Rejection Motion").  *See* Doc. No. 130.  Pursuant to the Rejection Motion, the Debtors seek to reject the Agreements due to massive overcharges which benefit only the FP Group and prevent the Hospitals from operating in a profitable manner. *Id.*

Also on November 16, 2020, the Debtors filed an Amended Motion for Authority to Enter Into Management Services Agreement with Arcadia Health Partners, LLC ("Management Motion"), *see* Doc. No. 134, seeking authorization to enter a new management agreement projected to save the Debtors approximately $35 million annually. Rejection of the Agreements with FP Group and the new management agreement with Arcadia will restore the Hospitals to profitability and provide a clear path to a reorganization.  Notably, over the last two years, the FP Group has pulled out over $35 million in profits due to the mark-ups under the Rejected Agreements, the continuation of which is no doubt what truly motivates FP Group's instant efforts to prevent the Hospitals from being able to reorganize.

8

Less than 24 hours after the Debtors filed the Rejection Motion and Management Motion, the FP Group filed a Motion to Terminate Exclusivity [Doc. No. 140].

The Debtors' assets include the operating Hospitals, lease rights to real estate on which the Hospitals operate, equipment, and supplies. The Debtors have approximately $12.8 million in net A/R as of September 30, 2020 based on historic collection rates (the "A/R"). As of the Petition Date, the Debtors' combined cash on hand was $3,115,735.08. The Debtors also have causes of action against the FP Group.

Ultimately, the Debtors decided to commence these Chapter 11 Cases to allow them to: (i) reduce their expenses including by rejecting onerous contracts and be managed more efficiently by a new management company; (ii) obtain access to their own books and records; (iii) reconcile all claims in a single forum; and (iv) reorganize for the benefit of all constituents. The Debtors believe a successful restructuring can only occur under the protection of bankruptcy.

## ARGUMENT

The Debtors filed these Chapter 11 Cases in good faith. The Debtors seek to unburden themselves from toxic executory contracts that not only threaten their ability to comply with state and federal regulations, but create an administrative nightmare in which the FP Group can, at will, prevent the Debtors from exercising their oversight duties and keep the Debtors in an artificial and unnecessary state of perpetual default. Although the Debtors are insolvent, they are operating businesses with the ability to reorganize. The proposed rejection of the FP Group's Agreements and entry into a new management agreement with Arcadia will generate an additional $35 million in savings per year, which savings will be used to fund a plan of reorganization, and which will inure to the benefit of patients. The Debtors have indisputably legitimate reasons for proceeding under Chapter 11 and should be afforded an opportunity to do so.

**A.     Standard for Dismissal of a Chapter 11 Case**

The FP Group bears the burden to prove by a preponderance of the evidence that there is

cause for either conversion or dismissal of the Chapter 11 case, whichever is in the best interests

of creditors and the estate. *See e.g. In re Woodbrook Assocs*., 19 F.3d 312, 317 (7th Cir. 1994); *In*

*re AdBrite Corp*., 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003); *In re Lizeric Realty Corp*., 188 B.R.

499, 503 (Bankr. S.D.N.Y. 1995). FP Group makes no such showing.  Indeed, as outlined herein,

the facts at issue demonstrate the opposite -- that FP Group is only interested in its own ability to

extract the Hospitals' revenue, and that a Chapter 11 reorganization would benefit all other

constituents, including the communities served by the Hospitals.

The FP Group tries to rely primarily on *In re Forest Hill Funeral Home & Mem'l Park*,

364 B.R. 808 (Bankr. E.D. Okla. 2007) ("*Forest Hill*") to support its dismissal and abstention

arguments.  *Forest Hill* describes a court's inquiry when determining whether to dismiss a case:

> Determining whether a debtor's filing for bankruptcy protection is
> in good faith requires the bankruptcy court's on-the-spot evaluation
> of the debtor's financial condition, motives, and the local financial
> realities. Findings of bad faith in proceedings based on §§ 362(d) or
> 1112(b) have been predicated on certain recurring but non-exclusive
> patterns, and are based on a conglomerate of factors rather than on
> any single event.... Individual factors, in and of themselves, may not
> lead to a conclusion that a bankruptcy filing is in bad faith. Bad faith
> is found when the cumulative effect of these individual factors
> together paint a factual picture that leads to the inescapable
> conclusion that use of the bankruptcy laws by the debtor is
> inappropriate.

*Forest Hill,* 364 B.R. at 820 (citing *In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 399–400

(Bankr. D.Colo. 2005) (footnote and citations omitted).  Further, the *Forest Hill* court established

the following non-exhaustive list of factors to determine whether a case is filed in bad faith:

> (1) the debtor has one asset; (2) the prepetition conduct of the debtor
> has been improper; (3) there are only a few unsecured creditors; (4)
> the debtor's property has been posted for foreclosure, and the debtor
> has been unsuccessful in defending against the foreclosure in state

> court; (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford; (6) the filing of the petition effectively allows the debtor to evade court orders; (7) the debtor has no ongoing business or employees; and (8) the lack of possibility of reorganization.

*Forest Hill,* 364 B.R. at 820. Far from demonstrating a preponderance of evidence, the FP Group has failed to establish even a *prima facia* case for dismissal or abstention at this early stage of the Chapter 11 Cases.

**B.     The Debtors Commenced These Cases In Good Faith**

    1.     <u>This is Not a Two Party Dispute</u>

The FP Group improperly mischaracterizes this case as a "two party" dispute.[5]  To start, the FP Group themselves are at least five different entities each with different agreements with the Debtors and, presumably, different goals.  These separate creditors – a secured creditor, a landlord, and three service providers (*i.e.* general unsecured creditors) – have diverse interests.

    The FP Group concedes that only the Debtors' secured creditor, RH Acquisition, and landlord, FP Realty, commenced the Litigation.  The other FP Group entities were not originally parties to the Litigation.[6] The District Court appointed a receiver purely because of the "toxic" relationship between the parties, which the judge noted was due in large part to FP Group's actions.  These issues can be resolved through the Motion to Reject and Management Motion.  The remaining issues before the District Court are routine bankruptcy issues that can and should be

---

[5] Although it is not, even if this were a two party dispute, that is not a sufficient reason for dismissal so long as there are legitimate reasons for the debtor to be in bankruptcy. *See e.g. Matter of Hulse*, 66 B.R. 681, 683 (Bankr. M.D. Fla. 1986) ("Admittedly, this case is essentially a two-party dispute with Musser's being the largest unsecured creditor, but this alone cannot constitute a bad faith filing by the Debtors under § 1112(b) and, therefore, the Motion to Dismiss should be denied.").

[6] Although other FP Group entities were impleaded as third party defendants to the Hospitals' related claims, those third party defendant FP Group entities asserted in the Litigation that all claims against them were required to be resolved in a separate arbitration.  Thus, further demonstrating the divergent interests of the various FP Group entities at issue, some of them wanted to proceed in the Litigation while others wanted to litigate the same issues in arbitration.

resolved together in one forum for the benefit of all creditors. Further, there are myriad other debts owed by both Debtors, as evidenced in the Debtors' Schedules, the claims registers in the Chapter 11 Cases, and the vendors in the Debtors' critical vendor motion.

FP Group's miscitation of *In re Muskogee Envtl. Conservation Co.*, 236 B.R. 57 (Bankr. N.D. Okla. 1999) ("*Muskogee*") ironically demonstrates that this is clearly not a "single asset"/two party dispute, and actually supports the Debtors' position that dismissal would be inappropriate and unwarranted. In *Muskogee*, the debtors operated a business centered around capturing a byproduct of burning coal plants. Prior to filing bankruptcy, the *Muskogee* debtors were involved in internal disputes between shareholders and a law firm which was involved in litigation. During the two and half year pendency of the *Muskogee* chapter 11 cases, the debtors sold their assets in a section 363 sale. After the sale closed, creditors involved in prepetition litigation with the debtors moved for dismissal of the bankruptcy. With the bankruptcy issues resolved over the prior two and a half years and section 363 sale of assets, only the state court litigation was left in dispute, and so the *Muskogee* court held the "[d]ebtors no longer need the protection of this Court" and dismissed the bankruptcy.

This bankruptcy is in its infancy, and none of the reorganization issues have been addressed, much less resolved. Like the debtors in *Muskogee*, the Debtors here should be afforded the same protections of the bankruptcy court and be permitted to seek relief which can only be sought under the Bankruptcy Code, *e.g.,* rejection of certain executory contracts and plan confirmation. Once all of those issues are resolved, then and only then would *Muskogee* counsel a return to state court to address any then remaining issues. For FP Group to cite *Muskogee* as applicable now is just another misrepresentation of the record. These Chapter 11 Cases have been pending for only one month, not two and a half years, and the Debtors here seek to accomplish a

successful reorganization through a plan. With the many parties involved in these Chapter 11 Cases and the need for specific bankruptcy protection for the Debtors, creditors, and interested parties, these Cases should not be dismissed simply because it may be in FP Group's selfish interests to ignore what would benefit Debtors, their other creditors and the communities served by the Hospitals.

2.      This is Not a Single Asset Case

FP Group's assertion that these Cases involve only a single asset is yet another misrepresentation of the record. The Debtors have numerous assets, including the operating Hospitals, lease rights to real estate on which the Hospitals operate, licenses to run the Hospitals, $12.8 million in A/R, equipment, supplies, and $3,115,735.08 in cash on hand. The Debtors own their positions in each Agreement with each of the separate FP Group entities, and have claims against each such FP Group as well. There is absolutely no support for the FP Group's baseless assertion that this is a single asset case.

3.      Having No Direct Employees Is Not Cause for Dismissal

That the Debtors have no direct employees cannot be cause for dismissal. The court in *In re RCM Glob. Long Term Capital Appreciation Fund, Ltd.,* 200 B.R. 514 (Bankr. S.D.N.Y. 1996) held that cause did not exist to dismiss a debtor's chapter 11 case for bad faith, even though the debtor had no employees, current operations, or cash flow, and that wanting to restart its business justified filing chapter 11. These Cases are even more compelling, as the Hospitals employ hundreds of physicians, medical staff, and employees retained by FP Resources pursuant to the Staffing Agreement, which it does solely pursuant to authorization by the Debtors.

4.      The Debtors' Prepetition Conduct Was Appropriate

The District Court did not find any wrongdoing by the Debtors in appointing a receiver, and if anything, blamed the animosity between the parties on the FP Group. In any event, the

55509559;1

appointment of a receiver cannot support dismissal in this context.

The FP Group once again miscites the precedent upon which it purports to rely. In reality, the simple fact of appointment of a receiver prepetition is not *per se* bad faith. Rather, it was the very particular and extreme prepetition malfeasance on the part of the debtor in *Forest Hill* that supported the bad faith finding in that case. The fact that a receiver had been appointed prepetition was almost coincidental, and, contrary to FP Group's mischaracterization, certainly not the basis of the court's ruling, and totally distinguished from the circumstances of this case.

In *Forest Hill*, the debtor, a funeral home, took the deposits of 13,500 clients for prepaid funeral and burial services, made incredibly poor investments to an affiliated entity in contravention of state law -- essentially embezzled those client funds -- and lost everything. Thus, it was that debtor's prepetition malfeasance that warranted appointment of a receiver and constituted the debtor's bad faith. That precedent is entirely distinguished here, where appointment of a receiver was approved largely due to FP Group's conduct in creating a toxic relationship between the parties. Indeed, FP Group's attempt to rely on *Forest Hill* only serves to illustrate the impropriety of its Motion to Dismiss.

The FP Group similarly miscites *In re LJBV LTD*, 544 B.R. 401, 405 (Bankr. N.D. Ill. 2016) for the proposition that filing bankruptcy just prior to the appointment of a receiver can somehow be *per se* bad faith regardless of the context. In fact, that case once again demonstrates that it is the specific factual circumstances, and not simply a prepetition order to appoint a receiver, that may or may not show bad faith. Unlike here, *LJBV* was a classic two party dispute in which a secured creditor foreclosed its collateral and, prior to the appointment of a receiver, the debtor filed chapter 11. The complex operation of two Hospitals and at least five FP Group entities and numerous unrelated third party creditors is radically different than the mere owning of real estate,

14

such that the *LJBV* case is inapplicable.

Moreover, as a matter of law, the appointment of a receiver in state court does not divest a bankruptcy court of subject matter jurisdiction. *See In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 552–553 (7th Cir. 1985), *cert. denied sub nom. Fryzel v. Cash Currency Exchange, Inc.*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). *In re Stolrow's Inc.*, 84 B.R. 167, 171 (B.A.P. 9th Cir. 1988) ("*Stolrow*") perfectly illustrates the appropriateness of continued bankruptcy proceedings. There, as a result of a dispute between the debtor's shareholders, a state court actually had appointed a receiver, and the debtor immediately filed bankruptcy. *Stolrow* found that notwithstanding that a receiver actually had been appointed, the debtor still had a legitimate purpose in filing to prevent disruption of its business operations from the receiver's appointment. The *Stolrow* court found this to be justification for a good faith filing. Much like the debtor in *Stolrow*, the Debtors here filed to avoid interruption of their operations, as the proposed state court receiver is a liquidator with no experience in operating not-for-profit hospitals.

In *In re 4 C Sols., Inc.*, 289 B.R. 354 (Bankr. C.D. Ill. 2003) ("*4 C Sols*"), a receiver was appointed, who upon filing for chapter 11, admitted the main reason it filed was because of the receiver. The *4 C Sols* court held "that even when viewed in the aggregate, the factors discussed above weigh in favor of allowing the Chapter 11 case to continue, at least for the time being, to give the DEBTOR an opportunity to propose a plan, and to solicit approval of its plan and, if necessary, to attempt a cramdown." The Hospitals are asking for the same opportunity. Filing these Chapter 11 Cases after the District Court appointed a receiver was not improper, nor is it indicia of bad faith. Under such circumstances, the Court should not dismiss the Chapter 11 Cases.

5.    The Debtors Can Confirm a Plan of Reorganization

Seeking to focus on (and misrepresent) the disputed facts of the preceding state court litigation, FP Group tellingly ignores the actual legal standard applicable to its Motion to Dismiss

15

in Bankruptcy Court. Section 1112(b)(2) provides the court should not dismiss a case, absent unusual circumstances not present or at issue here. Where, as is the case here, the debtor objects and establishes a reasonable likelihood that a plan may be confirmed within a reasonable period of time (or if the case is being dismissed due to an act or omission of the debtor "for which there exists a reasonable justification for the act or omission," the act or omission "will be cured within a reasonable period of time fixed by the court," which is not at issue), dismissal is inappropriate. Moreover, the Court's inquiry is not neutral -- FP Group, as the party seeking dismissal, bears the high "burden of demonstrating both objective futility and subjective bad faith by a preponderance of the evidence" in filing the case and seeking confirmation of a plan. *See, e.g., In re SUD Properties, Inc.*, 462 B.R. 547, 551 (Bankr. E.D.N.C. 2011); *In re Surf City Investments*, No. 11–01398–8–RDD, 2011 WL 5909489 (Bankr. E.D.N.C. May 6, 2011) (*citing In re Player Wire Wheels, Ltd*., 421 B.R. 864, 868 (Bankr. N.D. Ohio 2009)).

Further, unlike the more advanced cases miscited by FP Group and distinguished above, in evaluating the merits of a motion to dismiss at a relatively early stage in the case, "bankruptcy courts are not stringent in assessing the feasibility of the debtor's proposed reorganization plan." *In re Ramreddy, Inc*., 440 B.R. 103, 114 (Bankr. E.D. Pa. 2009). While still in in the earliest stages -- indeed, the start -- of these Chapter 11 Cases, the premature dismissal sought by FP Group would violate that clear standard. The Debtors are complying with the requirements of chapter 11 and in position to file a disclosure statement and plan in a timely manner. The deadline to file a plan and disclosure statement in this case is not until February 22, 2021, and the Debtors intend to comply with that deadline. In fact, FP Group's Motion to Dismiss is virtually unprecedented in asking this Court to dismiss a just filed bankruptcy before the Debtors have had any opportunity to even try to propose, much less confirm, a plan. Contrary to the circumstances here, cases in

16

which courts dismiss chapter 11 cases nearly unanimously only do so *after* a debtor has been afforded a meaningful opportunity to at least file a plan and disclosure statement. *See e.g., Keven A. McKenna, P.C. v. Official Committee of Unsecured Creditors, Bankr. L. Rep*. (CCH) P 82018, 2011 WL 2214763 (D.R.I. 2011) (failure to file a disclosure statement within the time set by the court could constitute cause under § 1112(b)); *In re Haines*, 2010 WL 252183 (W.D. Wash. 2010) (dismissal justified only where, after 15 months in the bankruptcy proceeding, debtor had "yet to file a disclosure statement and only this month filed a plan"); *In re Labankoff*, 2010 WL 6259969 (B.A.P. 9th Cir. 2010) (debtor had not confirmed the plan within the time court had specified in its status hearing order).

Dismissal based on inability to confirm a plan at this early point would be beyond premature. The FP Group filed this Motion to Dismiss less than two weeks after the Chapter 11 Cases were filed. The 341 meeting had not even occurred. Bankruptcy procedures and practices exist for a reason, and that reason is not to favor self-interested creditors such as the divergent entities comprising the FP Group.

Further, the FP Group's conclusory statements that these Cases are somehow doomed because the Debtors cannot continue paying the FP Group's onerous administrative and other fees and that the FP Group will refuse to support any plan the Debtors propose are not evidence of anything other than of the FP Group's ongoing recalcitrance. If the Court allows the Debtors to reject the burdensome FP Group Agreements and to enter a new agreement with Arcadia, the Debtors will be able to generate cash flow sufficient to service their debts and confirm a plan. The FP Group's bold statement that "[t]here is no possibility that the FP Group will agree to a plan for reorganization from the Debtors" has no bearing on whether the Debtors have a reasonable likelihood of confirming a plan. The FP Group are not the only creditors here. The Court need

17

only look at the claims registers, which are growing every day with new claims. Even without the support of the FP Group, there are sufficient creditors that the Court cannot, at this initial stage, make a definitive finding of objective futility that a plan is unconfirmable before the Debtors have even had the opportunity to present a plan. An impaired class could exist and accept the Debtors' plan, allowing for a cramdown.  That is made more likely by the fact the hospitals are non-profit corporations, and thus the absolute priority rule does not come into play.[7]  In fact, despite its protestation to the contrary, the FP Group has implicitly conceded that a plan could be confirmed, as they have moved to terminate exclusivity.

The only attachments to the Motion to Dismiss are the FP Group's filings in this Court and in District Court, that court's initial order approving the appointment of a receiver based on the toxic relationship largely caused by FP Group, and unsigned proposed orders defining the powers of the receiver which were never even considered, much less entered. In fact, the totality of purported 'evidence' presented in the Motion to Dismiss shows only that a dispute existed prepetition between the FP Group and the Debtors, which, among other factors, led to the filing of these Chapter 11 Cases so the Debtors could reorganize.  The Debtors' intent and ability to reorganize is already evidenced by the bankruptcy-specific relief sought thus far.  The Debtors have more than a reasonable likelihood of confirming a plan.  Therefore, the FP Group's premature and improper Motion to Dismiss must be denied.

## C.    Abstention is Not Warranted

Finally, abstention is also not warranted in these Chapter 11 Cases. Even in *Forest Hill* --

---

[7] *See In re Independence Village, Inc.*, 52 B.R. 715, 726, (Bankr. E.D. Mich. 1985) (allowing members of a nonprofit "lifecare" facility for the elderly to retain control of the nonprofit despite the objection of an indenture trustee, noting that the debtor has "no shareholders, hence… no interests inferior to the unsecured creditors" and, accordingly, that "there should be little difficulty [in confirming a plan that leaves pre-petition members in place, notwithstanding]… the absolute priority rule."); *In re Otero County Hospital Assoc., Inc.*, 2012 WL 5376623 (Bankr. N.M. 2012).

which is entirely distinguished as discussed above -- the court made sure to caution that "[a]bstention and dismissal under § 305(a)(1) is applied very narrowly and is only proper in extraordinary circumstances," and granted it there only due to the extreme facts at issue there (and not here). *Forest Hill*, 364 B.R. at 824.[8] The factors for a § 305 abstention analysis are very similar to the § 1112 dismissal factors. As stated in *Forest Hill*, the factors for abstention include:

> (1) the motivation of the parties in seeking bankruptcy jurisdiction; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice of the parties.

*Forest Hill*, 364 B.R. at 824.

As to the issue of motivation, as discussed above at length, the Debtors filed chapter 11 to reorganize their affairs, reject onerous executory contracts (not coincidentally including those of the FP Group entities at issue), enter into a new service agreement with Arcadia, and apply the savings to funding a plan of reorganization to the benefit of the Hospitals and the communities they serve. The Debtors would have been unable to reject executory contracts and propose a plan of reorganization in the District Court. The end goal of these Chapter 11 Cases is reorganization. The Bankruptcy Court is the only forum that can oversee reorganization of the Debtors and protect the rights of all creditors and interested parties rather than only those of the FP Group.

Further, proceedings before this Court will be more economical and efficient where the District Court has not made any decisions on the underlying merits of the lawsuit and this Court is equally (and soon to be more) familiar with the details of the Hospitals than the District Court.

---

[8] The other case that the FP Group seeks to rely upon, *In re O'Neil Vill. Pers. Care Corp*., 88 B.R. 76, 80 (Bankr. W.D. Pa. 1988) is equally inapposite.  Like *Forest Hill*, the extreme facts at issue there are distinguished and have nothing to do with what occurred here. Specifically, in *O'Neil*, one of the debtor's principals was found liable prepetition for breaching fiduciary duties, then defied state court orders preventing him from alienating assets, and then, <u>after</u> the state court appointed a receiver over the debtor, caused the debtor to file chapter 11.  Even after filing bankruptcy, the principal continued to violate state court orders. None of the foregoing bad acts is at issue here, and it is undisputed that no receiver was ever actually appointed in the state court Litigation.

Further, chapter 11 was created by Congress to permit operating debtors to reorganize. There is no evidence these Chapter 11 Cases will be more expensive than protracted litigation before the District Court. To the contrary, some of the FP Group entities (those with the executory contracts the Debtors seek to reject) had moved to compel arbitration of the Debtors' claims against them such that the FP Group was seeking to bifurcate the parties' dispute and force litigation in two forums -- the District Court and arbitration. As a result, there cannot be any serious dispute that this third factor of efficiency weighs in favor of continuing the Chapter 11 Cases and resolving all of the parties' and other creditors' disputes in one forum.

Finally, the FP Group has made no showing of prejudice. Rather, it just asserted its self-serving and baseless conclusion that the "continued administration of these cases in bankruptcy court could not only prejudice all parties in these cases, but also have disastrous consequences on the hospitals' patients and local communities." The FP Group provides no evidence supporting this conclusory assertion. To the contrary, all parties other than the FP Group, including the Hospitals' patients and local communities, would be prejudiced by abstention as they would have no voice in the state court Litigation.

## CONCLUSION

The Debtors are not-for-profit entities with public health missions. These Chapter 11 Cases involve multiple parties and the Debtors own multiple assets. The Debtors filed bankruptcy in good faith, have a reasonable likelihood of confirming a plan, and should be afforded an opportunity to do so. The FP Group has failed to meet its burden to demonstrate why these Cases should be dismissed or the Court should abstain literally at the very start of this action. Accordingly, the Motion to Dismiss must be denied. The Debtors respectfully request an order denying FP Group's Motion to Dismiss and granting such other relief as is just and proper.

55509559;1

Dated: November 27, 2020

Respectfully Submitted,

By: *s/ Esther McKean*
Esther McKean
AKERMAN LLP
Florida Bar No. 028124
420 S. Orange Ave., Suite 1200
Orlando, FL 32801
Telephone: 407-419-8583
Fax: 407-843-6610
esther.mckean@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

By: */s/ Michael A. Rubenstein*
Michael A. Rubenstein, OBA #7806
Leif Swedlow, OBA #17710
Rubenstein & Pitts PLLC
1503 E. 19th Street
Edmond, OK  73013
Telephone:  405- 340-1900
Fax:   405- 340-1001
mrubenstein@oklawpartners.com
lswedlow@oklawpartners.com
Proposed Attorneys for Debtors

By: *s/ David W. Parham*
David W. Parham
AKERMAN LLP
Texas Bar No. 15459500
2001 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: 214-720-4300
Fax: 214-981-9339
david.parham@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

By: *s/ Catherine Kretzschmar*
Catherine Kretzschmar
AKERMAN LLP
Florida Bar No. 85843
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, FL 33301
Telephone: 954-486-2443
Fax: 954-847-5336
catherine.kretzschmar@akerman.com
*Pro Hac Vice Admitted*
Proposed Attorneys for Debtors

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 27th day of November, 2020, a true and correct copy of the Debtors' Response to FP Group's Amended Motion to Dismiss or Abstain, With Brief and With Notice of Opportunity for Hearing filed on November 27, 2020, was served upon counsel registered with the CM/ECF system in this case and was forwarded via U.S. Mail, first class, postage prepaid to the those parties listed on the attached matrix.

By: *s/ Esther McKean*
Esther McKean, Florida Bar No. 028124

55509559;1