Page 1

## BEFORE THE UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

IN RE:  RHA STROUD, INC.;        )   CASE NUMBER
CHAPTER 11                       )   20-13482-SAH

_____

TELECONFERENCE 341 MEETING OF CREDITORS

TESTIMONY OF CHARLES ELDRIDGE, DEBTOR REPRESENTATIVE

BEFORE MARJORIE J. CREASEY, U.S. TRUSTEE

ON NOVEMBER 30, 2020

IN OKLAHOMA CITY, OKLAHOMA

_____

REPORTED BY:  BRENDA SCHMITZ, CSR, RPR

**EXHIBIT 2**

341 Meeting of Creditors                In Re: RHA Stroud, Inc.; Chapter 11
11/30/2020                                              20-13482-SAH

---

### Page 2

1          APPEARANCES
2
3    FOR FIRST PHYSICIANS REALTY GROUP, LLC:
4        MR. J. CLAY CHRISTENSEN
         MR. JONATHAN M. MILES
         Attorneys at Law
5        CHRISTENSEN LAW GROUP
         The Parkway
6        3401 Northwest 63rd Street, Suite 600
         Oklahoma City, Oklahoma 73116
7        Telephone:  405.232.2020
         Facsimile:  405.228.1113
8        E-mail: clay@christensenlawgroup.com
9             jon@christensenlawgroup.com
10
11   AND
         MS. KRISTEN BIRD
         Attorney at Law
12       QUINN EMANUEL URQUHART & SULLIVAN
         865 South Figueroa Street, 10th Floor
13       Los Angeles, California 90017
         Telephone:  213.443.3000
14       Facsimile:  213.443.3100
         E-mail: kristenbird@quinnemanuel.com
15
16
17   FOR SOUTHERN PLAINS MEDICAL CENTER:
18       MR. MARK TOFFOLI
         Attorney at Law
19       THE GOODING LAW FIRM, P.C.
         City Place
20       204 North Robinson Avenue, Suite 650
         Oklahoma City, Oklahoma 73102
21       Telephone:  405.948.1978
         Facsimile:  405.948.0864
22       E-mail: mtoffoli@goodingfirm.com
23
24
25       (APPEARANCES CONTINUED ON PAGE 3)

---

### Page 3

1
2          APPEARANCES
3    FOR THE DEBTOR:
4        MR. DAVID W. PARHAM
         MR. MARTIN L. MONACO, JR.
         MS. ESTHER A. McKEAN
5        Attorneys at Law
         AKERMAN, LLP
6        2001 Ross Avenue, Suite 3600
         Dallas, Texas 75201
7        Telephone:  214.720.4300
         Facsimile:  214.981.9339
8        E-mail: david.parham@akerman.com
9             martin.monaco@akerman.com
              esther.mckean@akerman.com
10   AND
11       MR. LEIF E. SWEDLOW
         Attorney at Law
12       RUBENSTEIN & PITTS
         1503 East 19th Street
13       Edmond, Oklahoma 73013
14       Telephone:  405.340.1900
         Facsimile:  405.340.1001
15       E-mail: lswedlow@oklawpartners.com
         mrubenstein@oklawpartners.com
16
17   DEBTOR REPRESENTATIVE
18       MR. CHARLES ELDRIDGE
19
20
21
22
23
24
25

---

### Page 4

1
2                INDEX
3
4    EXAMINATION BY U.S. TRUSTEE ------------  8
5    EXAMINATION BY MR. CHRISTENSEN ---------- 19
6    EXAMINATION BY MR. TOFFOLI ------------- 76
7    FURTHER EXAMINATION BY MR. CHRISTENSEN -- 78
8    CERTIFICATE OF REPORTER ----------------- 85
9
10   Meeting adjourned at 3:52 p.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

### Page 5

1          NOVEMBER 30, 2020, 2:08 P.M.
2                * * *
3        U.S. TRUSTEE:  U.S. Trustee here to
4    conduct the Chapter 11, Section 341 Meetings of
5    Creditors for RHA Stroud, Inc., 20-13482, and RHA
6    Anadarko, Inc., 20-13483.  Today is November 30th,
7    2020, it is 2:08 p.m., we did have a glitch with the
8    phone number, but I believe all parties are present.
9        Before I get appearances, I want to remind
10   everyone that even though we are all appearing and
11   speaking over the telephone, this meeting is going
12   to be conducted in the same way as though we were
13   all in person.  Here in just a moment, I will swear
14   in Debtor Representative and we'll go from there.
15   But first, if I could have appearances, starting
16   with the Debtor Representative and Counsel for the
17   Debtor in Possession.
18       MR. PARHAM:  Good afternoon.  This is
19   David Parham as Counsel for the debtor, also
20   Mr. McKean is Counsel for the debtor, and Charles
21   Eldridge as the Debtor Representative, and I'm not
22   sure if anyone else is on the line.  If they did,
23   they'll have to introduce themselves.  Those are the
24   only ones that I've heard so far.
25       MR. SWEDLOW:  This is Leif Swedlow with

---

Oklahoma Reporting Services, LLC - 405.529.6575
3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112

**Page 6**

1  Rubenstein & Pitts, local Counsel for debtors.
2       U.S. TRUSTEE:  Is there anyone else other
3  than --
4       MR. CHRISTENSEN:  Yeah.  Clay Christen --
5  or go ahead, go ahead, I'm sorry.
6       U.S. TRUSTEE:  Go ahead.
7       MR. CHRISTENSEN:  It's Clay Christensen
8  and Jon Miles on behalf of the First Physician
9  Group.  And we have a court --
10      MS. BIRD:  Kristen Bird with Quinn Emanuel
11  also on behalf of First Physicians Group.  Sorry, I
12  didn't mean to cut you off.
13      MR. CHRISTENSEN:  No, you're fine.  And we
14  also have a court reporter in my office, and I'll
15  let her state her name for the record.
16      COURT REPORTER:  Brenda Schmitz.
17      MR. CHRISTENSEN:  Brenda Schmitz, as court
18  reporter.
19      U.S. TRUSTEE:  And, Ms. Schmitz, is that
20  S-C-H-M-I-D-T?
21      COURT REPORTER:  M-I-T-Z.
22      MR. PARHAM:  So Clay, is this
23  transcription going to be made available to
24  everyone?
25      MR. CHRISTENSEN:  Yes, we have no problem

**Page 7**

1  with that.
2       U.S. TRUSTEE:  Okay.  I am going to name
3  out who I have listed as appearing, have Mr. Parham,
4  Ms. McKean, Mr. Swedlow, and Mr. Eldridge as the
5  debtor representative, the three prior were counsel
6  for the debtor in possession.
7       I have Mr. Christensen, Mr. Miles, Ms. Bird,
8  and then the court reporter, court reporter, Brenda
9  Schmitz.  Is there anyone else on the line?
10      MR. MONACO:  Yes, this Martin Monaco, I'm
11  also Counsel for the debtor.
12      U.S. TRUSTEE:  I'm sorry, can you say your
13  name again?
14      MR. MONACO:  Martin Monaco, M-O-N-A-C-O,
15  I'm with Akerman, Counsel for the debtor.
16      U.S. TRUSTEE:  Thank you, Mr. Monaco.  Is
17  there anyone else in addition to Mr. Monaco?  Okay.
18  I hear none.
19      Again, I know Mr. Christensen has a court
20  reporter in his office who will be transcribing the
21  proceedings.  I also have a -- I will have an audio
22  recording of the proceedings.  Again, we have
23  Mr. Charles Eldridge appearing as the Debtor
24  Representative for both RHA Stroud, Inc. and RHA
25  Anadarko, Inc. these cases are jointly administered.

**Page 8**

1  We are going to conduct the Meeting of Creditors
2  jointly.
3       I would ask anyone who is asking questions
4  today of Mr. Eldridge, if you have a question that
5  is specific to one of the cases, such as Anadarko,
6  if you would just -- if you would just say that
7  before the question so that everyone can follow
8  along.
9       So, Mr. Eldridge, I am going to swear you in.
10  Are you prepared?
11      THE WITNESS:  I am.
12      U.S. TRUSTEE:  Okay.  Please raise your
13  right hand.
14      And thereupon the following witness was
15  produced:
16      CHARLES ELDRIDGE,
17  being first duly cautioned and sworn to testify the
18  truth, the whole truth, and nothing but the truth,
19  testified on his oath as follows:
20      EXAMINATION
21  BY U.S. TRUSTEE:
22      **Q.  Okay.  Thank you.  Okay.  I have a few**
23  **questions for you before I turn it over to any**
24  **creditors.  First one is, Mr. Eldridge, and I'm**
25  **speaking to both of these cases collectively.  Can**

**Page 9**

1  **you tell me very briefly what the cause of the**
2  **bankruptcies were?**
3       A.  For some -- yeah.  For some time there
4  have been concerns what the level of cost is from
5  the management company that we -- that the hospitals
6  jointly have.  That's been ongoing for a long period
7  of time and we -- we've been trying to find ways to
8  ameliorate those issues, and whether constructing
9  new contracts or bringing in consultants to examine
10  expenses, but when we briefly tried to bring in
11  consultants, FP, or First Physicians, cut off the
12  hospital funds to pay consultants and legal team and
13  accountants, so that we were unable to go forward
14  with those things that we were trying to accomplish.
15      So we filed -- we made a decision that we need
16  to replace them, and the only way to do that is
17  through a bankruptcy proceeding to reject their
18  management contract.  It's been a longtime coming
19  and the need to get them out is paramount.
20      We have a responsibility under the contract to
21  sign off on cost reports for the federal government,
22  and we believe that we have a plan for bankruptcy
23  that will get the hospitals to a point that they can
24  service their debts and cure any expenses that are
25  owed, and to move forward in a positive manner.

**341 Meeting of Creditors**                    In Re: RHA Stroud, Inc.; Chapter 11
**11/30/2020**                                                            20-13482-SAH

---

**Page 10**

1    Q.  So, is it -- is it fair to say, and
2    correct me if I'm wrong, that you -- your plan, what
3    you -- what you would like to do to reorganize is to
4    renegotiate or get management -- new management
5    contracts, is that the crux of it?
6    A.  We -- we believe that we needed a new
7    management company and have -- we reached out back
8    in January, we met with a handful of different
9    management companies, and we believe that we have
10   the right opportunity that will show the hospitals
11   savings over $30 million, which they are currently
12   losing, almost immediately.  And that -- that is the
13   way that we feel that we can go forward is with a
14   new management company.
15   Q.  Okay.  I want to talk about banking for a
16   minute.
17   A.  Yes.
18   Q.  What is the status of the Debtor in
19   Possession's banking?  We don't have an update on
20   the account, whether they've been opened.
21   A.  Yeah, the Debtor in Possession's account
22   has been opened, there was some -- it took a little
23   while for Wells Fargo, on their side, to get the
24   approval and a couple of people were missing due to
25   health issues.  I just spoke with the CFO of First

---

**Page 11**

1    Physicians this morning, we had an exchange, we're
2    getting their -- First Physicians' CFO, Adrian
3    Reeder said that he will be happy, his team, go into
4    Wells Fargo for the next step that they would have
5    to do to create customer profiles and then get those
6    notarized, so that we can have a seamless transition
7    and be able to still pay people from the accounts
8    properly.
9    So right now, the step is with Adrian Reeder
10   and his team to get in their customer profiles at
11   Wells Fargo, and then so once we have the profiles
12   and get the signatures notarized, they will -- it
13   takes like three to five days, and so we have zeroed
14   the accounts, those same accounts that we have
15   within Valliance Bank for operating, the operation
16   account, grant fund account, debit card account, we
17   have mirrored all those at Wells Fargo, so the
18   transition should be seamless once we have the
19   appropriate people on the account whereas the
20   payments can be made out as the status quo that
21   we've been doing.
22   Q.  Okay.  So, did Wells Fargo, or do you know
23   the status of the authorized depository agreement
24   that Wells Fargo needs to sign?
25   A.  That it needs to sign?

---

**Page 12**

1    Q.  Yes, in order for Wells Fargo to be -- or
2    for this to be -- needs to be Debtor in Possession
3    accounts, we need an authorized depository agreement
4    from Wells Fargo.
5    A.  I believe we can get you that information
6    because all the accounts were established as Debtor
7    in Possession accounts at Wells Fargo, so that
8    shouldn't be a problem to get you that information.
9    Q.  Okay.  What about the lockbox account, are
10   those going to remain the same and be swept twice a
11   day?
12   A.  Yes, the lock -- I believe, as was
13   discussed with the judge in our previous hearing,
14   the lockbox account will remain with Valliance Bank
15   and swept twice a day.  The twice a day has already
16   been established, it is -- it is sweeping twice a
17   day, but the lockbox account will remain with
18   Valliance, because, I believe, as counsel has
19   expressed, to have that changed would -- would be an
20   extreme detriment to the hospital through a --
21   many, many problems cropped up to -- to get that
22   changed.  But I believe that was approved by -- by
23   the Court and agreed upon by everyone, that the
24   lockbox remains at Valliance and swept twice a day.
25   The moment that we are assured that we can have

---

**Page 13**

1    the payments come from the bank account in the
2    appropriate way, the ones that have the management
3    First Physician team members able to initialize
4    payments that are approved, we will move all of the
5    money immediately over to those accounts at Wells
6    Fargo.
7    Q.  Okay.  With respect to your bank accounts
8    that were opened pre-petition, our office has
9    requested the statements for August, September and
10   October, and we have not received those.  Can you
11   tell me what the status is of that?
12   A.  I -- I don't know why you haven't received
13   them.  We can have the -- the accounting people send
14   those to you as soon as possible.  That -- that
15   shouldn't be an issue.
16   Q.  Okay.  Thank you.  And we need those as
17   soon as possible.  And in addition, we are still
18   waiting on a financial -- an Initial Report, excuse
19   me, that was due November 9th.  Can you tell me the
20   status of that report and why it has not yet been
21   filed?
22   A.  I'm sorry, what initial report?
23   Q.  It's called an Initial Report.  Do you
24   recall meeting with Mr. McClernon of our office over
25   the phone at an intake meeting?

---

**4**                                        **(Pages 10 to 13)**

**Page 14**

1    A. Oh, yeah, yeah.
2    Q. He would have discussed the need to file
3  an Initial Report. Do you recall that?
4    A. That's -- that does sound familiar, yeah.
5    Q. Okay. Well, that's delinquent, and we
6  need that on file as soon as possible.
7    MR. PARHAM: I appreciate if I could just
8  insert, I believe, at least our thought was that we
9  had sent it to you. Now -- or over to your office.
10   U.S. TRUSTEE: First of all, could you
11  tell me who this is, for the record?
12   MR. PARHAM: I'm sorry, this -- I'm sorry,
13  for the record, this is David Parham. We believed
14  that we had sent it to your office, and we'll send
15  it again, or, you know, apparently for whatever
16  reason, it didn't get received, we -- you know, but
17  we will send it again. We thought we had done that,
18  we noticed --
19   U.S. TRUSTEE: How do you think you sent
20  it?
21   MS. McKEAN: This is Ms. McKean. I sent
22  it in two separate e-mails to -- I believe the
23  gentleman's name a John McClernon.
24   U.S. TRUSTEE: Was it -- was it titled
25  Initial Report? Because we don't show any record of

**Page 15**

1  it.
2    MS. McKEAN: It was replying to his e-mail
3  listing everything he wanted. So what I can do is
4  I'll resend it today. And if you guys don't -- and
5  I'll ask that you guys respond that you received it,
6  so if I don't get a response e-mail, that means
7  there's something wrong with the e-mail
8  communication.
9    U.S. TRUSTEE: You don't need to e-mail
10  it, you need to file it with the Court and then
11  everyone will have notice of it. Okay. Can you
12  guys get that filed?
13   MR. PARHAM: Yeah, we can file it with the
14  Court, you know, there's -- we can certainly do
15  that.
16   U.S. TRUSTEE: Yeah, it needs to be filed
17  with the -- with the Court, which I believe it
18  should have been how Mr. McClernon instructed you in
19  person, and it was certainly what he instructed you
20  in an e-mail that I saw. So if we could get that on
21  file with the Court as soon as possible, that would
22  be very helpful.
23   MR. PARHAM: Okay.
24  BY U.S. TRUSTEE:
25   Q. Okay. I notice also that the debtors

**Page 16**

1  recently amended their top 20 creditor list. My
2  question to Mr. Eldridge is, were those debts that
3  were delinquent at the time of the case filing or
4  were those debts that were paid in the ordinary
5  course? Can you answer that?
6    A. The info I have was from the accounts
7  payable schedule that we received. And it was
8  all -- all those were unsecured claims as of the
9  petition date. That's my understanding.
10   Q. Okay. Is your understanding that prior to
11  filing, if you go back 30 days or the last time the
12  payables were paid, that they had been paid in the
13  ordinary course and were not delinquent?
14   A. I would have to ask the Withum, our
15  professionals on the financials that we're working
16  with for clarification on that. I know that they
17  have said that we haven't received any aging reports
18  yet, even though they repeatedly request them from a
19  first edition. So that had some -- added some
20  confusion about what is outstanding and what has
21  been paid or hasn't been paid.
22   When we got a document dump of payments, you
23  know, some of them even went back to 2010 without
24  any clarification of if those are still outstanding
25  or if those have been paid. So a little bit of it

**Page 17**

1  has to do with the information that we have yet to
2  receive, and -- but for full clarification, we'd
3  have to ask the Withum team accountants.
4    Q. Okay. But based on your knowledge and
5  history of these two debtors, was it under your --
6  was it your understanding that, generally speaking,
7  the bills were being paid leading up to the
8  bankruptcy cases being filed?
9    A. Generally speaking, the bills have been
10  paid, not -- not all of them, there were some, I
11  think, we actually labeled as insiders, One Cura,
12  First Physicians, Akerman, but there are some
13  that -- like for Conner & Winters, I know that has
14  been fairly outstanding for a few months and not
15  paid, based upon First Physicians just choosing not
16  to pay them on behalf of the hospital.
17   Q. Okay. Thank you.
18   A. My understanding is these -- these
19  wouldn't go normally past 30 days.
20   Q. Okay. Thank you for that. Again, going
21  back to your meeting with Mr. McClernon, he should
22  have discussed with you, and I'm going to remind you
23  of several of your duties.
24   The first one is your duty to file monthly
25  operating reports, they're due the 21st of the month

**Page 18**

1 for the month that just ended.
2     So, I believe that since your case was filed on
3 October 25th, then those remaining days in October
4 can be lined with the November time, and so that
5 operating report is due December 21st.  Do you
6 understand that?
7     A.  I do.
8     Q.  And who -- who do you anticipate will be
9 preparing the monthly operating reports?
10     A.  That would be our professional teams for
11 the hospital, the Withum and Akerman, in conjunction
12 with myself.
13     Q.  Okay.  And in addition to that, there are
14 quarterly fees that are due, and it's based on your
15 disbursements that are made, your case was filed in
16 the fourth quarter of 2020, therefore, your first
17 quarterly fee due will be due in January in 2021,
18 which could be -- Mr. McClernon is estimating
19 $180,000 for one and $100,000 for another case.
20 Does that sound familiar to you?
21     A.  Yes, it does.
22     Q.  Okay.  And do you understand the duty to
23 timely pay those fees?
24     A.  Yes, we do.
25     Q.  Okay.  And then the two additional

**Page 19**

1 reminders, you cannot pay, the debtors cannot pay
2 any professionals, whether it be accountants,
3 lawyers or what have you, any professional without
4 getting a court order.  Do you understand that?
5     A.  I do.
6     Q.  In addition, you cannot pay any
7 pre-petitioned debt without getting court approval,
8 which you have already sought approval for, but I
9 want to make sure you understand that?
10     A.  Yes.
11     Q.  Okay.
12     U.S. TRUSTEE:  What I'd like to do now is
13 turn it over to any creditors, which I believe
14 there's only one, but any creditors who have
15 questions, in case anyone else joined, I'm going to
16 go ahead and turn it over to FP Group and I will see
17 if anyone else is available after they are finished.
18         EXAMINATION
19 BY MR. CHRISTENSEN:
20     Q.  Mr. Eldridge, this is Clay Christensen on
21 behalf of the First Physician Group, and we've met
22 before, correct?
23     A.  Yes, we have, Clay.
24     Q.  Are you alone or is anybody else with you
25 in the room that you're at?

**Page 20**

1     A.  I am alone in my room.
2     Q.  Okay.  If you receive any text messages or
3 e-mails, I would like for you to disclose that to
4 the -- to all the parties on the -- on the phone.
5 Is that okay?
6     A.  If -- I'm sorry, if I received any text
7 messages or e-mails --
8     Q.  Text messages --
9     A.  -- pertaining to this hearing?
10     Q.  -- pertaining to this hearing, I'd like
11 for you to disclose that to everybody on the phone,
12 is that acceptable?
13     A.  Will do.  I understand.
14     Q.  Okay.  Now, you personally are paid
15 220,000 a year by One Cura, correct?
16     A.  I am.
17     Q.  And part of your job duties is to oversee
18 the operations of the debtors, correct?
19     A.  That is correct.
20     Q.  And you testified in the receivership
21 hearing when questioned by your own attorney that
22 First Physicians does about everything at the
23 hospitals, correct?
24     A.  For medical care?  For -- can you get
25 specific to what you're referring to?  Everything

**Page 21**

1 sounds very broad.
2     Q.  They handle everything operational
3 relating to the hospitals, you only oversee --
4 oversee that, correct?
5     A.  I -- I oversee, I, you know, provide -- we
6 argue the policies, you know, contract negotiations
7 with non-First Physician vendors, and First
8 Physicians, too.  I organize, you know, mission of
9 strategy, there's a lot of things that I've done.
10 But if you're referring to the day-to-day medical
11 operations of the hospital and what goes in with
12 that, then, yes, First Physicians does that.
13     Q.  Okay.  And speaking of the duties that you
14 performed, have those been basically the same duties
15 from, for example, from 2015 through 2019 or '20,
16 that you perform?
17     A.  I would say so.
18     Q.  Okay.  Your duties haven't really changed
19 over the years, have they?
20     A.  Depends on what's needed, if we're -- you
21 know, we -- we add different things, you know, say,
22 marketing attempts or new groups that we're working
23 with, as things change in time, the hospitals are a
24 different place than they were in 2015, so, you
25 know, that's a broad statement to say that -- that

341 Meeting of Creditors                    In Re: RHA Stroud, Inc.; Chapter 11
11/30/2020                                                   20-13482-SAH

**Page 22**

1  nothing's changed since then.
2      Q.  Okay.  The One Cura is a nonprofit,
3  correct?
4      A.  Correct.
5      Q.  And the debtors are all nonprofit entities
6  as well, correct?
7      A.  Correct.
8      Q.  Have the debtors ever made a profit?
9      A.  The debtors have not made a profit.
10     Q.  Does One Cura have any source of income,
11 other than what it's received over the years from
12 the debtors?
13     A.  No.
14     Q.  Now, who does the opinion to determine
15 whether your salary is fair market value for the
16 nonprofit One Cura?
17     A.  I believe the board of directors
18 contracted out to a valuation firm that did
19 analysis, I was not privy to that analysis and that
20 process, but it's my understanding that is the
21 process that went on and what I was offered.
22     Q.  Does Akerman assist in the performance of
23 your fair market value opinion on your salary?
24     A.  I don't know how -- I know that they
25 contract it out to a fair market value firm, I do

**Page 23**

1  not know the details of that.
2      Q.  Okay.  And Akerman has represented the
3  hospitals in the past, correct?
4      A.  Akerman has represented the hospitals in
5  the past, yes.
6      Q.  One Cura, as the parent company of the
7  hospital, desired to assemble a team to assist in
8  the operations of the hospitals; is that correct?
9      A.  Can you say that again?  I --
10     Q.  One Cura desired to assemble a team in
11 2017, '18 or '19 to assist in operating the
12 hospitals; is that correct?
13     A.  Have we desired to expand the team for One
14 Cura?  Yes, we have desired to do that, yes.
15     Q.  And One Cura never really got that done,
16 other than to hire a fundraiser, did they?
17     A.  We did not have people on the direct staff
18 of One Cura.  We did utilize consultants and other
19 people.  But we did not -- we did not expand our --
20 our employment roster during that time.
21     Q.  Right.  And One -- One Cura wanted a team
22 to handle such things as compliance issues at the
23 debtor hospitals; is that accurate?
24     A.  Provide oversight, yes, we have some
25 concerns of some issues that were going on, and

**Page 24**

1  they -- the goal was to create a team that would be
2  able to provide the appropriate oversight for this
3  process, for, you know, doing the work and so we
4  never felt comfortable expanding the team beyond
5  consultants at the time because there was an
6  unsurety of the contract and other aspects with
7  the -- with the debtors --
8      Q.  Okay.
9      A.  -- and the companies.
10     Q.  Now, you mentioned you used consultants,
11 were the consultants that were used for compliance
12 issues at the hospital, or operational issues at the
13 hospital, the Akerman Law Firm?
14     A.  I have used Akerman for that purpose.
15     Q.  Okay.  And was Akerman used for compliance
16 and operational issues in 2018, 2019 and 2020?
17     A.  I don't have that information in front of
18 me, I'd have to check to make sure, I know that
19 we've utilized and have either engaged or attempted
20 to engage other people, also.
21     Q.  Did --
22     A.  I don't have -- I cannot make a blanket
23 statement that it was just Akerman that was
24 utilized.
25     Q.  Did you ever make a statement to anybody

**Page 25**

1  at First Physicians that Martin Monaco was your
2  operational officer?
3      A.  I do not recall making such a statement.
4  Martin Monaco is an attorney --
5      Q.  Now, what did --
6      A.  Martin Monaco is an attorney who provides
7  legal resources for the hospital.
8      Q.  What did Akerman do for the hospital,
9  specifically?
10     A.  What has Akerman done for the hospital?
11     Q.  Yes.
12     A.  That's a very broad question.  They --
13 they have provided legal services, we -- I utilized
14 different people on their team to go over policies,
15 we -- the hospitals are utilizing them for the
16 bankruptcy.  You know, there -- it's a very large
17 firm that has many different facets to it.
18     Q.  Have you used Akerman for compliance
19 issues?  Yes or no?
20     A.  At this time, I'm not quite sure if we had
21 them or utilized another firm.  I -- we -- you know,
22 I think --
23     Q.  Who -- who would the other firm be?
24     A.  Be more specific.  We've utilized -- I --
25 I don't have all the people we've used over the past

Oklahoma Reporting Services, LLC - 405.529.6575
3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112

**Page 26**

1  years in front of me, we utilized with them, we --
2  we engaged with other firms for little one-offs, but
3  I'm hesitant to say that, you know, you're trying to
4  get me to say it's a blanket thing that we only use
5  them for compliance.  You know, I believe we have
6  utilized them, but I can't say that that's the only
7  firm we've utilized at that time.
8      Q.  Well, and that's my point, you have
9  used -- I'm not trying to say only.  I'm saying you
10  have used the Akerman firm for compliance issues
11  relating to the hospital, yes or no?
12     A.  Yes.
13     Q.  Okay.  And you have used the Akerman firm
14  for policy issues relating to the hospital, yes or
15  no?
16     A.  Yes.
17     Q.  And you have used the Akerman firm for
18  operational issues at the hospital, yes or no?
19     A.  For operational issues?
20     Q.  Yes.
21     A.  In what context do you mean?
22     Q.  Anything related to operations of the two
23  debtor hospitals in the past two years.
24     A.  I'm trying to think if -- if we used --
25  used them for operation, I'm trying to think if that

**Page 27**

1  is the correct answer.  I -- if I ask for legal
2  guidance, does that mean I utilized them for
3  operational issues?
4      Q.  To -- I just want to know what you know,
5  Mr. Eldridge.
6      A.  I do not believe that an Akerman team
7  member has been utilized solely for operational
8  issues, I use them for legal guidance, that's my
9  understanding of your question.  I'm not, you know,
10  I do have -- like I said, policies before I got --
11  had them review policies, but of actual operations,
12  I'm not quite sure that fits what you're asking.
13     Q.  Now, under your schedules, I'm -- I'm
14  unclear.  Has Akerman been paid the, roughly, a
15  million two that's listed in the documents attached
16  to your schedule or not, that's listed in the
17  accounts payable aging reports, that are attached to
18  your schedules?
19     A.  Can you give me a page and document so I
20  can look at it?
21     Q.  Well, it's hard to do that over the phone,
22  Mr. Eldridge.  But my question is, there were
23  pleadings filed in the state court action on October
24  9th that said -- that said that Akerman was owed
25  well over a million dollars as of October 9th.  My

**Page 28**

1  question is, has Akerman been paid the over a
2  million dollars since the October 9th filing in
3  state court?
4      A.  By the hospital?
5      Q.  By anybody.
6      A.  They have not been paid by the hospital,
7  as you can see from the filing, they have not been
8  paid in the last 90 days from the hospital.  One
9  Cura did step in to help the hospital pay their
10  legal debts that have been standing unpaid by First
11  Physicians choosing to not pay them, since, I
12  believe, February.
13     Q.  Okay.  When did --
14     A.  The hospital did not pay Akerman.
15     Q.  Okay.
16     A.  The debtors did not pay Akerman.
17     Q.  When did One Cura pay any debts in 2020 to
18  Akerman and how much was that?
19     A.  I don't have that information in front of
20  me.
21     Q.  So -- so --
22     A.  We'd have to ask -- we'd have to ask the
23  accountants.
24     Q.  So, was any debt that had been submitted
25  by Akerman to the hospitals as of the filing date of

**Page 29**

1  October 25th, was there any debt -- let me back that
2  up.  Was there any debt owed --
3      A.  Yeah, please say that again, you buzzed
4  out again, I was unable to hear you.
5      Q.  Okay.  Sorry.  As of October 25th, did the
6  hospitals owe any debt to Akerman?
7      A.  No.
8      Q.  Okay.  And is it your testimony today
9  under oath that all debt owed to Akerman as of the
10  filing of this bankruptcy was paid by One Cura?
11     A.  That is not -- that is not -- no.  That is
12  not --
13     Q.  Okay.  So how does --
14     A.  The debtors -- the debtors do not owe
15  money to Akerman.
16     Q.  Okay.  And -- and why is that?  Please
17  explain that to me.
18     A.  Akerman forgave the debtor -- the money
19  that was owed by the hospitals and now are the
20  bankruptcy lawyers.
21     Q.  Okay.  So did One Cura pay any money to
22  Akerman in the year 2020?
23     A.  Yes.
24     Q.  How much and when?
25     A.  I don't have those numbers in front of me.

**341 Meeting of Creditors**                    In Re: RHA Stroud, Inc.; Chapter 11
**11/30/2020**                                                    20-13482-SAH

---

**Page 30**

1    We'd have to ask the accountants.
2        Q.  Were you the one that signed the check to
3    Akerman?
4        A.  Yes.
5        Q.  You're the only -- you're the only
6    employee of One Cura, right?
7        A.  At the time, yes.
8        Q.  Do you remember making any payments to
9    Akerman, you know, in the month of October of 2020
10   from One Cura?
11       A.  From One Cura, I don't recall.
12       Q.  And you don't recall any payments at all?
13       A.  I don't recall.  I'd have to ask the
14   accountants.  I don't have that information in front
15   of me, Clay.
16       Q.  And were there any -- when One Cura paid
17   money to Akerman, what was the arrangement that was
18   made with One Cura, between -- or strike that.
19           When money was paid by One Cura to Akerman,
20   what was the arrangement made between One Cura
21   and -- and Akerman?
22       A.  Can you say that again?
23       Q.  When One Cura paid money to Akerman in the
24   year 2020, what was the arrangement or the agreement
25   made between Akerman and One Cura?

---

**Page 31**

1        A.  I don't know what you mean by "the
2    agreement."  If One Cura paid money to Akerman, it's
3    for services rendered to One Cura or when One Cura
4    helped pay for the hospital's legal team because
5    they -- the hospitals, you know, were in litigation
6    brought by First Physicians, and First Physicians is
7    the one keeping the hospital from paying for their
8    own legal defense.
9        Q.  Okay.  The -- now, so your testimony today
10   is you don't have any idea how much money One Cura
11   paid on behalf of the debtors relating to the fees
12   owed to Akerman prior to the filing of the
13   bankruptcy?
14       A.  I could -- I would have to ask -- I don't
15   have that information in front of me, we will have
16   to ask the accountants and we can get you your exact
17   number.
18       Q.  Was it more than 100,000?
19       A.  I believe so.
20       Q.  Was it more than 500,000?
21       A.  I don't recall if it was.  Let's see.  I
22   think it was around that, but I don't have -- I
23   don't have the exact number for you, so please
24   don't -- so we can get that eventually, but I'd have
25   to ask the -- the accountants.

---

**Page 32**

1        Q.  Okay.  Now, you testified in the state
2    court action that the debtors never -- never made a
3    payment on the lease to First Physician Realty.  Do
4    you recall that testimony?
5        A.  That they never made a lease or they --
6        Q.  They never --
7        A.  At any point in time?  I don't believe --
8    I'm not quite sure that was the full testimony.  I
9    believe that they paid interest here and there
10   sporadically on the lease, if I recall correctly.
11       Q.  Let me back up, and I'm going to ask you a
12   question that may help with your memory.  Do you
13   recall testimony in the state court action that the
14   debtor sporadically paid interest on the notes owed
15   to Rural Hospital Acquisition?
16       A.  Yes, that sounds familiar.
17       Q.  Okay.  And do you -- does that help you
18   recall your testimony in the state court action was
19   that the debtors never made a payment on the lease?
20       A.  I believe that is correct.
21       Q.  Now, you recall signing audit confirmation
22   letters in the year 2020 that -- that showed that
23   there was $10 million owed on the lease by both
24   hospitals, don't you?
25       A.  I believe so.

---

**Page 33**

1        Q.  And you received -- you received a letter
2    from First Physician Realty in February of 2020
3    demanding immediate payment on the leases and
4    declaring a default.  Do you recall receiving that
5    letter?
6        A.  I do.
7        Q.  And it is your testimony today that no
8    payment was made on the lease after receipt of that
9    demand letter in early 2020, correct?
10       A.  After receipt?  I believe I actually
11   reached out to Adrian Reeder, CFO, to ask how to
12   make payments going forward with the petition and
13   have not been provided with that information.
14       Q.  Let me --
15       A.  He just said, oh, I'm sorry, I don't have
16   that right now, I just asked you and he has not.
17       Q.  Let me --
18       A.  So an attempt was made by the hospital to
19   pay post petition on the leases, but we have not
20   been provided with the appropriate information from
21   Adrian Reeder.  He -- he commented that he didn't
22   have that and -- but we haven't received a
23   follow-up.
24       Q.  Okay.  Let me clarify my question.  That
25   the debtors, after receipt of the demand letter in

---

Oklahoma Reporting Services, LLC - 405.529.6575
3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112

**341 Meeting of Creditors**  
**11/30/2020**

**In Re: RHA Stroud, Inc.; Chapter 11**  
**20-13482-SAH**

---

**Page 34**

1 February of 2020, did not make any payments on the  
2 lease in February, March, April or May of 2020,  
3 that -- that's correct, isn't it?  
4     A.   As -- as you know, there is a dispute  
5 about the 2019 contract, which would have caught,  
6 showed that the payments should have been made by  
7 First Physicians on behalf of the hospital, and  
8 brought up to the -- up to date on these payments.  
9     Q.   My question --  
10     A.   So the fact that those payments have not  
11 been made during that time could be indicative of  
12 the fact that a -- a contract was not being followed  
13 by First Physicians as the payment agent.  Since the  
14 petition, we have reached out, expressing who -- the  
15 instructions on where and how to pay and transfer  
16 payment money.  
17     Q.   So it is accurate to say that in February,  
18 March, April or May of 2020, that the debtors did  
19 not make any payments on the lease, correct?  
20     A.   Correct.  
21     Q.   Now, One Cura could have made payments on  
22 the lease during that period of time of February,  
23 April, you know, March, May of 2020, correct?  
24     A.   One Cura could have?  
25     Q.   Yes.

---

**Page 35**

1     A.   Had the ability to?  
2     Q.   Yes.  
3     A.   I -- I guess One Cura could have.  
4     Q.   And One Cura did not make any payments on  
5 the lease, either, in -- within 90 days after  
6 receipt of the demand letters on the lease, did it?  
7     A.   It did not.  
8     Q.   Okay.  And First Physician Realty  
9 terminated the lease and sued to evict the hospitals  
10 in early 2020, correct?  
11     A.   Yes.  
12     Q.   Okay.  Now, if the leases were not  
13 terminated and First Physician Realty allowed the  
14 debtors to reinstate the lease, how would -- how  
15 would the debtors cure the leases and pay the 10  
16 million that's owed on the leases?  
17     A.   Well, you know, that -- that plan is being  
18 worked on with the lawyers and the accountants for  
19 the reorganization.  The lawyers haven't begun  
20 drafting that, but we understand that we will have  
21 to pay secured debts over time, cure -- and cure the  
22 lease and pay off all secured creditors.  
23     Q.   Does --  
24     A.   The hospital lawyers and Withum will be  
25 drawing out the details of a financial projection

---

**Page 36**

1 funding a plan, but we don't have that in front of  
2 me at this time.  
3     Q.   Does the debtor -- does either the debtor  
4 or One-Cura or any investor or other party that you  
5 have talked to have the ability to cure the lease  
6 within the next 120 days?  
7     A.   Like I said, I don't have the full, you  
8 know, plan in front of us, so I can't speak to what  
9 our full plan is in the next 120 days.  
10     Q.   Does One Cura have 10 million sitting in  
11 its bank account?  
12     A.   One Cura does not have 10 million sitting  
13 in its bank account.  
14     Q.   So as you sit here today, you have no idea  
15 how you would cure the 10 plus million owed on the  
16 lease?  
17     A.   Like I said, we -- we have lawyers, and  
18 the accountant team are working on drafting that  
19 plan.  We believe that change in management company  
20 will bring a savings of about $30 million, in  
21 comparable to the current contracts that are  
22 happening, and if those numbers, you know, I'm  
23 approximating, but those numbers will allow the  
24 hospital with a plan that will be approved by the  
25 Court to have money, to, like I said, to pay secured

---

**Page 37**

1 debts over time, to cure a lease and pay unsecured  
2 creditors.  
3     Q.   Okay.  Let's talk about that for just a  
4 second.  How would the potential reduced payments to  
5 a management company such as Arcadia help the  
6 hospitals?  
7     A.   How would the reduced payments?  
8     Q.   Yes.  
9     A.   In the short term, it will help the  
10 hospital pay off their debt and come up with, you  
11 know, a plan to move forward.  
12     Q.   Okay.  Well, does the reduction,  
13 Mr. Eldridge, does the reduction in the payment to  
14 the management company create any profit at all to  
15 the debtor hospitals?  
16     A.   For hospitals?  I'd have to have the  
17 accounting team to speak to all of that, you know,  
18 the cost savings, the analysis that was done by  
19 Withum, you know, I don't have that in front of me,  
20 I can't speak to specific numbers, so I'll have to  
21 get back to you on that with the accounting team.  
22     Q.   Well, how does -- how does the -- how does  
23 the debtor hospitals get paid?  I mean, you've  
24 over -- you're --  
25     A.   Medicare, Medicaid, insurances.

---

**10**                                    **(Pages 34 to 37)**

**Page 38**

1    Q.  Okay.  And what's the designation of these
2  hospitals, is it -- are they critical access
3  hospitals?
4    A.  Critical access hospitals.
5    Q.  Okay.  And are they paid 101 percent of
6  the cost charged to them, is that how they're paid
7  by Medicare --
8    A.  Yes.
9    Q.  -- is they're reimbursed on 101 percent of
10  the cost?  Would you agree with me on that?
11    A.  Yes.
12    Q.  And the fees charged by any management
13  company is a cost to the hospital?
14    A.  Yes.
15    Q.  Correct?  And -- and if the costs are
16  reduced, does that mean that you will get reimbursed
17  more or less from Medicare?
18    A.  We'll get reimbursed less.
19    Q.  Okay.  So if your costs were reduced,
20  pick -- pick a number.  You pick a number on what
21  you think the costs will be reduced, you've said
22  30,000, so I'll use that.  So my question is -- or
23  30 million, excuse me.
24      If the cost paid to a management company is
25  reduced by your number of 30 million, it's going to

**Page 39**

1  cause the Medicare monies that are paid to the
2  hospitals to be reduced by 30 million as well; isn't
3  that correct?
4    A.  That is correct.  They will eventually be
5  reduced.
6    Q.  Okay.  And -- and when you say eventually
7  reduced, what do you mean by that?
8    A.  Well, it takes, what, about a year, 18
9  months, give or take, for the cost sometimes to be
10  reevaluated based on the yearly cost reports.
11    Q.  So is it the debtor's plan to try to let
12  Medicare overpay these hospitals during the next
13  year or 18 months to try to use Medicare monies to
14  pay back creditors?  Is that the debtor's plan that
15  you're talking about?
16    A.  That -- that doesn't sound exactly
17  correct, like I said, we'd have to talk to the
18  accounting team --
19    Q.  Well --
20    A.  -- to get kind of clarification on the
21  numbers.
22    Q.  If -- if --
23    A.  Say money -- money comes in from Medicare,
24  so we think that there will be -- there will be a
25  cost reduction from a new team coming in, and we --

**Page 40**

1  the team is somebody who I believe we can work with
2  well to find ways for the hospital to be profitable
3  and not be in the current situation that they've
4  been in since operating with First Physicians.
5    Q.  But -- but my question, my question,
6  Mr. Eldridge is, you know, it sounds like, and you
7  tell me if I'm wrong here and then tell me why I'm
8  wrong, it sounds like you want to reduce the
9  management fees, but not advise Medicare immediately
10  that you've reduced the management fees, and allow
11  Medicare to overpay the hospitals, you know, and let
12  Medicare catch that on the next cost report and then
13  they will reduce it.  Is that what your discussion
14  is?
15    A.  No, I don't believe that's exactly my
16  discussion, no.
17    Q.  Okay.  So, how does -- how does reducing
18  the amount you received from Medicare by reducing
19  the amount you paid to a management company help the
20  creditors?
21    A.  Well, we can see that the management
22  company prices are drastically different, and we
23  think that that might be able to get the hospitals
24  in a better position than they have been, because as
25  we've seen over the last years, the costs have been

**Page 41**

1  skyrocketing for the current management team at
2  First Physicians, and the hospitals' debts have
3  skyrocketed with it, and there's something --
4  there's something wrong there, you know.
5      We don't think a management team should be
6  taking out, you know, 18 million of profit, I
7  believe is what was testified by their chairman of
8  our board, we, you know, our back-of-the-envelope
9  makes it probably even higher, that $18 million
10  profit, when the hospitals are losing 30 million a
11  year.
12      We hope that utilizing a new firm that has a
13  much better price structure is going to put the
14  hospitals in getting -- finding that -- a much
15  better balance in the current inequities that they
16  have right now.
17    Q.  Have you run any projections or any
18  budgets or reports based upon the numbers provided
19  to you from Arcadia?
20    A.  The accounting team has -- has been doing
21  that.  I can't speak for specific numbers, you will
22  have to ask them at a different time.
23    Q.  So as far as you know today, you have no
24  idea whether anybody has prepared any numbers?
25    A.  Oh, I believe numbers have been prepared,

**Page 42**

1  I don't have the numbers in front of me, and the
2  accountant -- the accounting team has been the one
3  working those numbers.
4      **Q.  Would you -- would you agree with me that**
5  **if you're charged less, but then you're reimbursed**
6  **less, that it doesn't net anything to the debtor?**
7      A.  Not necessarily.  You can get the Medicare
8  mix changed, and that could have -- that could
9  actually increase some funds, but not necessarily.
10     **Q.  How does that work?  Explain that to me.**
11     A.  Well, we get reimbursed most heavily on
12 Medicare, and they, you know, based kind of on
13 percentage of the population served by it.  So if
14 the number goes up, their reimbursement is higher,
15 so I would point out that your blanket statement,
16 you know, was not fully correct, that there were
17 different ways.
18     **Q.  Does it -- does it change from -- does**
19 **Medicare reimbursement change from 101 percent of**
20 **your cost if the Medicare percentages goes up or**
21 **down?**
22     A.  No, no, no.
23     **Q.  Okay.  What -- under the Arcadia proposal,**
24 **what does One Cura receive out of it?**
25     A.  I don't have the Arcadia proposal in front

**Page 43**

1  of me.
2      **Q.  As you sit here today, you don't know what**
3  **the Arcadia proposal is?**
4      A.  I do -- I do -- I don't have the numbers
5  of the Arcadia proposal in front of me, so I can't
6  give you numbers.
7      **Q.  Well, my question is, what does One Cura**
8  **receive if Arcadia is the operator for the manager?**
9      A.  I don't have the proposal in front of me.
10     **Q.  Is there a proposal between Arcadia and**
11 **One Cura that would show that One Cura is receiving**
12 **anything under the Arcadia contract?**
13     A.  There is no -- I don't -- there is no
14 agreement between One-Cura and Arcadia.
15     **Q.  Okay.  So, what proposal are you referring**
16 **to?**
17     A.  The -- I thought you were referring to the
18 Arcadia proposal for the hospital for management.
19     **Q.  Okay.  So under the Arcadia proposal, One**
20 **Cura receives zero on a monthly basis, is that --**
21     A.  From Arcadia?
22     **Q.  Yeah, from the hospitals.**
23     A.  Okay.  Well, you didn't ask that.
24     **Q.  Okay, I'm sorry.  So --**
25     A.  One Cura has a contract with the hospitals

**Page 44**

1  for 62,500 a month, that was a number that One Cura,
2  the hospitals and even First Physicians agreed upon
3  as an adequate number.  So the hospitals have that
4  agreement with One Cura.  Arcadia does not have any
5  agreement with One-Cura.
6      **Q.  So Arcadia would allow the 125,000 a month**
7  **to be paid to One Cura going forward?**
8      A.  I would assume.
9      **Q.  Well, you're One Cura, do you know one way**
10 **or the other?  What's your discussion?**
11     A.  I don't know.  One Cura has the
12 relationship with the hospital with that contract,
13 but I assume Arcadia would be upholding that
14 contract.
15     **Q.  When was the first time you had heard of**
16 **the concept from Arcadia or Sean Kirrane putting**
17 **together a group to manage the two hospitals?**
18     A.  Well, I -- I met with and initiated
19 meetings with multiple potential management
20 companies, I met with three different ones back in
21 January on behalf of the hospitals back in Oklahoma.
22 So, you know, I met with Sean Kirrane at that time.
23 I initiated a meeting with him to discuss a few
24 things.  But Sean Kirrane's proposal from Arcadia
25 came this month.

**Page 45**

1      **Q.  Okay.  Who else did you meet with in**
2  **January of 2020?**
3      A.  Do I have to disclose that to you?  I
4  mean --
5      **Q.  I think it -- it's -- everything in**
6  **bankruptcies --**
7      A.  I -- I'm going to ask my attorneys really
8  fast, because I don't know if I have to -- wouldn't
9  that be proprietary information?
10     **Q.  I mean, you're -- we're on the phone**
11 **talking about the debtor hospitals, and it would be**
12 **the debtor hospitals having meetings to talk about**
13 **management changes in January, I think that's highly**
14 **relevant.  There may be better companies than**
15 **Arcadia that you talked to.  So who was it?**
16     THE WITNESS:  Is there any objection from
17 the debtors?
18     MR. PARHAM:  No, Chuck, I think you -- I
19 think you've got to answer that.  Go ahead and
20 answer.
21     THE WITNESS:  Okay.  That's fine then.  I
22 just wanted confirmation, thank you.
23     MR. PARHAM:  Sure.
24     THE WITNESS:  Yes, we -- the hospitals met
25 with Cohesive and we also met with the Southern

**Page 46**

1  Plains Medical Group.
2  BY MR. CHRISTENSEN:
3     Q.  Okay.  And Arcadia was chosen?
4     A.  Arcadia presented a unique -- a unique
5  presentation that seemed to hit the right notes in
6  the last couple weeks.
7     Q.  What was unique about Arcadia's
8  presentation as compared to Cohesive or Southern
9  Plains?
10    A.  Well, I believe that Arcadia is going to
11 be utilizing aspects and resources from Southern
12 Plains and Cohesive.  So the Arcadia may be the name
13 that's on it, but the resources are actually -- seem
14 to be part of a triumphant, if you will, aspects of
15 each of the three different companies, taking the
16 strengths from each of them.
17    Q.  Now, did you have any discussion, you or
18 any attorney for the hospitals have any discussion
19 with Sean Kirrane in 2018 about starting a
20 management company?
21    A.  No, I don't believe so.
22    Q.  Did you or any of the attorneys for the
23 hospital have a conversation with Sean Kirrane in
24 2019 about starting a management company for the
25 hospitals?

**Page 47**

1     A.  I would -- I would have to ask for
2  clarification, when did Sean Kirrane no longer work
3  for First Physicians, because I sure didn't have any
4  conversation with him during the time that he worked
5  with First Physicians.
6     Q.  Do you know if any of your attorneys had
7  any conversations with Mr. Kirrane about managing
8  hospitals, whether it's these hospitals or other
9  hospitals, in 2019?
10    A.  As -- as an individual of his own company,
11 or as part of First Physicians?
12    Q.  As an individual in his own company.
13    A.  Well, I -- I told you I did not have any
14 conversations with him while he was employed with
15 First Physicians regarding management company.  I
16 cannot speak for any attorneys.  I did not direct
17 any attorneys to have conversations with him.
18        MR. PARHAM:  You know, I'm going to object
19 at this point to this line of questioning, because
20 it doesn't seem to have anything to do with the
21 debtors, and it seems to moving towards --
22        MR. CHRISTENSEN:  I'm moving --
23        MR. PARHAM:  This is David Parham.  I
24 understand there's employment litigation that's
25 ongoing between First Physicians and Mr. Kirrane,

**Page 48**

1  and it seems like this is more geared towards that
2  than it is towards anything to do with the
3  hospitals.
4        MR. CHRISTENSEN:  It all has to do with
5  the hospitals, but I'm kind of moving on anyway,
6  David, so --
7  BY MR. CHRISTENSEN:
8     Q.  Has Arcadia or Sean Kirrane provided any
9  budgets, projections or valuations to you or the
10 hospitals relating to the operations at the
11 hospital -- hospitals?
12    A.  He has provided a proposal, yeah, with
13 budgets, yes.
14    Q.  Are there budget details that went with
15 the proposal, other than just the proposal that was
16 attached to pleadings, you know, budgets or
17 projections?
18    A.  I'd have to ask -- I'd have to ask the
19 accountants for what details, I don't know.  I
20 believe the accountants followed up with him, with
21 the proposal, but I'd have to ask the accountants
22 for what exact details they have.
23    Q.  Who all was involved in the discussions
24 with Sean Kirrane on the proposal from Arcadia,
25 involved for the hospitals?

**Page 49**

1     A.  So it's the -- for the hospitals?  It
2  would be myself, it would be, you know, the
3  hospital's legal and accounting team.
4     Q.  Who at the legal team and who on the
5  accounting team?
6     A.  Well, our bankruptcy consultant team or
7  bankruptcy team right here, Dave Parham, Esther
8  McKean, you know, and then it was Ken McGraw,
9  Serena, I'm sorry, I've forgotten Serena's last name
10 at this moment.
11    Q.  Okay.  Was Mr. Monaco involved?
12    A.  Mr. Monaco is not part of the anchor of
13 the team, he has been counsel for the hospitals for
14 quite some time and provided a historical aspect to
15 it, but he's not part of the bankruptcy team for us.
16    Q.  So the question, was Mr. Monaco involved
17 in any discussions relating to the proposal made by
18 Arcadia and Sean Kirrane?
19    A.  I -- he's part of the legal team, so he
20 may have been on a few of the calls.  I -- it --
21 again, that's -- I don't remember how many people
22 are on these, you know, some of these calls, so --
23    Q.  You mentioned earlier that Cohesive and
24 Southern Plains Medical Center is teaming up to
25 provide different aspects with Arcadia.  Are there

---

**Page 50**

1  documentation that could be provided to -- to my
2  client and -- and the U.S. Trustee as to their
3  involvement with Arcadia?
4      A. I'd have to ask Arcadia on what -- on what
5  documentation they have for any arrangements of
6  services as a subcontractor.
7      Q. Then maybe I misunderstood you,
8  Mr. Eldridge. What involvement does Cohesive have
9  with regard to the proposal made by Arcadia?
10     A. I -- I don't have the specifics, I have
11  not seen a subcontracting contract with -- with
12  them, but, you know, what was discussed is a
13  different strength that each company has that are
14  going to be utilized.
15     Q. Okay.
16     A. If you want the specifics, we would have
17  to talk to Arcadia.
18     Q. And would your answer be the same as to
19  Southern Plains?
20     A. That is correct.
21     Q. Okay. Have you done any investigation to
22  see whether Arcadia has the funding to employ
23  several hundred people at the hospitals?
24     A. Have I done any investigation?
25     Q. Yes. Any due diligence or investigation

---

**Page 51**

1  to know whether Arcadia has the funding to employ
2  several hundred people at the hospitals?
3      A. It is our understanding that they can.
4      Q. Have you checked out how they have the
5  ability to provide the funding?
6      A. I'd have to check the documents that they
7  provided us.
8      Q. And --
9      A. We have the accounting team doing the due
10  diligence on that, I believe.
11     Q. And what due diligence is the accounting
12  team doing at your direction?
13     A. They're running all the numbers to make
14  sure things work, you -- we have to bring in the
15  accounting team to talk about that.
16     Q. Okay. So as you sit here today, you don't
17  know whether there's been any due diligence done as
18  to whether Arcadia has the funding to cover the
19  payroll for several hundred people at the hospitals?
20     A. I believe a due diligence has been done, I
21  don't -- I cannot confirm that at this time.
22     Q. And have you been told whether Arcadia has
23  the funding to cover the salaries of several hundred
24  people at the hospitals?
25     A. I have been told that they can.

---

**Page 52**

1      Q. Okay. And have you been told where they
2  would get the funding?
3      A. No.
4      Q. And is it your testimony that they would
5  get the funding from overpayments from Medicare?
6      A. I don't -- I don't know that.
7      Q. And have --
8      A. I don't know if Arcadia -- I don't know
9  who all of Arcadia -- if they have partners with
10  funding, I don't know the -- I don't have Arcadia's
11  breakdown of their, you know, their funding in front
12  of me.
13     Q. And as we sit here today, Mr. Eldridge,
14  you're the only person in the parent company that
15  provides oversight to -- to the debtor hospitals,
16  and you don't know whether the proposal you've made
17  to the bankruptcy court to change management,
18  whether the party in that proposal, Arcadia, has the
19  ability to fund salaries; is that accurate?
20     A. You asked if it would be overpayment that
21  was funding their salaries, and I don't believe that
22  is correct.
23     Q. Okay. But as you sit here today, as
24  the -- the debtor in possession for the hospitals,
25  do you have any knowledge, personal knowledge that

---

**Page 53**

1  Arcadia would have the ability to fund 300 employees
2  at the hospitals?
3      A. That I -- it has been represented to me
4  that under their model, the money coming into the
5  hospitals would cover the cost of the hospitals, and
6  that includes the overpayments, if there's an
7  overpayment.
8      Q. So it's been represented to you that
9  money flowing from the government would be used to
10  pay salaries of the individuals; is that your
11  testimony today?
12     A. Yes.
13     Q. Okay.
14     A. The money coming from the government for
15  services that the hospitals have done will be used
16  to pay for services that the hospital will be doing.
17     Q. And has anybody at Arcadia or anywhere
18  else represented where they would come up with the
19  roughly 300 employees to run the hospitals?
20     A. That is -- that is -- yes. They have
21  represented that, and that's part of -- they have as
22  part of their collective teams.
23     Q. And where do they get those employees?
24     A. You'd have to ask Arcadia --
25     Q. Is --

**14**                        **(Pages 50 to 53)**

**Oklahoma Reporting Services, LLC - 405.529.6575**
**3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112**

**Page 54**

1  A. -- for the specifics of how they are
2  utilizing their employment.
3  Q. As the representative of the debtors, you
4  don't have an idea where they would come up with the
5  300 employees?
6  A. I -- I have some ideas, I can't give you
7  their -- explicitly how Arcadia's plan is. I know
8  that there will likely be people at the hospitals
9  themselves that will -- if a management company
10 changes, would want to continue with their
11 employment, and I believe that Oklahoma is a
12 right-to-work state, and they will be able to
13 seamlessly come and work for -- continue to work for
14 the hospital for a different management company. I
15 believe that that is a part of the plan.
16 I know that there are a lot of resources that
17 Arcadia and there's -- their subcontractors have at
18 their disposal, both for staffing and providers, so
19 I'm sure they're going to utilize some of that.
20 You'd have to ask Arcadia for a percentage breakdown
21 of where certain people will come from, but what's
22 been represented to me is that staffing is not an
23 issue.
24 Q. And have you or anyone on behalf of the
25 debtors investigated the people that are listed on

**Page 55**

1  the Arcadia proposal as being part of the team?
2  A. Have we investigated it? I'm familiar
3  with -- with a lot of them.
4  Q. Dr. Michael Carter, what does he presently
5  do?
6  A. I don't have his -- he's not one that I'm
7  familiar with. I don't have the Arcadia proposal in
8  front of me, so I can't give you the biographies of
9  everybody.
10 Q. Well, my question on Dr. Carter is --
11 A. Mike Carter, I mean, I can't give you the
12 specifics, I don't want to be like, oh, you, because
13 if I misstep on, you know, somebody's CV that I saw
14 a couple of times. You know, Mike Carter has worked
15 for different critical access hospitals, has been
16 the, you know, on-site CEO of different critical
17 access hospitals, I believe, you know, so that --
18 that is somebody who has worked in the space for
19 quite sometime.
20 Q. Does -- does Dr. Carter work for Arcadia
21 right now, if you know?
22 A. I believe he does.
23 Q. Okay. Joanna Davis?
24 A. I -- I feel like some of these questions
25 would probably more appropriately directed at

**Page 56**

1  Arcadia.
2  Q. Well, these all relate to the hospital,
3  and you are the representative of the hospital, and
4  changing management companies can cause drastic
5  impacts on a critical access hospital, so that's why
6  I'm asking you, Mr. Eldridge. Joanna -- as to
7  Joanna Davis, do you know if she presently works for
8  Arcadia?
9  A. I believe so, but I'm not privy to their
10 full, you know, employment status and how things
11 are.
12 Q. Dane Johnson, does Dane Johnson presently
13 work for Arcadia?
14 A. I believe so, but I don't -- like I said
15 before, I don't know exactly how their employment
16 status works for their company.
17 Q. The -- and what did you understand their
18 status, their work status, how the work status
19 relates to the company, is there some sort of --
20 A. I -- I assume that they are part of the
21 company, you're asking me if there's specifics for
22 it, and I'm not the right person to say their
23 specific title, you know, or such with Arcadia.
24 Q. Okay. Do you know whether Dane Johnson
25 presently works at Feed the Children, do you know

**Page 57**

1  that or not know that?
2  A. I don't know. I don't know.
3  Q. Kathy Kennett.
4  A. I don't know.
5  Q. Kathy Kennett, do you know whether she
6  presently works at Arcadia?
7  A. I don't know.
8  Q. Have you done anything to investigate
9  whether any of these employees actually work at
10 Arcadia right now or they're planning to moonlight
11 with their present jobs?
12 A. I don't -- I -- I don't know.
13 Q. Okay. Do you know where Kathy --
14 A. It seems that each of these people have
15 varied experiences, you know, I know Dane Johnson
16 used to have a different company that worked with
17 revenue cycle, you know, and he has expertise in
18 that area, and, you know, I -- the team worked with
19 him, also.
20 Q. Do you --
21 A. We've known his products, I think it's a
22 company called Praxis back in the day, and so that
23 is -- if that is somebody that's part of the Arcadia
24 team, that is somebody who has infinite familiarity
25 with these debtor hospitals, and could be of

**Page 58**

1  assistance to them.
2      Q.  Do you know whether Kathy Kennett even
3  lives in the state of Oklahoma?
4      A.  I don't.  But we live in a, you know, at a
5  time where you can work from home as everyone here
6  on this call knows very well, since we are all
7  working primarily from home.  So I don't know where
8  Kathy Kennett lives.
9      Q.  Do you know if Patrick Waters presently
10  works for Arcadia?
11      A.  I -- I do not.  It has been represented
12  that he will be a part of the Arcadia team.
13      Q.  And do you know when Arcadia was
14  established?
15      A.  Arcadia provided their presentation to me
16  this month, so I do not know when Arcadia was -- was
17  established or if they're incorporated or whatnot, I
18  don't know their -- their founding date.
19      Q.  Okay.  Now, if I understood correct
20  earlier, Sean Kirrane, who's now with Arcadia,
21  provided a presentation to you relating to these
22  hospitals in January of 2020?
23      A.  It -- I don't think he -- I did not
24  request the meeting because he had a company with
25  Arcadia, he is somebody that I wanted to talk to at

**Page 59**

1  that time, and he was not with First Physicians, to
2  see what -- what he might be doing.  And at that
3  time, he -- he represented to me that he had ideas
4  of what to -- what could be done, but he wasn't --
5  it was not in a presentation from Arcadia or on
6  behalf of Arcadia at that time.
7      Q.  When did you first talk to your directors
8  of the hospitals about filing bankruptcy?
9      A.  Probably January, 2019.
10      Q.  And when did you next talk to them about
11  filing bankruptcy?
12      A.  It's been on and off a continual
13  conversation since 2019.
14      Q.  Okay.
15      A.  A lot of factors at play.
16      Q.  Did -- your director signed a resolution
17  on, I want to say October 14th of this year relating
18  to this bankruptcy action.  How much advance notice
19  was given to your directors that you were going to
20  be putting it into bankruptcy in October?
21      A.  Like I said, it's been an on-and-off
22  conversation, with a lot of different factors at
23  play, so I don't -- I don't think I can say a
24  specific moment in time that it's like, ahh, this
25  is -- you know, like now, we've always -- we've

**Page 60**

1  always had, you know, advice coming, so we've always
2  had a discussion about this, and so that, you know,
3  we decided to go forth in October.
4      Q.  Did you have any discussion about filing
5  bankruptcy after the receivership hearing on
6  September 14th, 2020, with your directors?
7      A.  Yes, that is one moment that this
8  bankruptcy was discussed, yes.
9      Q.  Okay.  When was the first discussion of
10  bankruptcy after September 14th, with your
11  directors?
12      A.  I -- I don't know.  I don't have that
13  conversation -- I don't have that information in
14  front of me.
15      Q.  Okay.  And when -- when did you and your
16  directors flip the switch that you're going to go
17  into bankruptcy in October?  The resolution was
18  signed around the 14th, when -- when did you guys
19  decide to go in?
20      A.  When we signed the resolution.
21      Q.  Not before?
22      A.  Well, no.  We've always had discussion
23  that it might be necessary, but we signed the
24  resolution on the 14th.
25      Q.  Okay.  Now, you talked -- you talked a

**Page 61**

1  little bit earlier about One Cura was -- is paid so
2  much per month.  But for the years -- for many
3  years, One Cura was paid about 25,000 a month for
4  the two hospitals, correct?
5      A.  Correct.
6      Q.  And that amount was to cover your salary
7  and the benefits to oversee the operations, correct?
8      A.  And there was a little bit extra for --
9  for -- yeah, expenses, you know, travel.
10      Q.  Some in addition to the --
11      A.  A little bit for marketing, like that.
12      Q.  There was some in addition to the 25 to
13  cover travel or seminars or other things, correct?
14      A.  Yes, a little.  Yeah.
15      Q.  Okay.  The -- in 2018, you instructed the
16  management company to start paying One Cura 200,000
17  a month for both hospitals, didn't you?
18      A.  Combined, yes.
19      Q.  And you and your attorney asserted at that
20  point in time that it was the hospital's money and
21  you owned the hospitals, you could do what you
22  wanted to do with that money, and that was part of
23  the rationale on raising it from 25,000 a month
24  combined to 200,000 a month combined, correct?
25      A.  I don't think that that exact wording is

**341 Meeting of Creditors**                    In Re: RHA Stroud, Inc.; Chapter 11
**11/30/2020**                                                      20-13482-SAH

---

**Page 62**

1   appropriate.
2       Q.  Something --
3       A.  I think that our -- what One Cura was
4   attempting to -- we wanted to bring in and pay for
5   consultants and eventually expand the team, and we
6   needed to be able to have access to money to do
7   that, and there was an issue that the hospital and
8   One Cura, overseeing the hospital, did not have any
9   access to the hospital funds to provide those
10  services for the hospital.
11      And as you well know, there are many issues
12  that were coming up that were problematic from some
13  of the things that were happening with the
14  management company, and we wanted to make sure that
15  there was funding to pay for the consultants that
16  may be needed to remedy those agreements with these
17  vendors, to pay for oversight, to pay for reviews of
18  a -- of more thorough reviews of policies and
19  contracts than what was -- we were able to do before
20  that.  So, yes, the amount was increased.
21      Q.  So I'm going to break down my statement.
22  It's true that the debtor hospitals own the money
23  that's in the bank accounts, correct?
24      A.  Is it true that the debtor hospitals owe
25  the money that's in the bank account?

---

**Page 63**

1       Q.  Own, own.  Let me rephrase it.  It's
2   accurate that the debtor hospitals own the bank
3   accounts and the money in the bank accounts,
4   correct?
5       A.  Which bank accounts?
6       Q.  The lockbox coming in where money comes in
7   from Medicare or other paying sources, those
8   accounts are in the name of the debtor, correct?
9       A.  Yes.
10      Q.  And isn't it also accurate that when you
11  told the hospitals to raise the amount One Cura was
12  being paid, it's because that money, in your view,
13  belongs to the hospitals, and the hospitals are
14  owned by One Cura?
15      A.  That money -- that money is necessary for
16  the hospitals to have oversights over issues that we
17  felt needed more oversight on.
18      Q.  The management --
19      A.  So I felt that money was necessary.
20      Q.  The management company, based on your
21  instructions, paid One Cura 200,000 a month,
22  correct, for several months?
23      A.  I believe it may have been two months, I'm
24  unsure.
25      Q.  Okay.  And have you ever heard your

---

**Page 64**

1   attorney tell anybody that either you pay the
2   200,000 or we're going to take away First
3   Physicians' access off of those lockbox accounts?
4       A.  No, I have not heard him say that, nor
5   would he have the authority to say that.
6       Q.  Okay.  And you would agree that the
7   management company only had the right to access the
8   debtor accounts, they didn't own -- the management
9   company did not own the accounts?
10      A.  I believe the management company, due to,
11  you know, secure debt has a claim on the money, as
12  you've expressed before, but we -- the hospitals
13  also have to be able to provide, you know, get the
14  correct oversight to make sure everything's going
15  right.  And we came -- I -- First Physicians and the
16  hospitals, One Cura all came to an agreement, and
17  that number was 62,500, and that that was the
18  appropriate number that would allow the hospitals to
19  build up funds to hopefully expand their team and
20  provide for what was needed for the hospitals.
21      Q.  Okay.  So, breaking down your answer, the
22  200,000 a month got reduced to 125,000 a month,
23  correct?
24      A.  That's correct.
25      Q.  And the reason that One Cura wanted that

---

**Page 65**

1   money was to build the team, to provide more
2   oversight to the operations at the hospitals,
3   correct?
4       A.  Correct.
5       Q.  And -- and, in fact, the only team member
6   that was hired by One Cura was a fundraiser,
7   correct?
8       A.  That is correct.  However, they're -- we
9   were in the middle of contract negotiations and
10  there -- we wanted the assurety of a longer term
11  contract before bringing in permanent people.
12      Q.  And those contract negotiations involved
13  rates being proposed by First Physician that are
14  much lower than what the current contracts are,
15  didn't they?
16      A.  I believe so.
17      Q.  And -- and those contracts were never
18  fully executed by your side of the coin, by the --
19  by the debtors?
20      A.  That is incorrect.  Those contracts were
21  signed by both myself and they were -- as testified
22  in the state hearing, they were signed by the CEO of
23  First Physicians.
24      Q.  Now --
25      A.  So those contracts should be in place and

---

Oklahoma Reporting Services, LLC - 405.529.6575
3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112

**Page 66**

1   with some specifics to be worked out, so the 62.5
2   was part of that, those contracts, and those were
3   given for more than a calendar year.
4       Q.  Now, any of the money that was paid on
5   this 125,000 a month or 200,000 a month, did any of
6   that get paid to Akerman at any time?
7       A.  At any time?
8       Q.  Yes.
9       A.  Yes.
10      Q.  And is that the more than 100,000 or maybe
11  up to 500,000 that you testified about earlier?
12      A.  Yes.
13      Q.  Did -- and One Cura didn't use any of that
14  money to make any payments on the note or the lease,
15  correct?
16      A.  One Cura did not.
17      Q.  Did, you know, what did One Cura do
18  differently for the hospitals after receiving the
19  change from 25,000 a month to 200, then reduced to
20  125 a month?  What -- what services were provided by
21  One Cura that weren't already being provided by One
22  Cura?
23      A.  One Cura was attempting to build its team,
24  but we were hindered on that as because of contract
25  negotiations seemingly were stalled or stopped or

**Page 67**

1   not recognized anymore by First Physicians, and then
2   litigation happens, was brought earlier this year by
3   First Physicians.
4       So the money that was built up was not utilized
5   to bring in new people because of the uncertainty of
6   respecting the contracts that First Physicians
7   brought and the litigation that First Physicians
8   brought.
9       Q.  Anything else you want to add to your
10  answer on that?
11      A.  Not at this time.
12      Q.  Okay.  Does One Cura --
13      U.S. TRUSTEE:  Excuse me, this is M.J.
14  Creasey, Mr. Christensen, can you tell me about how
15  much longer you think you have?
16      MR. CHRISTENSEN:  I -- I probably have
17  less than ten minutes, I'm about at the end of my
18  script, if that's okay.
19      U.S. TRUSTEE:  Okay.  Got it, thank you.
20  BY MR. CHRISTENSEN:
21      Q.  Does One Cura still have any of the money
22  that was paid, you know, by the hospitals to One
23  Cura out of that 200,000 a month, or the 125 a
24  month?
25      A.  Yes.

**Page 68**

1       Q.  Okay.  And how much do they still have on
2   that?
3       A.  Does One Cura have to answer that?  One
4   Cura is not specifically the debtor on this.
5       Q.  I view that as a fraudulent transfer or
6   preference, so I would like to know the answer.  It
7   could be a claim that the estate has against One
8   Cura, so I'd like for you to answer it.
9       A.  The -- I believe there's about $100,000
10  left.
11      Q.  And out of the over $2 million that One
12  Cura received when the pay jumped from 200,000 a
13  month, then reduced to 125 a month, One Cura only
14  has about 100,000 of that left?
15      A.  Yes.
16      Q.  Okay.  Now, Mr. -- Mr. Eldridge, you
17  recall roughly about a week ago, First Physicians,
18  as well as the hospitals infectious disease doctor,
19  made a recommendation to shut down elective surgery
20  due to the fact that a Dr. Trang had been performing
21  surgeries through Southern Plains Medical Center,
22  and he had COVID?  Do you remember that
23  recommendation being made by First Physicians?
24      A.  The recommendation was along those lines,
25  so I'm not quite sure that's -- we went -- when

**Page 69**

1   Dr. Trang -- it was -- what I understood, after
2   talking to both Southern Plains and receiving First
3   Physicians' recommendation, yeah, the moment
4   Dr. Trang got a positive COVID test, you guys were
5   informed.
6       They -- it did not seem that there was some
7   insinuation in what was sent to One Cura, was that
8   they've known for a week that he had COVID or was
9   exposed, but that looked like it was not the case at
10  all, based upon what Southern Plains had provided me
11  and provided your teams before you reached out to
12  me.
13      Q.  What did Southern Plains --
14      A.  I just wanted to clarify a little bit of
15  the bigger picture of that.
16      Q.  What did Southern Plains provide you as to
17  those events?
18      A.  I spoke -- I spoke with their principal,
19  Mike Schuster, and questioned him on exposure on the
20  12th, which is why what it was claimed in the e-mail
21  that we got, and he immediately said that, no, there
22  was no exposure on the 12th, no one -- we don't know
23  what that was talking about, no one has --
24  everyone's been tested on the floor, everyone has
25  been tested that has interaction with him, there's

**Page 70**

1    no incident on the 12th like what brought as
2    concern.  And that was -- it was shared to me in
3    e-mail, that was -- that information of Len
4    Lacefield answering the questions, that First
5    Physicians requested of him was that Travis Villani,
6    the on-site leadership of Anadarko, and there was a
7    confirmation of Travis Villani and Jon Lowry
8    receiving that e-mail.
9        Q.  All right.  Are you aware that Dr. Trang,
10   on the 19th, tested positive of COVID and performed
11   surgeries on the 19th of November, and he's a
12   Southern Plains doctor?
13       A.  I'm aware that happened on the 19th.
14       Q.  Okay.
15       A.  That he was tested.  It was not expressed
16   to me that he -- once he was tested that he
17   performed anything after he was tested.
18       Q.  Are you aware that a CRNA employed by
19   Southern Plains that was in the surgery with
20   Dr. Trang on November 19th, has also been diagnosed
21   with COVID?  Have you --
22       A.  I have not been made aware of that by
23   First Physicians or Southern Plains.  In fact, I've
24   actually had many concerns about COVID in Anadarko,
25   and I reached out with letters to First Physicians

**Page 71**

1    on November 11th and November 18th and following up
2    in my response to the Dr. Trang incident, and I have
3    received absolutely zero communications with anyone
4    from the First Physicians team regarding the
5    information and clarification of what issues are
6    going on medically with COVID in Anadarko.  The
7    silence is deafening.
8        Q.  Do you receive daily --
9        A.  No, First Physicians did not inform me
10   that a second person has received COVID -- or from
11   Southern Plains has a positive COVID diagnosis, when
12   First Physicians has not even confirmed, you know,
13   any of my inquiries about the COVID issues happening
14   with their own patients and staff at Anadarko.
15       Q.  Do you receive daily reports from both
16   hospitals?
17       A.  I receive a small resource report from the
18   on-site leadership.
19       Q.  Okay.
20       A.  And the COVID -- there's just one line
21   that says "COVID patients in hospital" in reference
22   to Anadarko, and then a number, and I have formally
23   asked for more information regarding that to Adrian
24   Reeder on the 11th and the 18th, and have gotten no
25   response.

**Page 72**

1        Q.  What is Adrian Reeder's position, is he a
2    CFO or is he an --
3        A.  CFO, he's the only person that's a
4    contract for myself.  The CEO, I used to -- your
5    former CEO of First Physicians for many years, I had
6    a very good relationship with, talked to almost
7    every single day, you know, over what's going on
8    with the hospitals, what issues about the hospital,
9    positive, negative, anything like that.  Since he's
10   been let go, I have not even had an introduction to
11   the current CEO.
12       Q.  Okay.
13       A.  There's been no introduction, no e-mails
14   from -- from him, her, not sure.
15       Q.  My -- I'm going to go back --
16       A.  The point person has always been -- since
17   the removal of the last CEO, has been the CFO,
18   Adrian Reeder.  I did have a very good working
19   relationship with your interim chief operations
20   officer, Carl Laffoon, we would speak or e-mail
21   very, very often, and any issues that popped up, he
22   was immediately calling me and/or having a
23   discussion about it, but I believe he was let go or
24   fired from your company, and there's been no -- no
25   contact with that.  In fact, I had to instruct the

**Page 73**

1    on-site leadership to continue sending me the daily
2    reports, because I believe those stopped the moment
3    that Mr. Laffoon was let go.
4        Q.  My --
5        A.  So, yes, that has -- has been heavily --
6    Adrian Reeder has been, you know, Adrian Reeder and
7    I have always been able to talk to each other for
8    many years, and since Sean Kirrane was let go of
9    First Physicians, has been the next person --
10       Q.  Has --
11       A.  -- for the past year and change.
12       Q.  Has Southern Plains informed you that they
13   had a CRNA who was in surgeries on the 23rd and the
14   25th that has COVID?
15       A.  No, they have not informed me.
16       Q.  Okay.  And --
17       A.  And First Physicians has not informed me
18   of such until this moment right now.
19       Q.  And -- and -- and it is your understanding
20   that both First Physicians and -- and an infectious
21   disease doctor that I believe is either at Mercy or
22   Integris had recommended to shut down the elective
23   surgery to make sure the facts were known, and you
24   refused to shut down the surgery -- the elective
25   surgery center?

**Page 74**

1    A.   The facts that were present to me seemed
2  in question, and a couple of them seemed to be
3  hearsay.  So what we dealt with, which was the
4  immediate fact of this doctor has COVID.  The
5  concerns that were presented by the First Physicians
6  team, we addressed with Southern Plains clinic, both
7  with their principal, Mike Schuster, and with their
8  on-site person, I believe her name is Angela, I'm
9  sorry, I'm blanking out on her last name right now.
10  So we received confirmation from them that the
11  procedures for the hospital would be followed to a
12  T, and that was what was requested by First
13  Physicians, also.
14    **Q.   Did you ever --**
15    A.   And that part was followed.
16    **Q.   Did you ever talk to Dr. Trang to see if**
17  **he avoided going through the procedures set up by**
18  **the hospital to get to a surgery room?**
19    A.   I'm sorry, could you say that again,
20  please?
21    **Q.   Did you ever talk to Dr. Trang?**
22    A.   I did not talk to Dr. Trang.  I talked to
23  Mike Schuster.
24    **Q.   And did Mike Schuster tell you that**
25  **Dr. Trang always follows all protocols at the**

**Page 75**

1  **hospital, all COVID protocols at the hospital?**
2    A.   He did not state specifically that.  We
3  talked about just the Southern Plains team followed
4  the protocols that have been set forth, and I was
5  given confirmation by himself and Angela that they
6  do, they gave that confirmation to the First
7  Physicians, team, also.
8    **Q.   And in finalizing things here, how do you**
9  **propose to pay the notes owed to Rural Hospital**
10  **Acquisition?**
11    A.   As I have said before, the lawyers have
12  begun drafting with the accountants, you know, we do
13  understand that we have to pay the secure debt, we
14  believe that will have to be over time.  But we view
15  that as part of our reorganization plan.
16    **Q.   And is your answer the same as to the**
17  **lease on First Physician Realty, that it would have**
18  **to be payments over time?**
19    A.   Yes.
20    **Q.   If --**
21    A.   As part of the reorganization plan.  We
22  haven't finalized that yet, so I can't speak to the
23  finalized plan.
24    **Q.   Assuming First Physicians would allow the**
25  **lease to be reinstated.  Do you understand that**

**Page 76**

1  **part?**
2    A.   I do.
3    **Q.   And would you also agree that the fair**
4  **market value of the hospital assets are the value**
5  **you placed on them in the schedules and statement of**
6  **affairs?**
7    A.   I believe so, yes.
8    MR. CHRISTENSEN:  Okay.  I don't think I
9  have any other questions at this point in time.
10    U.S. TRUSTEE:  Okay.  Thank you,
11  Mr. Christensen.  Are there any other creditors or
12  parties in interest who have joined in who would
13  like to ask him questions today?
14    MR. TOFFOLI:  Ms. Creasey, Mark Toffoli
15  for Southern Plains Medical Center, just a couple of
16  questions.
17    U.S. TRUSTEE:  Sure.  Go ahead.
18    EXAMINATION
19  BY MR. TOFFOLI:
20    **Q.   Mr. Eldridge, is Southern Plains Medical**
21  **Center a pre-petition creditor of RHA, Anadarko?**
22    A.   Yes, they are a pre-petition creditor.
23    **Q.   Could you explain then, and I've looked at**
24  **the schedules that have been filed, but I cannot see**
25  **that they're listed anywhere.**

**Page 77**

1    A.   Let me -- let me find the one for
2  Anadarko.  I believe they would be owed the first
3  three weeks of October, correct?
4    **Q.   I think, if based on what I've seen in**
5  **pleadings with respect to a Motion to Pay as a**
6  **critical vendor, I think their pre-petition claim**
7  **was somewhere in the neighborhood of $220,000.**
8    A.   I believe -- I believe you are correct.
9  Our list of creditors, when it was first formulated,
10  was based upon the info from the accounts payable
11  schedules that we got from First Physicians.  We --
12  I wonder if your -- the invoice for Southern Plains
13  got a little shuffled there, because we had to break
14  it up to make sure that you guys got paid the
15  post-petition week of October, which I got
16  confirmation from Mike Schuster this morning that
17  you -- you did receive the -- that last week of
18  October.
19    So I will speak to the accountants, they will
20  probably need to amend this top 20 list for
21  Anadarko, specifically, to get your pre-petition on
22  there.  I apologize that it isn't going to be on
23  there at this moment.  They were working off of the
24  information that they were receiving from First
25  Physicians.

**Page 78**

1    Q.  Okay.  Thank you.
2         MR. TOFFOLI:  Ms. Creasey, that's all I
3    had.
4         MR. CHRISTENSEN:  Ms. Creasey, I --
5         U.S. TRUSTEE:  Thank you.  Are there any
6    other -- state your name for the record and go ahead
7    and ask your question.
8         MR. CHRISTENSEN:  Well, it's Clay
9    Christensen, I have a follow-up question to Mark's,
10   if that's okay.
11        U.S. TRUSTEE:  Okay.
12        FURTHER EXAMINATION
13   BY MR. CHRISTENSEN:
14   Q.  If bankruptcy would not have been filed,
15   would Southern Plains Medical Center been paid on
16   its pre-petition claim in the normal course of
17   business?
18   A.  Yes.
19   Q.  And as to other trade creditors,
20   third-party vendors, would they have been paid in
21   the normal course of business as they always have
22   been paid over nine years had bankruptcy not been
23   filed?
24   A.  They will -- they would be if they are
25   paid with the monies first, I know First Physician

**Page 79**

1    invoices normally are a very large amount, and
2    historically, First Physicians has taken only a
3    percentage of what they have actually billed in
4    order to keep the amounts needed to pay off the
5    other vendors first.
6    Q.  Okay.
7    A.  So I believe First Physicians, we ran the
8    numbers for the past year, First Physicians has --
9    normally only takes, on average, about 60 percent
10   and change, I think for Stroud, 70 percent and
11   change for Anadarko, of what they -- they have on
12   their invoices.  So if all the other vendors are
13   paid first and the amount that's remaining goes to
14   First Physicians, then, yes, they would be paid.
15   Q.  And there are documentation you've seen
16   before within audits over the years that will say
17   that First Physicians have been deferring full
18   payment to make sure other vendors get paid in full,
19   correct, in the past?
20   A.  Yes, they have done that.  There was a
21   time earlier this year that First Physicians decided
22   to not pay certain vendors for legal defense for
23   accounting, for oversights that the hospitals had
24   contracted with, which they didn't have a right to,
25   but for the most part, yes, and those get paid.

**Page 80**

1         MR. CHRISTENSEN:  I have no other,
2    Ms. Creasey.
3         U.S. TRUSTEE:  Okay.  Thank you.  Are
4    there any other parties, creditors, parties in
5    interests who have not already asked questions who
6    would like to at this time?  Okay.  I don't hear
7    any.
8        I have a couple of housekeeping issues.  The
9    first is, I guess, a question to anyone and
10   everyone.  When I look at the schedules and
11   statements of financial affairs for both Stroud and
12   Anadarko on the Court's website, and after I
13   gathered them, there are a number of pages that are
14   blank, and I'm wondering if that's just a glitch on
15   my end or if -- do other parties, can they see every
16   page that is supposed to be filed?
17        MR. PARHAM:  Ms. Creasey?
18        U.S. TRUSTEE:  Yes.
19        MR. PARHAM:  I would -- I had to download
20   Anadarko's schedules probably three times before I
21   could get the entire filing downloaded.
22        U.S. TRUSTEE:  Okay.  The blank pages like
23   in the middle, is that what you were having?
24        MR. PARHAM:  I wasn't having blank pages,
25   I was just simply having pages that were deleted

**Page 81**

1    altogether.
2         U.S. TRUSTEE:  Okay.  So, Mr. Christensen,
3    do you guys have complete sets of the schedules and
4    statements of financial affairs with no blank pages?
5         MR. CHRISTENSEN:  We -- we think we do,
6    but I haven't really looked from that aspect,
7    Ms. Creasey, but we think we do.  Jon's nodding at
8    me over here.
9         U.S. TRUSTEE:  Okay.  All right.  Then I
10   have a glitch and I'll get that taken care of.
11   Having said that, the schedules and statements of
12   financial affairs have been filed.  We are lacking
13   the filing of the Initial Report and also the debtor
14   in possession banking information, you know, the
15   final -- the finality of that, which I know is in
16   progress.
17        So what I would like to do is continue this for
18   one week to December 7th at 1:00 p.m. for the sole
19   purpose of getting the Initial Report on file and
20   getting the authorized depository information back
21   to the U.S. Trustee's office.  If those things are
22   provided, then I can conclude the meeting at that
23   time.  Is this acceptable to you?  I'm asking the
24   debtor's representative and counsel at this time.
25        MR. PARHAM:  Yes, so what -- just to make

---

### Page 82

1  sure that we're clear, you want the IDI file on the
2  court file and then on the court docket, rather, and
3  then you want the bank account information provided
4  to you, right, or -- I want to make sure you don't
5  want it also filed on the --
6      U.S. TRUSTEE: No, it's the Initial
7  Report, the Initial Report needs to be on file, and
8  then, yes, the debtor in possession authorized
9  depository banking information, once it's finalized,
10  a voided check and all that good stuff, needs to be
11  provided to our office, yes. Now, of course, that
12  information will ultimately be in the monthly
13  operating reports, so I want to make sure that is
14  hastily taken care of, or expediently is a better
15  word.
16      MR. PARHAM: Yeah. I don't see any
17  reason, we'll -- I think we can -- I think we can
18  agree to do that, it sounds like the DIP accounts
19  have been opened, so I don't think what you're
20  looking for necessarily waits on First Physicians to
21  get the signature card, so we should -- we should be
22  able to get that account information to you, I would
23  think, by the 7th.
24      U.S. TRUSTEE: Okay. And I want to
25  continue it for that purpose only and not

---

### Page 83

1  necessarily for additional testimony. The debtor
2  representative has appeared and given testimony, and
3  all the other documents have been filed, so, but for
4  these final administrative issues, I can conclude
5  the meeting, and so I would like to do that after
6  actually I have that next week hopefully on December
7  7th.
8      If that -- if everything is provided, I will
9  e-mail everyone and let them know I will conclude
10  the meeting and there's no reason to appear. If
11  that stuff has not been provided, then -- then we
12  can certainly appear.
13      MR. PARHAM: Okay. Very good.
14      U.S. TRUSTEE: Okay. With that, okay, I'm
15  going to continue this meeting for those purposes
16  that I've just discussed to December 7th, 2020 at
17  1:00 p.m. It will be the same call-in information,
18  and I will file a memo with the Court for everyone's
19  reference. And with that, this meeting is
20  adjourned.
21      MR. PARHAM: Let me -- if you could hang
22  on just one second. If the court reporter -- Clay,
23  could you give the court reporter our information so
24  she can coordinate with us on us getting a copy,
25  also?

---

### Page 84

1      MR. CHRISTENSEN: Yes, that's no problem,
2  David, no problem.
3      MR. PARHAM: Okay. Very good. And I'm
4  sorry, Ms. Creasey, I just wanted to --
5      U.S. TRUSTEE: No problem at all. With
6  that, then I'm going to adjourn this meeting until
7  next Monday.
8      MR. PARHAM: Very good. Thank you.
9      MR. CHRISTENSEN: Thank you.
10      (Meeting adjourned until December 7, 2020
11  at 1:00 p.m.)

---

### Page 85

1          CERTIFICATE
2  STATE OF OKLAHOMA  )
                       )  SS:
3  OKLAHOMA COUNTY    )
4
5
6
7      I, Brenda Schmitz, Certified Shorthand Reporter
8  within and for the State of Oklahoma, do hereby
9  certify that the above 341 Meeting of Creditors was
10  by me taken in shorthand and thereafter transcribed;
11  that the same is true and correct; and that it was
12  taken on NOVEMBER 30, 2020, at the time of 2:08 p.m.
13  in the City of Oklahoma City, County of Oklahoma,
14  State of Oklahoma under the stipulations
15  hereinbefore set out, and that I am not attorney for
16  or relative of any of said parties or otherwise
17  interested in the event of said action.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19  and official seal this 2nd day of December, 2020.
20
21  BRENDA SCHMITZ, CSR, RPR
    Oklahoma Certified Shorthand Reporter
22  Certificate No. 00823
    Expires: December 31, 2020
23
24
25

Oklahoma Reporting Services, LLC - 405.529.6575
3030 Northwest Expressway, Suite 200 | Oklahoma City, OK | 73112